UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. ANTHONY W. ISHII

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | 1:12-cr-00056 AWI |
| ) | |
| Plaintiff, ) | JURY TRIAL |
| ) | |
| vs. ) | Day 2 |
| ) | |
| RICKY DAVIS, ) | |
| ) | |
| Defendant. ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ ) | |

Fresno, California                    Wednesday, March 18, 2015


REPORTER'S TRANSCRIPT OF PROCEEDINGS



Vol. 2, Pages 237 to 457, inclusive



REPORTED BY:
GAIL LACY THOMAS, RMR-CRR
Official Court Reporter
CSR No. 3278

APPEARANCES OF COUNSEL:

For the Government:          **BRIAN ENOS**
                            **ALYSON BERG**
                            Assistant U.S. Attorneys
                            2500 Tulare Street
                            Suite 4401
                            Fresno, California 93721

For the Defendant:          **ANN McGLENON**
                            **ANDRAS FARKAS**
                            Assistant Federal Defenders
                            2300 Tulare Street
                            Suite 330
                            Fresno, California 93721

INDEX

GOVERNMENT'S WITNESSES:

WILLIAM SCHWARTZ                                    280
DIRECT EXAMINATION                                 280
BY MS. BERG
CROSS-EXAMINATION                                  292
BY MR. FARKAS
MARK COPELAND                                      296
DIRECT EXAMINATION                                 297
BY MS. BERG
CROSS-EXAMINATION                                  301
BY MS. McGLENON
REDIRECT EXAMINATION                               314
BY MS. BERG
JEFF MORRIS                                        319
DIRECT EXAMINATION                                 320
BY MS. BERG
CROSS-EXAMINATION                                  328
BY MS. McGLENON
WENDY HALL                                         330
DIRECT EXAMINATION                                 331
BY MS. BERG
CROSS-EXAMINATION                                  338
BY MS. McGLENON
BIANCA                                             356
DIRECT EXAMINATION                                 357
BY MR. ENOS
CROSS-EXAMINATION                                  405
BY MS. McGLENON

* * * * *

EXHIBITS

GOVERNMENT'S                                  RECEIVED
3                                                  283
5.1 to 5.4                                         287
6                                                  300
7                                                  325
8.1, 8.2                                           334
4                                                  335
9.1 to 9.7                                         336
14                                                 391

DEFENDANT'S
  H                                                      339
  B                                                      342
  F                                                      414
  C-1                                                    426
  J-1                                                    437
  G                                                      452

*****

1    Wednesday, March 18, 2015                   Fresno, California

2                                                 8:30 a.m.

3

4            MR. ENOS:  Your Honor, is it okay if we start setting

5    up the computer while we're handling other matters?

6            THE COURT:  Sure, no problem.

7            (Pause in the proceedings.)

8            THE COURT:  All right, let's go ahead and proceed

9    while the computer is getting set up.

10           Let me just mention one thing.  We got a telephone

11   call this morning from alternate juror number 1, Juror 0026,

12   who indicated that he was ill and was uncertain whether he

13   would be able to make it in on time, if at all.  So my staff

14   advised him that he needs to be here on time.  Our jury

15   administrator is going to call him to let him know that if

16   he's going to attempt to be excused for medical reasons, that

17   he needs a note from a doctor.  We'll wait until at least

18   9:00, maybe even after 9:00.  But if he's not here, and we

19   don't have any more word, then I will make the assumption that

20   he is going to contend that he is ill and not going to be able

21   to appear.

22           Certainly, if the parties wish, I'll certainly hold

23   off a little bit, but I don't know if we really want to delay

24   the trial too long just to see if he shows up.  It didn't

25   sound like he was going to appear, and he was the one that

1    indicated his father -- he didn't drive, or whatever.  His

2    father had to transport him, and he wanted to know whether or

3    not we would pay for his father's hotel bill, et cetera.  So I

4    don't know whether there are other dynamics other than a

5    sudden illness.  He looked fine all day yesterday.  So I'm

6    just making that observation.

7            But anyway, at 9:00, I'll see if he's here, and then

8    I'll certainly entertain comments by counsel as to how you

9    wish to proceed with him.

10           Okay, now, with that, then, in terms of the matters

11   to be heard this morning, I'll leave it to counsel as to how

12   you wish to take them up and in what order.  So is there any

13   preference as to what you'd like to address first?

14           MS. McGLENON:  Your Honor, the first thing I would

15   just like to say, I've been thinking about what the Court said

16   yesterday about -- about Detective Stigerts and Mr. Lawson.

17   And here's our position:

18           We provided the Government with Lawson's report a

19   very long time ago.  We made a request that they prepare for

20   us an expert disclosure.  They did.  Then they suggested that

21   rather than have a hearing, a *Daubert* hearing, which is what

22   we asked for, that they would bifurcate.  I've read about this

23   bifurcation to the cite that was given to us by the

24   Government.  And that seems -- I think the most appropriate

25   thing is to have *Daubert* hearings both for Mr. Lawson and for

1    Detective Stigerts.  I do not want to have him be a factual

2    witness -- have Stigerts be a factual witness, then midway

3    through have him converted to an expert in front of the jury.

4    And I just think that that doubly enhances all his testimony.

5            And our objection to his being an expert is simply

6    based on, basically, the research we have done on him and on

7    his basis of his expertise.  And I will just say that just

8    during the course of these proceedings, he has sometimes

9    interviewed 60, sometimes 75, sometimes over 100.  I'm not

10   saying that -- that they have to be bound to a particular

11   number.  I don't even know that the number matters, but I

12   think that the flow of the information, it makes it important

13   for the Court to consider whether he should be considered an

14   expert.

15           And candidly, Your Honor, if he's qualified as an

16   expert, we're probably just as happy as they are because,

17   then, we can cross-examine him on that.  But -- but I think

18   the procedure should be followed.  I think that if we're going

19   to be randomly -- not randomly -- if we're going to be

20   choosing experts, they should be qualified as experts, and we

21   can do that in advance without the jury.

22           THE COURT:  Sure, and that's fine.  And I'm perfectly

23   willing to have a hearing.

24           The big thing for me, in terms of logistics now is,

25   you know, we're on the verge of making opening statements, and

1    I don't know whether or not we need to do the *Daubert* hearings

2    now before opening statements, so think about that in terms of

3    your opening statement.  If you're going to obviously -- if

4    either or both sides are going to rely on your opening

5    statements on -- indicating to the jury that an expert will

6    testify to A, B, and C before we have the *Daubert* hearing,

7    then that would be problematic.  So --

8            MR. ENOS:  I don't plan on -- Your Honor, Brian Enos

9    for the Government.

10           Frankly, my expectation is to use Detective Stigerts

11   simply as the lead agent in this case.  What did you do in

12   furtherance of the investigation?  What did you do pursuant to

13   these leads, et cetera?  If, for some reason, contrary to my

14   expectations, defense objects to things that I would

15   ultimately have to qualify him for, then we could cross that

16   bridge when we get there.  This is not the kind of case where

17   he's coming in from afar and going to talk about language

18   people use with each other, so on and so forth.  It's pretty

19   straightforward.  It's what did you see, and what did you do

20   next, that kind of thing.

21           And because of that, no reference to him being an

22   expert is going to be in my opening statement.

23           THE COURT:  All right.  Defense.

24           MR. FARKAS:  Your Honor, I don't anticipate referring

25   to Mr. Lawson's testimony, but it would be helpful for us to

1    know when the *Daubert* hearing would be because our expert is

2    in Sacramento, and he's coming down.

3         THE COURT:  You know, as far as I'm concerned,

4    whenever -- you know, it works out for both sides, you can

5    meet and confer, and just let me know.  And if it's during the

6    trial day, then we'll just tell the jury, you know, you're

7    coming in at 10:00 today, or you're leaving at 3:00 today, and

8    we'll set it up.  I recognize witnesses, certainly expert

9    witnesses, they have schedules, and we do try to work around

10   that.  If you folks just meet and confer, contact Mr. Lawson,

11   figure out when the best time for him to be here, and like I

12   say, we could do it, you know, my Monday -- this coming Monday

13   is kind of full.  I could do it Friday afternoon.  But

14   otherwise, if it's on a trial day, you know, we'll have him

15   come in at 8:30 or 8:00, whatever works out with you folks,

16   and I'll just tell the jury they're going to come in a little

17   late or leave a little early on that particular day, and

18   that's fine with me.

19        So I guess the immediacy, if the defense intends to

20   give an opening statement right after the Government's opening

21   statement, and you're okay with not making any references to

22   his expert testimony before I obviously rule on it, then we'll

23   just go ahead and proceed, and we have more flexibility in

24   terms of -- of, you know, when he would appear for a *Daubert*

25   hearing.  And then the Government can decide -- or whether or

1  not to have a *Daubert* hearing with respect to Detective

2  Stigerts also.

3          MR. ENOS:  And on that -- and, Your Honor, the only

4  logistical issue I raise is perhaps it would be best to have

5  this hearing of Mr. Lawson before I forever lose my chance to

6  recall Detective Stigerts in light of the Court's comments

7  yesterday of, hey, it's going to be a double-edge sword here.

8  If you're going to talk about your computer guy opining about

9  age, then we're going to bring our lead agent to do the same.

10          MS. McGLENON:  And, Your Honor, I believe that it

11  would be possible to have Mr. Lawson here tomorrow morning.

12  And we can do that, if that would be the most convenient, and

13  then we'll all know.  And then that's fine.

14          THE COURT:  Okay.  And that's okay with me.  And,

15  again, meet and confer, and if that's what we're going to do,

16  just let me know because I'll just tell the jury before they

17  leave today, you know, we're going to have a hearing tomorrow

18  morning, and -- I have another matter tomorrow morning, and so

19  you'll come in at 9:30 or 10:00, whatever works out.

20          MS. McGLENON:  I don't think it would be a long

21  hearing, at least, for Mr. Lawson.

22          MR. ENOS:  Your Honor, you say you have another

23  matter tomorrow morning?

24          THE COURT:  No, I'm just going to tell the jury that

25  so they understand that there's something else going on that

1    requires them to come in later.  But I don't want to push the

2    blame off on the parties like, "Oh, why didn't you do this

3    sooner," this sort of thing, so I'll just say I have something

4    going on.

5            So, all right, okay, so -- so, okay, so that we'll

6    address, then, the expert issue possibly tomorrow morning or

7    whatever date and time you folks work out between yourselves.

8            Okay, the next matter that you would like to take up?

9            MR. ENOS:  Just a procedural one, Your Honor.  I

10   talked to the court reporter this morning with respect to

11   transcriptions of defendant's interview with Detective

12   Stigerts, or, frankly, any other interview where there is a

13   written transcript already in place with respect to what it

14   says.  And defense counsel can correct me if I'm wrong, but

15   with respect to those audio recordings or video recordings

16   where there's already a written transcript, perhaps the court

17   reporter can incorporate those into the record.  The one audio

18   recording that I do not believe has a written transcript is

19   the jail call, Exhibit 12, so that just maybe something if

20   this case were on appeal.

21           THE COURT:  Hold on.

22           JUROR:  How do I get into the jury room?  My

23   apologies, the door is locked.

24           THE COURT:  Ah, okay.

25           MR. ENOS:  Sorry, Your Honor, with respect to

1   Exhibit 12, we don't have a written transcript, but, you know,

2   perhaps we can make reference that the actual substance is on

3   Exhibit 12 itself.

4           THE COURT:  Yeah.  I guess for court reporting

5   purposes, the parties stipulate, if there is an audio or video

6   played, that she would not have to report that.  And obviously

7   if there's a comment made during the audio or video, or an

8   objection, she will take down anything spoken, but otherwise,

9   she would just stand by.

10          Now, in terms of audio, video, generally those are

11  the exhibits, and the transcripts, if you have some prepared

12  as a matter of convenience, if you want to give a copy of the

13  transcript to the jury.  But I think there's a jury

14  instruction that I read that indicates that the video or the

15  audio is the evidence and not the transcript.  The transcript

16  is merely for their convenience so they can follow along.  We

17  normally hand out the transcript if you choose to do so.  And

18  at the end of that audio or video, we gather up the

19  transcripts.  So what goes back to the jury are the audio,

20  video, and if they want to see or hear it, then we just bring

21  them back into the jury room during the jury deliberations.

22          MS. McGLENON:  Logistically on that, should I get 12

23  copies of transcripts made, or can we use the Elmo and let

24  them look at it on the screen?

25          THE COURT:  Either way.  You know, again, it's

1   really -- they're going to be listening or viewing the audio

2   or the video, and that's really what they need to focus in on.

3   Sometimes as we know, the transcripts are not particularly

4   good.  I mean, the audio/video not particularly good, it's

5   helpful for the jury to have a transcript.  Whether it's

6   displayed to them or otherwise, I'll leave it up to you folks,

7   but if you want to make copies, 13, 14, if Juror 0026 shows

8   up, you can do that.  But I'll leave it totally up to you

9   folks how you want to do that.  Again, it's more of an

10  assistance to the jury as opposed to something that you're

11  required to do.

12          MS. McGLENON:  Okay, thank you.

13          THE COURT:  So parties stipulate, then, on an audio

14  video, Miss Thomas is not going to be taking those down

15  verbatim, that those documents are themselves the exhibits,

16  et cetera.  Is that okay with defense?

17          MS. McGLENON:  I'm sorry.

18          THE COURT:  Is that okay, that Miss Thomas does not

19  have to take down --

20          MS. McGLENON:  I think that's fine.  And, in fact --

21  I don't know how the Government feels about the one that has

22  not been transcribed, but I think that's fine.

23          THE COURT:  Okay, good.  All right, and that's okay

24  with the Government?

25          MR. ENOS:  Agreed, Your Honor.

1          THE COURT:  Okay, great.

2          All right, next matter, if there is one?

3          MR. ENOS:  I don't believe the Government has any

4     other matters at this time.

5          THE COURT:  All right.  Defense?

6          MS. McGLENON:  I think we're waiting and dealing with

7     the jury instruction issues later, right?

8          THE COURT:  Yes, exactly.  And I think the Government

9     was going to file something, and so we'll hold off on that.

10          Now, there is one thing that I did want to mention.

11     You know, on the preliminary jury instructions, they're

12     basically the Ninth Circuit model instructions.  It's

13     basically chapter 1.  The one that I always want you folks to

14     look at is 1.2 because that's the one we have to incorporate.

15     I can either read what we have prepared which, I think, is

16     what the Government submitted.  I can simply insert the

17     statement that I read to the jury panel at the outset, or I

18     can read a portion of the indictment, whatever you folks

19     prefer.  So take a look at that.  You just let me know what

20     you want to do.

21          For me, 1.2, the charge is simply just, again, to

22     remind the jury what the case is about, and I'm not wedded on

23     that to any particular format.  Rarely do I read the

24     indictment, but I can certainly read portions of it if you

25     prefer.  Again, I can read what has been submitted, or I can

1    just read -- substitute in the statement of the case that you

2    folks submitted earlier.

3              MS. McGLENON:  Your Honor, I thought that the Court's

4    instruction was fine, and I would stip to that.

5              MR. ENOS:  Agreed, Your Honor.

6              THE COURT:  Okay, good.  So I'll go ahead and read

7    1.2, the copy that's been given to you.

8              So the first thing when the jury comes in, I will

9    read the preliminary jury instructions to them as submitted

10   and as given you folks copies, and then we'll go right into

11   opening statement by the parties and presentation of the

12   Government's case in chief.

13             MS. McGLENON:  I'm sorry, Your Honor, and the

14   reconsideration of the texts, are we going to wait until

15   after -- how are we going to do that?

16             THE COURT:  Okay, I don't know if the Government was

17   going to submit anything else on that or not?

18             MS. BERG:  Your Honor, I don't know -- if the Court

19   would like something, we could if it needed it.  I don't know.

20   If the Court wants a supplemental brief, we'd be happy to do

21   so.  If it's not necessary, our position is simply that we're

22   revisiting an issue.  If the Court has already decided and

23   nothing has changed in the factual law, that would require

24   reconsideration of the Court's --

25             MS. McGLENON:  And, Your Honor, as I reiterated

1    yesterday, the thing that changed was we got a disk with 300

2    pages that all -- a week after the hearing that -- that we had

3    not previously had and realized that every reference came

4    after.  And so that -- I think that is a significant change in

5    facts of law.

6              MR. ENOS:  And just to clarify that issue,

7    Your Honor, the text messages all came from Bianca's phone,

8    which are made available to Mr. Lawson whenever he analyzed

9    everything.  As I was on the train to Sacramento to visit with

10   Investigator Vasiliou a few weeks ago, defense counsel texted

11   or sent me an e-mail and said, "Hey, can we get a copy of all

12   of the texts?"  And rather than fight that, I said, "Fine,

13   whatever."  So we actually made a disk of all the texts, just

14   gave it to them as soon as I got back, which were no more in

15   substance than had already been provided to expert Lawson.

16   The reason why expert Lawson had to review it under the terms

17   of the Adam Walsh Act is that same cell phone had sexually

18   explicit images on it.

19             MS. McGLENON:  Right.  And, Your Honor, I understand

20   that the Government doesn't understand necessarily the

21   logistics of our use of an expert to review things, but the --

22   you know, as far as they were concerned, they provided the

23   phone.  And I will say that my request for the phone took

24   place in October 2012, and that's when I first got

25   authorization to review it, and then we got to review it this

1 | year.

2 |         And Mr. Lawson, when he looked at it and prepared a

3 | report, we provided the report to the Government.  There was

4 | nothing -- nothing.  No objection to anything that he wrote in

5 | the report at that time.  And so -- so then, when I said we'd

6 | like to see the rest of the texts, then -- then we got this

7 | pile, and that's when we realized it.

8 |         And the other point, and I know the Government has

9 | said, you know, we can't use it as habit, but I believe that

10 | somebody that always says "I'm 18," regardless if they say it

11 | before or after, it's just -- it's worth being able to

12 | cross-examine on, and it's worth being able to present to the

13 | jury.  And without it, we have to rely on -- on a person who

14 | consistently lies to try to tell the truth.  And we don't have

15 | any idea whether she will or not.  We've never interviewed

16 | her.

17 |         MS. BERG:  Your Honor, may I briefly respond to the

18 | issue of habit under Rule 406.  The problem with that is you

19 | don't have the first link in the chain.  If there is nothing

20 | before, you can't say it's habit afterwards, so they're

21 | missing any statement before, and that gets us back to the

22 | whole issue of what was the defendant aware of on September

23 | 17th, 2011.  So the habit and custom argument fails because

24 | you don't have the first pre-September 17th, 2011

25 | representation of an age.

1       THE COURT:  Okay, well, let me just indicate, in

2    reviewing Mr. Lawson's report, which is Defense Exhibit E, he

3    does state at page 21 -- I'm just reading a portion:

4       "My review of the considerable text messages on minor

5    B's phone reveal regular ongoing meetings with adult men for

6    prostitution.  My review of these show that on the occasions

7    where minor B asked her age by a potential customer, she

8    stated she is 18.  I noted no exchange from minor B stating

9    she was under age."

10      So obviously Mr. Lawson, at least, had these text

11   messages, assuming that's what we're talking about.

12      Let me just indicate to you this:  You know, my

13   ruling -- and I did state, you know, and I was a little

14   concerned about even allowing any of that information because

15   of the specific federal rules relating to sex offenses,

16   et cetera, and, you know, I did read over the Circuit case.

17   That's the *United States v. United States District Court for*

18   *the Central District of California*, 858 F.2d 534, Ninth

19   Circuit, 1988 case, where, amongst other things, in terms of

20   the information that was going to be testified to, as far as

21   the knowledge of individuals as regarding Traci Lords, the

22   Circuit -- and defense does point this out in their request

23   for reconsideration, Document 114, filed March 16th, that the

24   Circuit does indicate, as some of the evidence, her prior and

25   subsequent appearances in other X-rated films, thus giving

1  some, I guess, argument that subsequent acts might be

2  relevant.

3        But in the context -- and this is cited by the

4  defense at page 2 of the request or motion, the Circuit goes

5  through a whole laundry list of things that would be made

6  available.  And this is just one of the many -- so I don't

7  necessarily consider it to be controlling law.  But the thing

8  that sort of strikes me about the motion for reconsideration

9  and the request that defense be allowed to ask Bianca if she

10 had indicated to anyone else or others that she was over the

11 age of 18, is that defense is not asking for -- as I

12 understand it, that anything related to acts of prostitution

13 or other sexual acts, they just want to ask if she's ever told

14 anybody that she was over the age of 18.  And so that seems to

15 be a relatively innocuous question, if we don't get into

16 anything about what the circumstances were when she told

17 someone she was over the age of 18.

18        So the concern I had before with respect to the

19 federal rules relating to prohibitions of eliciting testimony

20 regarding sexual conduct would not necessarily apply if all

21 the defense is going to ask is, "Did you ever tell anyone that

22 you were over 18?"  It could be problematic, if she says "no."

23 But then I think we have to sanitize the text messages and

24 show them to her to see if it refreshes her recollection.

25        MS. McGLENON:  And, Your Honor, that's very simple to

1   do.  The texts are specific, and -- and they are sanitized

2   essentially.  We don't have to show the parts where she's

3   offering herself.  Those are not necessary.  And the little

4   chart we created with the five doesn't say -- and I don't

5   recall whether it says anything about any sex acts.

6           THE COURT:  And obviously there has to be some

7   temporal proximity.  So I think if the defense is going to ask

8   a relatively sanitized question, you know, since September --

9   and I don't know the specific language, you know, "September

10  of 2011, did you ever tell anyone that you were over the age

11  of 18?  Yes or no?"  Or something, words to that effect, I

12  think that gets around any rule prohibitions regarding sexual

13  conduct.

14          MS. McGLENON:  And that would be our intention, to

15  keep it clean.

16          THE COURT:  Okay.  So then the next issue, of course,

17  is with respect to Mr. Davis' knowledge, understanding,

18  opportunity to know, these happened after, and there's

19  apparently nothing before that indicates that Bianca told

20  anyone -- at least that there is any evidence of -- that she

21  ever told anyone that she was over the age of 18.  I guess my

22  real concern and why I'm starting to lean towards allowing it

23  in is, as I understand, there's going to be a credibility

24  issue here.  If Bianca testifies that she told Mr. Davis that

25  she was 13, 14, whatever, under the age of 18, then obviously

1   her credibility -- I suppose there's some argument that

2   well -- let me back up a little.

3           If Mr. Davis testifies that she told him he was over

4   the -- she was over the age of 18, then even the

5   post-September 11th or 17th contacts, something that occurred

6   fairly soon after, September the 19th or the 25th, whatever,

7   may be relevant in terms of credibility.  And it would

8   basically go towards the jury's assessment of their respective

9   credibility as to who said what.  So I can understand that to

10  be of some relevance on credibility of both Bianca and

11  Mr. Davis.

12          But that assumes that Mr. Davis is going to testify,

13  and I don't know that, and he's not required to do that.  So

14  right now, I can't say because I can certainly understand if

15  the sanitized question is asked, if it's close in time, which

16  it is, within a week or so after their encounter, I think it

17  could be relevant on credibility issues, credibility grounds.

18          I'm not so sure that otherwise, if Mr. Davis chooses

19  not to testify, and Bianca testifies that she told Mr. Davis

20  she was 13, I'm not sure that the fact that she might have

21  told someone after that encounter that she was 18 would really

22  necessarily go to her credibility as to what she might have

23  told Mr. Davis on September 17th as opposed to what she told

24  somebody on September 19th, 25th, or whatever.

25          So that's a problem, and I don't know -- and I'm not

1    going to require the defense, but if you're going to make a

2    proffer that Mr. Davis is going to testify, and he's going to

3    testify that she told him she was 18, then I think it would

4    be -- I would strongly consider admitting -- allowing that

5    question of Bianca on the issue of credibility.  And I would

6    advise the jury that it really goes to the issue of

7    credibility.

8              MS. McGLENON:  Well, Your Honor, I'm not sure that it

9    goes to the issue of credibility.  He's probably not going to

10   testify.  I'll make that proffer.

11             THE COURT:  Okay.

12             MS. McGLENON:  We don't want him to waive his Fifth

13   Amendment rights in order to permit his Sixth Amendment right.

14   However, I think it also -- what these go to is the -- not so

15   much the credibility, but the -- not for the truth of the --

16   the truth of the matter, but to state of mind.  Actually state

17   of mind of both parties.  And so that's -- that would be what

18   I think it is.

19             THE COURT:  But it's not credibility.  Her state of

20   mind is not in issue.  His state of mind certainly is.  And I

21   can understand the defense position would be even if he

22   doesn't testify, in terms of what you're going to present to

23   the jury obviously is her physical features.  I mean, she

24   looked -- the jury ultimately, whether or not I allow

25   Mr. Lawson or Mr. Stigerts to testify with respect to their

1    opinion as to whether or not she looks over the age of 18,

2    ultimately it's going to be a question of fact for the jury.

3    The jury can look at that, obviously, and I suppose the

4    defense could also argue, well, not only does she look mature,

5    but she told people that she was over 18, and so the jury can

6    consider all that.  I'm not sure -- I'm just not sure whether

7    I can allow that.

8         MS. McGLENON:  The other point that I'd like to

9    clarify is that these texts are on her phone.  They're not

10   Redbook.  And they're not -- we believe it appears that people

11   see her on Moco and then start texting in the same way that

12   Mr. Davis did, because at this time period, which is the week

13   before Armstrong became involved, as far as we understand, the

14   Redbook had been taken down, but I don't know for sure.

15        MR. ENOS:  And I can add to that, Your Honor.  The

16   Government's expectation is that Bianca will testify that when

17   people responded to the Redbook ads, they responded to a phone

18   number that was Mr. Davis' phone number, and then he in turn

19   provided Bianca's phone number.  So the responses on the phone

20   are still a result of the Redbook ads.

21        And one other just minor issue is the Government

22   still stands by its intention to call Detective Stigerts only

23   as a fact witness in this case.  However, if we start getting

24   into testimony about, you know, why Bianca said she's a

25   different age than she is, then the Government would indeed

1    plan to qualify Detective Stigerts as an expert with respect

2    to why minor girls who are contacted by johns may lie about

3    their age.

4              THE COURT:  Um-hmn.  Okay.  All right.

5              MS. McGLENON:  And we have no problem with the

6    limiting instruction also, Your Honor.

7              THE COURT:  Okay.  Okay, this is what I'm going to

8    do:  It's based in part, and, again, it's really a little

9    sketchy on that district court case, the Ninth Circuit case,

10   but I will allow the defense to ask what I consider to be

11   something of a sanitized question as to within a specific time

12   frame, whether she ever told anyone that she was over the age

13   of 18.  And she will answer "yes" or "no."

14             MS. McGLENON:  Okay.

15             THE COURT:  All right.

16             MS. McGLENON:  Thank you, Your Honor.

17             THE COURT:  Okay, any other preliminary matters that

18   we should take up, plaintiff's side, anything else that we

19   should address?

20             MR. ENOS:  No, Your Honor.

21             THE COURT:  Defense side, anything else we need to

22   address before we have the jury come?

23             MS. McGLENON:  I don't believe so, Your Honor.

24             THE COURT:  All right, let's come back in at 9:15.

25   I'm going to have -- we're going to check with Mr. -- to see

1   if Juror 0026 has come in.  I want my staff to check with my

2   jury clerk to see what conversation she had with him.  We'll

3   tell the jury that we were waiting for the alternate juror,

4   and proceed from there.  But I'll come back on the bench in a

5   few minutes.  I just want to double-check on that.  9:15.

6          (Recess.)

7          THE COURT:  All right, back on the record outside the

8   presence of the jury.  Now, in the meantime, our jury clerk

9   did get ahold of Juror 0026, have him come in.  He didn't have

10  transportation, but he was going to take the train in.  He was

11  going to be late.  The train wouldn't get in until almost

12  10:00, and then we just received word he missed the train.  So

13  I'll leave it to counsel, but I am just going to suggest that

14  we dismiss Juror 0026 from the jury and move on.

15         MR. ENOS:  I've discussed this issue with defense

16  counsel, and we agree.

17         THE COURT:  All right, defense.

18         MS. McGLENON:  True.  We do agree.

19         THE COURT:  All right, then, we will dismiss Juror

20  0026.  He's alternate juror number 1.  Basically Juror 0034

21  will become the alternate juror.

22         MS. McGLENON:  Thank you.

23         THE COURT:  Anything else before we have the jury

24  come in, then?  Okay, we'll have the jury come in.

25         (The jury entered the courtroom, and the following

1  proceedings were held:)

2         THE COURT:  All right, the record will reflect the

3  jury is present.  Please be seated.  Good morning, members of

4  the jury.  Thank you for your patience.

5         What happened was, we received a telephone call from

6  alternate juror number 1, Juror 0026.  He indicated that on

7  his way home last night, he became ill and wasn't sure whether

8  he'd be able to make it into court today.  So we've been in

9  telephonic contact with him.  The bottom line is, he was

10  hoping if we delayed it a little bit he could be here.  It

11  turns out he cannot be here.

12         So basically we've excused Juror 0026 from the jury,

13  and, Juror 0034, you will be the alternate juror, then.  So

14  everyone stay healthy.

15         Okay, now, what we're going to do, we're going to

16  start the trial itself.  I'm going to read you some

17  preliminary jury instructions.  At the end of the trial, I

18  will also read you concluding instructions which contain the

19  bulk of the actual law that would apply to the case, but the

20  preliminary jury instructions are important because they give

21  you some guidance as to your role as jurors during the course

22  of the trial.

23         Now, with these instructions, as with the concluding

24  instructions, I do literally have to read them to you because

25  if I misstate any word or phrase, it could throw off the whole

1    instruction.

2            I will try to vary the cadence, tone, pitch,

3    et cetera of my voice so it doesn't come across as a flat

4    monotone, but I'm not trying to emphasize or deemphasize any

5    word or phrase.  They're all important.  The concluding

6    instructions, after I read those to you, they'll go back to

7    the jury room with you.

8            You are now the jury in this case, and I want to take

9    a few minutes to tell you something about your duties as

10   jurors and to give you some preliminary instructions.  At the

11   end of the trial, I will give you more detailed instructions

12   that will control your deliberations.  When you deliberate, it

13   will be your duty to weigh and to evaluate all the evidence

14   received in the case and, in that process, to decide the

15   facts.

16           To the facts as you find them, you will apply the law

17   as I give it to you, whether you agree with the law or not.

18   You must decide the case solely on the evidence and the law

19   before you and must not be influenced by any personal likes or

20   dislikes, opinions, prejudices, or sympathy.  Please do not

21   take anything that I may say or do during the trial as

22   indicating what I think of the evidence or what your verdict

23   should be.  That is entirely up to you.

24           This is a criminal case brought by the United States

25   Government.  The Government charges the defendant with one

1   count of sexual exploitation of a minor, specifically the

2   production of child pornography, and a second count of

3   attempting sex trafficking.  The charges against the defendant

4   are contained in the indictment.  The indictment simply

5   describes the charges the Government brings against the

6   defendant.  The indictment is not evidence and does not prove

7   anything.

8          The defendant has pleaded not guilty to the charges

9   and is presumed innocent unless and until the Government

10  proves the defendant guilty beyond a reasonable doubt.  In

11  addition, the defendant has the right to remain silent and

12  never has to prove innocence or present any evidence.

13         In order to help you follow the evidence, I will now

14  give you a brief summary of the elements of the crimes which

15  the Government must prove to make its case:

16         In Count 1, the defendant is charged with the sexual

17  exploitation of a minor, specifically, the production of child

18  pornography.  The indictment alleges in part that in September

19  2011, the defendant employed, used, persuaded or coerced

20  Briana -- I'm sorry, Bianca -- to take part in sexually

21  explicit conduct for the purpose of producing a visual

22  depiction of such conduct; and the defendant knew or had

23  reason to know that the visual depiction would be mailed or

24  transported across state lines or in foreign commerce, or the

25  visual depiction was produced using materials that had been

shipped -- I'm sorry -- mailed, shipped, or transported across
state lines or in foreign commerce, or the visual depiction
was mailed or actually transported across state lines or in
foreign commerce.

In Count 2, the defendant is charged with attempted
sex trafficking.  The Indictment alleges in part that in or
about September 2011, the defendant intended to commit the
offense of sex trafficking either:  (1) through force, threats
of force, fraud or coercion, or any combination of these; or
(2) of a person under the age of 18, and that the defendant
did something that was a substantial step toward committing
the crime of sex trafficking.

The evidence you are to consider in deciding what the
facts are consists of:

(1)  the sworn testimony of any witness;

(2)  the exhibits which are received in evidence; and

(3)  any facts to which the parties agree.

The following things are not evidence, and you must
not consider them as evidence in deciding the facts of this
case:

(1)  statements and arguments of the attorneys;

(2)  questions and objections of the attorneys;

(3)  testimony that I instruct you to disregard; and.

(4)  anything you may see or hear when the court is
not in session even if what you see or hear is done or said by

1    one of the parties or by one of the witnesses.

2            Evidence may be direct or circumstantial.  Direct

3    evidence is direct proof of a fact, such as testimony by a

4    witness about what that witness personally saw or heard or

5    did.  Circumstantial evidence is indirect evidence, that is,

6    proof of one or more facts from which one can find another

7    fact.

8            You are to consider both direct and circumstantial

9    evidence.  Either can be used to prove any fact.  The law

10   makes no distinction between the weight to be given to either

11   direct or circumstantial evidence.  It is for you to decide

12   how much weight to give to any evidence.

13           Okay, and I'm going to step away from the

14   instructions just for a moment.

15           Trial judges are advised to give jurors a little bit

16   of an example of direct and circumstantial evidence because it

17   seems very technical, and yet we all use direct and

18   circumstantial evidence in our own lives every day.  We just

19   don't think about it as such.  So I'll give you a couple of

20   very simplistic examples.

21           If you wake up in the morning, and you look outside

22   your window and your sidewalk is wet and it's in the winter

23   time -- let me back up for a second.

24           If you wake up in the morning, and you look outside

25   and raindrops are falling down, that is direct evidence that

1   you have seen it raining.

2          If, on the other hand, you wake up in the morning and

3   your sidewalk is wet, and it was predicted to be raining, you

4   can conclude from circumstantial evidence, not that you saw it

5   raining, but that your sidewalk was wet, that it rained last

6   night.  There may be other explanations, however, as to why

7   your sidewalk is wet.  For example, your automatic sprinklers

8   might have gone on.

9          Another simplistic example of direct and

10  circumstantial evidence is -- this is sort of silly, but it's

11  sort of cute.  If the wife bakes a cake for the rummage sale,

12  and she tells her husband, "Don't eat that cake."  She leaves

13  the kitchen.  She walks back into the kitchen, the husband is

14  there, he's eating a slice of the cake.  That's direct

15  evidence that he ate a slice of the cake.

16         If, on the other hand, she -- she tells her husband,

17  "I baked this cake, do not eat it."  She walks out.  She walks

18  back in, she does not see her husband eating the cake, but she

19  does see that a slice of the cake is missing.  He's the only

20  one in the kitchen.  There are cake crumbs on his face and

21  down his shirt.

22         Now, from those facts, there is a slice missing from

23  the cake, he's the only one in the kitchen, there are cake

24  crumbs on his body, she can conclude from circumstantial

25  evidence that he ate the slice of the cake.  So that's

1  simplistic.  But anyway, that's direct and circumstantial

2  evidence.

3       All right, back to the instructions.

4       There are rules of evidence that control what can be

5  received in evidence.  When a lawyer asks a question or offers

6  an exhibit in evidence and a lawyer on the other side thinks

7  that it is not permitted by the rules of evidence, that lawyer

8  may object.  If I overrule the objection, the question may be

9  answered, or the exhibit received.  If I sustain the

10  objection, the question cannot be answered, or the exhibit

11  cannot be received.  Whenever I sustain an objection to a

12  question, you must ignore the question and must not guess what

13  the answer would have been.

14       Sometimes I may order that evidence be stricken from

15  the record and that you disregard or ignore the evidence.

16  That means that when you are deciding the case, you must not

17  consider the evidence that I told you to disregard.

18       In deciding the facts in this case, you may have to

19  decide which testimony to believe and which testimony not to

20  believe.  You may believe everything a witness says, or part

21  of it, or none of it.  In considering the testimony of any

22  witness, you may take into account:

23       (1)  the witness' opportunity and ability to see or

24  hear or know the things testified to;

25       (2)  the witness' memory;

1           (3)  the witness' manner while testifying;

2           (4)  the witness' interest in the outcome of the

3    case, if any;

4           (5)  the witness' bias or prejudice, if any;

5           (6)  whether other evidence contradicted the witness'

6    testimony;

7           (7)  the reasonableness of the witness' testimony in

8    light of all the evidence; and

9           (8)  any other factors that bear on believability.

10          The weight of the evidence as to a fact does not

11   necessarily depend on the number of witnesses who testify

12   about it.

13          Now, I read this instruction yesterday.  I do have to

14   read it again.  I'm not going to continue to repeat this

15   particular instruction.  It is important.  And when you break,

16   I may just say, "Remember the admonition."  What I'm referring

17   to is this particular instruction.

18          It's a very lengthy instruction.  We've added a

19   number of things based upon the development of technology, but

20   they all apply.

21          I will now say a few words about your conduct as

22   jurors.

23          First, keep an open mind throughout the trial and do

24   not decide what the verdict should be until you and your

25   fellow jurors have completed your deliberations at the end of

1    the case.

2          Second, because you must decide the case based only

3    on the evidence received in the case and on my instructions as

4    to the law that applies, you must not be exposed to any other

5    information about the case or to the issues it involves during

6    the course of your jury duty.  Thus, until the end of the case

7    or unless I tell you otherwise:

8          Do not communicate with anyone in any way and do not

9    let anyone else communicate with you in any way about the

10   merits of the case or anything to do with it.  This includes

11   discussing the case in person, in writing, by phone or

12   electronic means, via e-mail, text messaging, or any Internet

13   chat room, blog, website or other feature.  This applies to

14   communicating with your fellow jurors until I give you the

15   case for deliberation, and it applies to communicating with

16   everyone else including your family members, your employer,

17   the media or the press, and the people involved in the trial,

18   although you may notify your family and your employer that you

19   have been seated as a juror in the case.  But if you are asked

20   or approached in any way about your jury service or anything

21   about this case, you must respond that you have been ordered

22   not to discuss the matter and to report the contact to the

23   Court.

24         Because you will receive all the evidence and legal

25   instruction you properly may consider to return a verdict, do

1   not read, watch, or listen to any news or media accounts or

2   commentary about the case or anything to do with it; do not do

3   any research, such as consulting dictionaries, searching the

4   Internet or using other reference materials; and do not make

5   any investigation or in any other way try to learn about the

6   case on your own.

7          The law requires these restrictions to ensure the

8   parties have a fair trial based on the same evidence that each

9   party has had an opportunity to address.  A juror who violates

10  these restrictions jeopardizes the fairness of these

11  proceedings, and a mistrial could result that would require

12  the entire trial process to start over.  If any juror is

13  exposed to any outside information, please notify the Court

14  immediately.

15         At the end of the trial, you will have to make your

16  decision based on what you recall of the evidence.  You will

17  not have a written transcript of the trial.  I urge you to pay

18  close attention to the testimony as it is given.

19         If you wish, you may take notes to help you remember

20  the evidence.  If you do take notes, please keep them to

21  yourself until you and your fellow jurors go to the jury room

22  to decide the case.  Do not let note taking distract you from

23  being attentive.  When you leave the Court for recesses, your

24  notes should be left in the courtroom.  No one will read your

25  notes.

1          Whether or not you take notes, you should rely on

2    your own memory of the evidence.  Notes are only to assist

3    your memory.  You should not be overly influenced by your

4    notes or those of your fellow jurors.

5          The next phase of the trial will now begin.  First,

6    each side may make an opening statement.  An opening statement

7    is not evidence.  It is simply an outline to help you

8    understand what that party expects the evidence will show.  A

9    party is not required to make an opening statement.

10         The Government will then present evidence and counsel

11   for the defendant may cross-examine.  Then, if the defendant

12   chooses to offer evidence, counsel for the Government may

13   cross-examine.

14         After the evidence has been presented, the attorneys

15   will make closing arguments, and I will instruct you on the

16   law that applies to the case.  After that, you will go to the

17   jury room to deliberate on your verdict.

18         All right, at this time, I'll invite the parties, if

19   they wish, to make an opening statement.  We'll start with the

20   plaintiff's side.  Does the Government wish to make an opening

21   statement?

22         MR. ENOS:  Yes, Your Honor.  Thank you.

23         THE COURT:  All right.

24         Okay, now, you have screens in front of you.  If your

25   screen is not on, you can always move them up and down to your

1    convenience.  But if your screen is not on, let me know so we

2    can get you up and running.  All right.

3           MR. ENOS:  May it please the Court.  Good morning,

4    everyone.

5           The indictment in this case includes two counts.

6    Count 1 charges defendant Ricky Davis with producing sexually

7    explicit images of a minor.

8           Count 2 charges him with attempting to traffic this

9    minor for sex by posting these same images online within a

10   website advertising prostitution services.

11          As you receive evidence in this case, you will learn

12   about two key dates.  First is September 17, 2011.  That's the

13   date that you will learn that Bianca, a then 13-year old

14   within the Modesto area, went to the defendant's home for the

15   purpose of getting a tattoo.  She did not receive a tattoo

16   that night.  Instead, sexually explicit photos of her were

17   taken and posted online.

18          The second date is January 26, 2012.  That's the date

19   that you will learn that defendant was interviewed by the lead

20   investigator in this case, Detective Derek Stigerts of the

21   Sacramento PD, and acknowledged that he indeed took the

22   photographs and posted them online.

23          More specifically, the evidence you will receive

24   includes the following:  You'll hear that Detective Stigerts

25   first received word of this case, and an investigator in a

1  separate investigation in the Bay Area, Bill Schwartz of the

2  South San Francisco PD, recovered a cell phone that included

3  sexually explicit pictures of Bianca on them.  I'll refer to

4  them as the Bianca photos.  And he also identified Bianca as a

5  minor who had at that time had been reported missing in the

6  Modesto area.

7         Detective Stigerts followed up on this and contacted

8  Mark Copeland of the Stanislaus County Sheriff's Office.

9  Copeland told him that Bianca, who indeed had run away several

10 times before, had since been recovered and returned to a group

11 home.

12        You will hear from Detective Stigerts and Bianca with

13 respect to his interviewing her twice over the winter of

14 2011-2012.  You first will hear that he presented the Bianca

15 photos to her in November 2011, and Bianca identified a third

16 party, one Brian Armstrong is taking the photos in a motel

17 room in Manteca.  Detective Stigerts followed up on this lead,

18 identified the motel room and realized wrong room, wrong

19 bedspread.  Neither one of those matched the room or the

20 bedspread depicted in the Bianca photos.

21        Detective Stigerts went back to Bianca, interviewed

22 her a second time.  This time in January 2012.  During this

23 interview, Bianca acknowledged that she lied the first time,

24 told him she was scared, and instead, the defendant took the

25 photographs one night in his bedroom.

1          Detective Stigerts was able to corroborate this

2     information received in January 2012 as follows:  He

3     identified who defendant was, and the defendant's physical

4     description matched that provided by Bianca.  He identified

5     defendant's phone number.  That matched the number provided by

6     Bianca.

7          He also identified where defendant lived, which was

8     consistent with the area of Modesto where defendant lived.

9          You will learn that Detective Stigerts also contacted

10    defendant's parole officer, at the time Wendy Hall, who was

11    able to confirm that the bedspread, the description of the

12    bedspread in the Bianca photos matched the bedspread still on

13    defendant's bed.

14         January 26, 2012, defendant's home was searched.

15    Items were seized.  You'll see photographs of the search,

16    including items that were seized were his bedspread, his

17    computer and cell phone.  You'll see where the computer and

18    bedspread were in the room, et cetera, and the defendant was

19    thereafter arrested and interviewed.

20         At the outset of this interview, the defendant told

21    Detective Stigerts he'd never physically seen Bianca.  He only

22    had known her through social media.  When presented with the

23    picture -- or with Bianca's photos of her on his bed, he then

24    acknowledged that he took the pictures and posted them online.

25         You'll hear defendant tell -- or you will hear

1  Detective Stigerts testify that the defendant told him he

2  thought Bianca was 19 years old.  Additional evidence you'll

3  receive with respect to Bianca's age says she was 13.  And

4  that through social media chats between Bianca and defendant

5  before she went to his house that night, she told him she was

6  16.  You will receive visual evidence of what Bianca looked

7  like that evening and most likely around the time of the

8  incident.

9          You'll also hear that defendant told Detective

10  Stigerts that he didn't tattoo Bianca that night because she

11  couldn't provide him ID confirming her age.

12          You'll receive evidence that Bianca and defendant

13  communicated for a short while after the advertisement was

14  posted, and within these communications, defendant asked

15  Bianca if she had a room to have sex in, if she was down with

16  making money, and they both talked about getting customers.

17          With respect to the forensics in this case, you will

18  hear from investigator George Vasiliou, computer forensic

19  expert who analyzed the contents of all three devices.  He'll

20  tell you that he found evidence of the Bianca photos on all

21  three of them.

22          With respect to the defendant's cell phone, they were

23  in deleted space.  He'll explain what that is.

24          With respect to the defendant's computer, there were

25  thumbnail files.  He'll explain where those are.  And with

277

1    respect to Bianca's phone, they were indeed in a photo file.

2           He will also testify that he was able to through

3    analyzing the metadata of the Bianca photos, which he'll

4    explain better than I could, but essentially explains where

5    the photos come from, that these photos came from a device, a

6    Samsung cell phone that matched the model of the device seized

7    from the defendant.

8           Ladies and gentlemen, what I have provided you is a

9    general overview of the evidence we expect to present in the

10   case.  At the conclusion of the evidence, we'll argue why

11   defendant should be found guilty beyond a reasonable doubt

12   with respect to both counts charged.  Thank you.

13          THE COURT:  And opening statement on behalf of

14   defense?

15          MR. FARKAS:  Thank you, Your Honor.

16          Good morning, ladies and gentlemen.  This case is

17   about a lonely man that met someone online who he thought was

18   18 years old.  She turned out to be 13 years old.

19          He thought she was 18 because she represented to him

20   that she was 18, both in person and online.  She represented

21   to other people that she was 18.

22          My name is Andras Farkas, and along with Ann

23   McGlenon, I have the privilege of representing Ricky Davis in

24   this case.

25          Now, you just heard the Government's theory of the

1    case, and as all of you know, there has been -- those of you

2    that were high school students, and I know there are several

3    on this jury, there's more than one side of this story.

4             This story begins a year before September 17, 2011.

5    You'll hear about Mr. Davis' on-line profile.  It was on a

6    site called MocoSpace.  MocoSpace is sort of like Spacebook

7    and MySpace, where people go online, there's chat rooms,

8    there's games, but it is also where men meet women, and women

9    meet men.

10            Now, on that social profile, Mr. Davis was a tattoo

11   artist, was advertising tattoos.  Bianca hit him up for a

12   tattoo.  She wanted a tattoo, so she contacted him.  She had a

13   picture on MocoSpace.

14            Now, on September 17th, 2011, Bianca ran away from

15   home, contacted Ricky for a tattoo.  We believe the computer

16   evidence in this case will show that on September 16th, she

17   sent him a picture, which was traditionally called a selfie, a

18   picture that she took of herself in a mirror, but she's

19   wearing a stripe shirt, she's wearing either very short shorts

20   or her underwear, and she put a pair of pink lips in the

21   corner.

22            She sends him a picture.  Ricky thought she was good

23   looking.  He thought she was over 18.  And he invites her over

24   to his house.  Now, Bianca goes over to his house.

25            Bianca will testify that he took naked pictures of

1    her, and that those pictures were posted online.

2            Now, the whole reason this case came to the attention

3    of law enforcement is because those pictures were found on his

4    cell phone that was in Brian Armstrong's possession in a motel

5    room in South San Francisco.  When detectives first

6    interviewed Bianca, you'll hear that she told him that it was

7    Brian Armstrong that took those photos.  Later during the

8    second interview, she pointed the finger at Ricky.

9            Now, the Government's theory is that Ricky forced

10   Bianca into doing this.  We believe that the evidence will

11   show that it was after their initial meeting on September

12   17th, which was a matter of hours, not even a whole day, a

13   matter of hours, they never met again in person.  On September

14   18th on the next day, she, Bianca, is the one that contacted

15   Ricky and asked him to get her customers because she wanted to

16   make money.  We believe that the text messages will bear this

17   out.  Now, they never meet again in person after September

18   17th.

19           As jurors, it's your job to be the judges of the

20   facts in this case.  Mr. Davis, sitting at that table right

21   now, is presumed innocent.  And at the end of this trial,

22   we're confident that after you review all the evidence in this

23   case, you will find him not guilty of the charges.

24           Thank you.

25           THE COURT:  We'll begin with the evidence.  We'll

1    start with the plaintiff's side, so the Government may present

2    its case in chief and call its first witness.

3           MS. BERG:  Thank you, Your Honor.  The Government

4    would like to call Sergeant William Schwartz.

5           THE CLERK:  Good morning.  Please approach the

6    witness stand.  Remain standing and raise your right hand to

7    be sworn.  After I administer the oath, please affirm by

8    saying "I do."

9                        WILLIAM SCHWARTZ,

10   called as a witness on behalf of the Government, having been

11   first duly sworn, testified as follows:

12          THE CLERK:  Please have a seat, state your full name

13   for the record, and spell it.

14          THE WITNESS:  First name is William, W-I-L-L-I-A-M,

15   last name Schwartz, S-C-H-W-A-R-T-Z.

16                        DIRECT EXAMINATION

17   BY MS. BERG:

18   Q.   Good morning, Sergeant Schwartz.

19   A.   Good morning.

20   Q.   Where do you work?

21   A.   I work for the South San Francisco Police Department.

22   Q.   And how long have you worked for that police department?

23   A.   Approximately 16-and-a-half years.

24   Q.   What position do you hold?

25   A.   I am currently a sergeant in patrol and also a supervisor

1    with the San Mateo County Human Trafficking Task Force.

2    Q.  And what are your duties?

3    A.  My duties for patrol is supervising a six and seven person

4    patrol team, and then also with my other duties, I supervise a

5    monthly operation of law enforcement agencies in San Mateo

6    County to self-initiate investigations in human trafficking.

7    Q.  And what are your duties -- I'm sorry, strike that.  So

8    how long have you been investigating human trafficking or sex

9    trafficking?

10   A.  Well, prostitution and -- prostitution and

11   prostitution-related crimes since 2007.  Sex trafficking,

12   human-trafficking-related crimes more so since 2009, 2010.

13   Q.  Have you received training regarding investigating sex

14   trafficking cases?

15   A.  Yes.

16   Q.  And what type of training have you been provided?

17   A.  Human trafficking, sex trafficking, sex trafficking of

18   minors, and all the related crimes that go along with that,

19   commercial sex operations, interviewing victims, recognizing

20   signs of human trafficking and victim services.

21   Q.  Have you worked child sex trafficking cases with the FBI?

22   A.  Yes.

23   Q.  And how many cases have you worked with the FBI,

24   approximately?

25   A.  I believe at least two.

1  Q.  And just a best estimate, I don't want to hold you to any
2  numbers, the number of sex trafficking cases you've
3  investigated?
4  A.  It's hard to say, maybe 25 to 50.
5  Q.  Thank you.  Can I now shift gears and direct your
6  attention to September 29th of 2011.
7  A.  Yes.
8  Q.  And can you tell me what investigations were you
9  conducting at that time?
10  A.  I was on an unrelated investigation at the La Quinta Inn
11  Hotel in South San Francisco.
12  Q.  What did you observe in that hotel, if anything?
13  A.  In the hotel room, there was a laptop, two cellular
14  telephones, and two subjects I contacted in the room.
15  Q.  Can you explain more about the cell phones?
16  A.  There was a cell phone.  One was on the bed, and one was
17  being charged on one of the tables in the room.  Both parties
18  that we had contacted both denied ownership of that phone, and
19  I later took possession of it.
20  Q.  So we're talking about the phone that was being charged?
21  A.  Yes.
22  Q.  Did that have anything to do with the investigation that
23  you were conducting there at the -- at that hotel room?
24  A.  No.
25  Q.  All right.  Do you review -- do you recall what that phone

283

1   looked like?

2   A.   I do.

3   Q.   Okay.  Can you describe it for me.

4   A.   I believe it was a Samsung, it was either red or magenta,

5   with the old-style Blackberry buttons, and then a screen.

6           MS. BERG:  Your Honor, permission to approach?

7           THE COURT:  Yes.

8   BY MS. BERG:

9   Q.   I'd like to give you now something to review, which we've

10  premarked as Exhibit 3.  Sergeant Schwartz, do you know what

11  that is?

12  A.   Yes, this is the phone that I booked into evidence.

13  Q.   And what type of phone is that?

14  A.   That is a Samsung.  I don't know the model number, but

15  it's a Samsung cellular phone.

16  Q.   And that was the one that was being charged on the desk?

17  A.   Yes.

18  Q.   That is the actual phone.

19          Your Honor, may I move Exhibit 3 into evidence?

20          MS. McGLENON:  No objection.

21          MR. FARKAS:  No objections, Your Honor.

22          THE COURT:  It is admitted.

23          (Government's Exhibit 3, received in evidence.)

24          MS. BERG:  Thank you.  May I take that back?

25  BY MS. BERG:

284

1   Q.   Okay.  So you find this phone being charged on the desk,

2   and what happens next?

3   A.   Later on that night, I observed the contents of the phone,

4   and the next day, I believe I downloaded the contents of the

5   phone.

6   Q.   Do you recall what were the contents of the phone that you

7   saw that night before you downloaded them?

8   A.   Yes.

9   Q.   And what were they?

10  A.   There was, I believe, thousands of text messages and

11  numerous photos of a young juvenile female.

12  Q.   And were there anything in the photos that were of concern

13  to you?

14  A.   Yes.  Many of the photos of the female where she was

15  wearing no clothing or provocative clothing, and based on my

16  training and experience regarding prior human trafficking and

17  sex trafficking cases, it raised alarms.

18  Q.   And then so what did you do next?

19  A.   Later on, I -- I think -- I don't know if it was the same

20  day, but eventually, I tried to find out by reviewing the text

21  messages who the phone belonged to.

22  Q.   Were you able to identify who potentially the phone

23  belonged to?

24  A.   I did.

25  Q.   And who was that?

1   A.   A juvenile female named Bianca ███████.

2          MR. ENOS:  Your Honor, move to strike the last name

3   in light of prior stipulations.

4          MS. BERG:  Yes, I apologize.

5          THE COURT:  All right.

6   BY MS. BERG:

7   Q.   Can we refer to her as Bianca?

8   A.   Yes.

9   Q.   And we'll call this Bianca's phone?

10  A.   Yes.

11  Q.   Thank you.

12         And then you said something about you downloaded some

13  information from the phone?

14  A.   Correct.

15  Q.   And what did you download?

16  A.   That would have been the contents of the phone of forensic

17  data attraction, which puts the information on the phone, the

18  data on the phone into a readable format essentially.

19  Q.   Is that a particular program that you use?

20  A.   It's Cellebrite forensic downloader.

21  Q.   And this Cellebrite program separates the photos from the

22  text?

23  A.   It does.

24  Q.   And does it maintain the integrity of the phone?

25  A.   Yeah, it's a read only, so there is no -- the integrity of

1    the information isn't compromised.

2    Q.  So you've got a disk now that is a mirror image of what

3    was on the phone in a readable format?

4    A.  That's correct.

5    Q.  Did you download any photos from the phone?

6    A.  Yes, the forensic download included the photos that were

7    on the phone.

8    Q.  Okay, can I have you turn to Exhibit 5 in the binder in

9    front of you.

10   A.  These appear to be letters.  Am I looking for a specific

11   letter?

12   Q.  Okay.  Let me get you those.

13        Your Honor, I apologize.

14        THE CLERK:  You can use the court's binder.

15        MS. BERG:  Thank you.  Permission to approach.

16        THE COURT:  Yes.

17        MS. BERG:  Thank you.

18   BY MS. BERG:

19   Q.  Sorry, Sergeant Schwartz.  Let's try one with numbers.

20   Maybe that would be better with numbers here.  Number 5.

21   A.  Yes.

22   Q.  Okay, now we're tracking.

23        Are you familiar with what's in Exhibit 5?

24   A.  Yes.

25   Q.  And what is Exhibit 5?

1   A.   These are photos -- the same photos I observed in the

2   phone and later on in the data extraction.

3   Q.   Are they a fair and accurate representation of what you

4   downloaded from the phone?

5   A.   They are.

6        MS. BERG:  Your Honor, I'd like to move Exhibits 5.1

7   to 5.4 into evidence.

8        MR. FARKAS:  One second, Your Honor.

9        THE COURT:  Yes.

10       MR. FARKAS:  No objection.

11       THE COURT:  All right, they are admitted.

12       (Government's Exhibits 5.1 to 5.4, received in

13   evidence.)

14  BY MS. BERG:

15  Q.   May I publish them to the jury?

16       MS. McGLENON:  No objection.

17  BY MS. BERG:

18  Q.   Okay.  Let's start with Exhibit 5.1.  I'm going to put

19  this on the Elmo.  Okay, that was the wrong direction.  Okay.

20       Now, sorry, Sergeant Schwartz, can you tell me what

21  Exhibit 5.1 is.

22  A.   It appears to be -- or they are a young juvenile taking

23  pictures of herself with a cell phone.

24  Q.   Is this the Cellebrite report that you prepared?

25  A.   Oh, yes, it is.

Schwartz

288

1    Q.   So you downloaded and prepared the Cellebrite report?

2    A.   Yes, that's how, when I print out the forensic download,

3    that is the format that it prints it out.

4    Q.   Okay.  And I'm going to show you what's part of 5.1, and

5    there's one that's whited out.  Do you see that?

6    A.   I do.

7    Q.   Which is number 58?  Do you see that?

8    A.   Yes.

9    Q.   And so when you download the Cellebrite, it indicates in

10   the middle column where I'm referring to, the camera that

11   takes the photo; is that correct?

12   A.   It does.

13   Q.   All right.  And then I'm going to show you another part of

14   your Cellebrite report, do you see that?

15   A.   I do.

16   Q.   Okay.  Now, I'd like to direct your attention to what are

17   the actual photos that is Exhibit 5.2 in your binder.

18        Ladies and gentlemen, these are going to be some

19   photos, some graphic material.

20        Now, Sergeant Schwartz, is this the photo, one of the

21   photos that you downloaded in September of 2011?

22   A.   Yes.

23   Q.   Okay.  And this was the photo?

24   A.   Yes.

25   Q.   And that, if you go back to your Cellebrite report, would

1   that be number 58?

2   A.  Yes, it would.

3   Q.  Okay.  Can I have you look at Exhibit 5.3, please.  Excuse

4   me.  Is this a -- another one of the photos that you

5   downloaded from that cell phone?

6   A.  It is.

7   Q.  And that's referenced as -- is that number 59 or 60 --

8   which one on your Cellebrite report?

9   A.  That would be -- mine have the covering, so I assume it's

10  number 60.  I'm not sure.

11  Q.  All right, let's just go to 5.  So that's 5.3.  Let's go

12  to Exhibit 5.4, please.  This is another photograph that you

13  downloaded from that cell phone on that date?

14  A.  It is.

15  Q.  Now, after you reviewed these photographs, what did you do

16  next?

17  A.  I later determined if I was able to positively identify

18  the female in the photos.

19  Q.  Were you able to do that?

20  A.  I was.

21  Q.  And how did you go about doing that?

22  A.  I conducted a records check on the name "Bianca," with

23  what I believed to be the approximate age.  And I came back

24  with a missing person record out of Riverbank Police

25  Department for a Bianca at 13 years old.

1   Q.  What was the -- what was the approximate age that you put

2   into the records checks --

3           MS. McGLENON:  Objection.  No foundation.

4           THE COURT:  Overruled.

5           THE WITNESS:  I put in what I believed the age of the

6   female was, which was 13 to 14 years old.

7   BY MS. BERG:

8   Q.  And in return, you received a response relating to a

9   missing person?

10  A.  Yes.

11  Q.  And that individual was named Bianca?

12  A.  Yes.

13  Q.  And then what did you do next?

14  A.  I did not have a photo of this female.  It was just an

15  information abstract, so I still did not have a picture to

16  confirm that it was the same person.  So I contacted the --

17  Detective Copeland with the Stanislaus County Sheriff's

18  Department and inquired about the missing person abstract for

19  Bianca and had him send me a missing person flier.

20  Q.  All right.  Can you turn to Exhibit 6 in your binder,

21  please.  Do you recall what that is?

22  A.  Yes.

23  Q.  And what is that?

24  A.  This is the Missing Person BOL flier that is sent out by

25  law enforcement agencies to let other law enforcement agencies

1  know about a missing person.

2  Q.  What's a BOL?

3  A.  It's a "Be on the Lookout."  It's letting law enforcement

4  agencies know to look out for this person in case she's found.

5  Q.  Is that a fair and accurate representation of the missing

6  person's report that you received?

7  A.  It is.

8         MS. BERG:  Your Honor, may I move Exhibit 6 into

9  evidence?

10         MR. FARKAS:  Your Honor, objection.  I think this

11  contains hearsay.

12         THE COURT:  All right, I'll take it under submission

13  for now.

14         MS. BERG:  Okay, Your Honor, may I respond to the

15  objection?

16         THE COURT:  We'll take it up at the recess.

17         MS. BERG:  Okay.

18  BY MS. BERG:

19  Q.  And having received the missing person's report, what did

20  you do next?

21  A.  I looked at the flier that I received and confirmed it was

22  the same person, same female that I observed in the photos of

23  the phone.

24  Q.  And what did you do next?

25  A.  At that point, I completed my report, and I forwarded the

1    information to the Stanislaus County Sheriff's Department, the

2    Stockton Police Department and the FBI field office in San

3    Francisco for further investigation and information.

4              MS. BERG:  No further questions, Your Honor.

5              THE COURT:  Cross-examination?

6                          CROSS-EXAMINATION

7    BY MR. FARKAS:

8    Q.  Good morning, Detective Schwartz.

9    A.  Good morning.

10   Q.  Now, you mentioned there were two people in that motel

11   room in San Francisco?

12   A.  There was.

13   Q.  One of them was Brian Armstrong; correct?

14   A.  Correct.

15   Q.  And the other person was a woman named Destiny

16   Haroldson --

17             MS. BERG:  Objection, Your Honor.  Relevance.

18             THE COURT:  Overruled.

19             THE WITNESS:  Correct.

20   BY MR. FARKAS:

21   Q.  And you initially began this investigation because you

22   found -- you found ads online that you believed were for

23   prostitution; correct?

24   A.  Correct.

25   Q.  And that's what led you to this hotel room?

1    A.   That's correct.

2    Q.   And there were two separate ads involved; correct?

3    A.   Yes.

4    Q.   One of them featured a picture of Destiny Haroldson;

5    correct?

6    A.   Yes.

7    Q.   And the other one featured pictures of another minor,

8    correct, or of someone you believed to be a minor; correct?

9    A.   Yes.

10   Q.   And initially you believed Destiny Haroldson was underage;

11   correct?

12   A.   Before I went to the hotel, I believed she could have

13   been.

14   Q.   So that's correct?

15   A.   Yes.

16   Q.   But she wasn't underage; correct?

17   A.   She was not.

18   Q.   Now, you arrested Brian Armstrong; correct?

19   A.   I did.

20   Q.   And you arrested Brian Armstrong for pimping; correct?

21   A.   Correct.

22   Q.   Pandering?

23   A.   Correct.

24   Q.   And there were several photos and laptops in that motel

25   room; correct?

294

1   A.   I'm sorry.

2   Q.   There were several phones and a laptop --

3   A.   Two phones and a laptop, yes.

4   Q.   And you examined Bianca's phone which was found in

5   Armstrong's possession; correct?

6   A.   Bianca's phone was not found in Armstrong's possession,

7   no.  It was found in the room on a desk charging.

8   Q.   And there were two people in that room?

9   A.   Yes.

10  Q.   Brian Armstrong; correct?

11  A.   Yes.

12  Q.   And Destiny Haroldson?

13  A.   Correct.

14  Q.   And they both denied possession of that phone?

15  A.   Correct.

16  Q.   So who possessed the phone in that room that day?

17  A.   Your guess is as good as mine.  I do not know.

18  Q.   Now, you said you downloaded the texts in that phone;

19  correct?

20  A.   Text messages, yes.

21  Q.   And in reviewing those text messages, did you determine

22  when Mr. Armstrong may have met Bianca?

23  A.   I believe it was around September 24th or 25th.

24  Q.   So Mr. Armstrong met Bianca?

25  A.   I don't know if he met her.  I know he texted her.

1    Whether or when they actually met, I have no idea.

2    Q.  You found -- and then reviewing the photos in that phone,

3    you found a picture of Mr. Armstrong on a bed with a large

4    amount of cash, right?

5    A.  Correct.

6    Q.  Did you find any pictures of Ricky Davis in Bianca's phone

7    as far as you know?

8    A.  I've never met Ricky Davis.

9            MR. FARKAS:  One second, Your Honor.

10           THE COURT:  Yes.

11           (Pause in the proceedings.)

12   BY MR. FARKAS:

13   Q.  Now, several of the photos -- -- several of these initial

14   photos that you found in the phone were taken prior to

15   September 17th, correct, according to the Cellebrite data?

16   A.  Yes.

17   Q.  And several of these phones, including what appears to be

18   40, 41 -- I'm sorry.

19           THE CLERK:  What exhibit are you looking at, Counsel?

20           MR. FARKAS:  Exhibit 5.1.  I'm sorry.

21           THE CLERK:  Thank you.

22   BY MR. FARKAS:

23   Q.  Several of these photos in Exhibit 5.1 including number

24   408, 409, 410, and 411, are those selfie photos?

25   A.  They appear to be, yes.

1    Q.  Meaning that the person was holding a camera and took the

2    photo in the mirror?

3    A.  Correct.

4              MR. FARKAS:  Nothing further, Your Honor.  Thank you.

5              THE COURT:  Redirect?

6              MS. BERG:  No redirect, Your Honor.

7              THE COURT:  Any party wish this witness remain

8    subject to recall?

9              MR. FARKAS:  No, Your Honor.

10             MS. BERG:  Thank you, Your Honor.  Thank you,

11   Sergeant Schwartz.

12             THE COURT:  Recall or not?

13             MR. ENOS:  No, Your Honor.

14             THE COURT:  You are excused from further testimony.

15             THE WITNESS:  Thank you, Your Honor.

16             THE COURT:  Thank you very much.

17             MS. BERG:  The Government would like to call its next

18   witness, Detective Mark Copeland.

19             THE CLERK:  Good morning.  Please approach the

20   witness stand, remain standing, and raise your right hand to

21   be sworn.  After I administer the oath, please affirm by

22   saying "I do."

23                         **MARK COPELAND**,

24   called as a witness on behalf of the Government, having been

25   first duly sworn, testified as follows:

1    THE CLERK:  Please have a seat, state your full name

2   for the record and spell it.

3    THE WITNESS:  Mark Copeland, C-O-P-E-L-A-N-D.

4    DIRECT EXAMINATION

5   BY MS. BERG:

6   Q.  Good morning.

7   A.  Good morning.

8   Q.  What position did you hold in September 2011?

9   A.  I was a detective for the Stanislaus County Sheriff's

10  Department.

11  Q.  Were you contracted to a particular police department at

12  the time?

13  A.  Yeah, Riverbank.

14  Q.  And how long have you been involved with law enforcement?

15  A.  Since 1979.

16  Q.  Now, in September of 2011, when you were with the

17  Stanislaus Sheriff's Office, what were your duties?

18  A.  I was basically general crimes, dealing with burglaries,

19  missing persons, check cases, things like that.

20  Q.  Did you create missing persons fliers?

21  A.  Yes.

22  Q.  Let me turn you specifically to September 2011.  Do you

23  recall being assigned to a case of a missing person regarding

24  Bianca?

25  A.  Yes, I do.

1   Q.  And before this assignment, were you familiar with Bianca?

2   A.  Yes, I was.

3   Q.  And were you aware of Bianca running away before?

4   A.  Yes.

5   Q.  Approximately how many times?

6   A.  About four or five.

7   Q.  Did she always return home?

8   A.  Yes.

9   Q.  Were you contacted by anyone regarding Bianca in October

10  of 2011?

11  A.  Yes.

12  Q.  And what do you recall?

13  A.  I recall talking to Deputy Walsh.

14  Q.  And then was anybody -- else contacted you about Bianca in

15  October of 2011?

16  A.  Yes, I was contacted by, I think it was, Deputy Watson and

17  her mother, I think.

18  Q.  Okay.  Did anyone else from any other law enforcement

19  contact you regarding Bianca missing -- persons --

20  A.  Yes.  I later got contacted by Sergeant -- Sergeant or

21  Detective Schwartz.  I think it is from South San Francisco

22  PD.

23  Q.  What do you recall about being contacted by Sergeant

24  Schwartz of the South San Francisco Police Department?

25  A.  He had arrested somebody there and had located Bianca's

299

1   phone, cell phone.

2   Q.  And did he tell you anything else that might assist in

3   identifying Bianca?

4   A.  He stated that he had gotten her phone and found some

5   photographs of her in the phone.

6   Q.  Did you need to provide him with anything?

7   A.  Yes, I faxed him a copy of the flier that I had -- I had

8   out on her.

9   Q.  Can you turn to Exhibit 6 in the binder.

10  A.  This one?

11          MS. BERG:  Permission to approach?

12          THE COURT:  Yes.

13  BY MS. BERG:

14  Q.  There's one with letters and one with numbers.  Let's go

15  to the numbers.

16  A.  You said 6?

17  Q.  Yes.

18  A.  Okay.

19  Q.  And do you recall this?

20  A.  Yes, I made this.

21  Q.  Oh.  What is Exhibit 6?

22  A.  Exhibit 6 is a missing flier or missing juvenile flier at

23  risk from the Stanislaus County Sheriff's Department Riverbank

24  Substation.

25  Q.  Is it a fair and accurate representation of the flier you

1    prepared?

2    A.  Yes.

3         MS. BERG:  Your Honor, may I move Exhibit 6 into

4    evidence?

5         MS. McGLENON:  No objection.

6         THE COURT:  It is admitted.

7         MS. BERG:  Thank you.  May I publish it to the jury?

8         THE COURT:  Yes.

9         MS. BERG:  Thank you.

10         (Government's Exhibit 6, received in evidence.)

11         MS. BERG:  Indulge me for a moment.  Let me see, is

12    there any way to get this onto the Elmo a little bit better?

13         THE CLERK:  Are you wanting to zoom in on the

14    picture?

15         MS. BERG:  Just make the whole thing a little bit

16    smaller.  Okay.  I apologize for my technological difficulties

17    here.

18    BY MS. BERG:

19    Q.  So let's see if we can refer to this.  So this is the

20    missing juvenile report that you prepared for Bianca; correct?

21    A.  That is correct.

22    Q.  And you sent this to Sergeant Schwartz; is that correct?

23    A.  Yes, I did.

24    Q.  Did you have any further communications with Sergeant

25    Schwartz?

1    A.   I believe I did, but I can't remember when.

2    Q.   During your handling of the missing persons case regarding

3    Bianca, did she return home?

4    A.   Yes, she did.

5    Q.   And did you recall approximately when she returned home?

6    A.   She returned home two weeks before that, I believe.

7    Q.   During your handling of the missing persons case regarding

8    Bianca, did you learn what her birth date was?

9    A.   Yes, I did.

10   Q.   And what is that?

11   A.   February 3rd, 1998.

12   Q.   And did you have any other involvement regarding this case

13   other than sending the missing persons flier?

14   A.   No.

15            MS. BERG:   Thank you.   No further questions.

16            THE COURT:   Cross-examination.

17            MS. McGLENON:   Be just a moment, Your Honor.

18            (Pause in the proceedings.)

19                         CROSS-EXAMINATION

20   BY MS. McGLENON:

21   Q.   Good morning.

22   A.   Good morning.

23   Q.   What is your rank?   How do I refer to you?

24   A.   I was a detective at the time.

25   Q.   Okay.   Detective Copeland, you said that in your

1    experience, Bianca ██████ had run away four or five times?

2            MS. BERG:  Your Honor, we've used the last name --

3            MS. McGLENON:  I'm so sorry.  Bianca.

4            MS. BERG:  Can we strike that?

5            MS. McGLENON:  I request to move to strike.

6            THE COURT:  Granted.

7    BY MS. McGLENON:

8    Q.  That Bianca had run away four or five times?

9    A.  I believe so, yes.

10   Q.  Were you -- you were kind of responsible for the entire

11   investigation regarding her, am I correct?

12   A.  Yes.

13   Q.  And didn't other detectives discuss the fact that she had

14   run away up to 20 times?

15   A.  No.

16   Q.  Okay.  How old was Bianca in the pictures that you put up

17   on that flier?

18   A.  I believe she was 13.

19   Q.  Okay.  Did you -- did you create those pictures?

20   A.  Those pictures were given to me by her mother.

21   Q.  Okay.  So as far as -- did you identify before you put

22   those pictures on the flier, the age that she was in the

23   pictures?

24   A.  I believe so, yeah.  Mother said anywhere from 10 to 12.

25   Q.  Okay, so she was 10 to 12 in those pictures?

1  A.  Right.

2  Q.  Okay.  And is that when she started running away?

3  A.  I don't remember the first time.

4  Q.  Okay.  At the time that she was picked up in this case, or

5  the time that you were talking to her in this case, she was no

6  longer living at home; correct?

7  A.  What time are you talking about?

8  Q.  When you were contacted by Schwartz, was Bianca -- was

9  Bianca living in a group home?

10  A.  When I was contacted by Schwartz, she was still missing as

11  far as I knew.

12  Q.  Okay.  Was she returned to her home, or was she returned

13  to a group home?

14  A.  I remember that she had returned home, and I found out

15  from her mother that she had returned home two weeks earlier,

16  but I didn't know that.

17  Q.  Okay.  So when you created the missing persons flier on

18  9/17/11, she was already back?

19  A.  No, when I was contacted by Detective Schwartz, I think,

20  in October.

21  Q.  Okay.  So that was October 26th?

22  A.  I'm not sure what the exact date was.

23  Q.  Okay.  Did you create a report?

24  A.  Yes, I did.

25  Q.  And you were contacted by FBI Agent Sparrow?

1   A.   I believe so, yes.

2   Q.   Okay.  And then you requested to have an interview with

3   Bianca, right, in October?

4   A.   Yes.

5   Q.   And did you -- did you advise her of her *Miranda* rights?

6            MS. BERG:  Objection, Your Honor.  Relevance.

7            THE COURT:  Okay, sustained.

8   BY MS. McGLENON:

9   Q.   You interviewed her, and you told her that she may have

10  committed a violation of the law under 647(b), correct?

11           MS. BERG:  Objection, Your Honor.  Relevance.

12           THE COURT:  Overruled.

13           THE WITNESS:  Yes.

14  BY MS. McGLENON:

15  Q.   And she asked if she was in trouble; correct?

16  A.   I believe so, yes.

17  Q.   And you told her maybe, but you told her also to tell you

18  the truth; correct?

19  A.   That's correct.

20  Q.   And she had her mom present, and she waived her *Miranda*.

21  Correct?

22  A.   Yes.

23  Q.   Now, at that time, she had a cell phone on her; correct?

24  A.   That's correct.

25  Q.   And were you aware of the cell phone that had been taken

305

1   from the hotel room by Schwartz?

2   A.   Yeah, he booked it in evidence.

3   Q.   Okay.  And he -- had he shown you the pictures that were

4   on there?

5   A.   I believe he -- he sent me some pictures.  I never

6   actually physically saw -- I wasn't there with him.  He either

7   e-mailed me or faxed me photographs.

8   Q.   Okay, and she had a different cell phone on her --

9   different from the one that has been identified by Schwartz as

10  having been found in the hotel room; correct?

11  A.   That's correct.

12        MS. BERG:  Objection.  Lacks foundation.

13        THE COURT:  Overruled.

14        THE WITNESS:  That is correct.

15  BY MS. McGLENON:

16  Q.   And when you went through -- she told you that she had

17  another cell phone from a cousin in San Jose, right?

18        MS. BERG:  Objection.  Calls for hearsay.

19        THE COURT:  Overruled.

20  BY MS. McGLENON:

21  Q.   And if you need to, if your report is there, I'm on page

22  22 of your 24-page report, if you have it.

23  A.   I don't have my report, no.

24  Q.   Okay.  And we'll just muddle through here.

25        She did tell you that she activated a phone after

306

1    Brian Armstrong had taken her phone; correct?

2    A.   She got -- I think she got another phone from a cousin of

3    hers who got her a phone at the store.

4    Q.   Okay, and you talked to her a little bit about that phone,

5    right?

6    A.   I believe so, yes.

7    Q.   And did you -- she had some downloaded pictures on that

8    phone; correct?

9            MS. BERG:  Objection, Your Honor.  Relevance.

10           THE COURT:  Overruled.

11           THE WITNESS:  Yes.

12   BY MS. McGLENON:

13   Q.   And you talked to her about how -- how she -- how she

14   downloaded those pictures from the Internet; is that correct?

15   A.   That's correct.

16   Q.   Okay, and talked about going to Manteca with Brian

17   Armstrong, right?

18   A.   That is correct.

19   Q.   And that she agreed to meet him in Stockton; correct?

20   A.   Correct.

21   Q.   And she identified a photograph that she said Brian -- and

22   that Brian took the photograph of her, and that she -- that he

23   downloaded it onto myRedbook; correct?

24   A.   I believe she took a couple of photographs of herself.

25   Q.   Okay.

1   A.  Then he took one, I think.

2   Q.  Okay.  And that she did not have sex with him; correct?

3   She said that to you?

4   A.  That's correct.

5   Q.  Okay.  And then -- then she left that hotel, right?

6   A.  Yes.

7   Q.  And a nice lady picked her up and took her to Ceres;

8   correct?

9   A.  I believe so, yes.

10  Q.  She never saw Brian Armstrong again after that hotel room

11  in Manteca according to her, right?

12  A.  As far -- yeah, as far as I know, yes.

13  Q.  When she got home to her mother's, they sent -- her mom

14  sent her to San Jose; correct?

15  A.  I believe so, yes.

16  Q.  Okay.  And she said she never met this girl Destiny,

17  right, that was in the hotel room?

18  A.  I believe, yes.  She didn't know who Destiny was.

19  Q.  Okay.  And then -- so really, he met her -- Armstrong met

20  her in Stockton and took her to Manteca, and she said that she

21  got drunk in Manteca?

22  A.  I believe so, yes.

23  Q.  And that -- that they were drinking there.  She got drunk,

24  and that she remembered him taking off her clothes and taking

25  a picture of her.  And, again, she reiterated that she had not

1  had sex with him.

2  A.  I believe that's correct.

3  Q.  And she said that she told you that she was being honest

4  and telling the truth; correct?

5  A.  Yes.

6  Q.  And then that he took her -- took her cell phone -- he,

7  being Brian Armstrong, took her cell phone from her at that

8  time.

9  A.  Yes.

10  Q.  Okay.  And you looked at the Kyocera Laylo that she had on

11  her possession when you were meeting with her; correct?

12  A.  That is correct.

13  Q.  And when you looked at it, you observed numerous

14  photographs that we would now call selfies, different stages

15  with -- some with clothes, and some shots of her breasts and

16  photos of a vaginal area, and she identified those photos that

17  she took of herself; is that correct?

18  A.  That's correct, except for the one I think was taken by

19  somebody else.

20  Q.  Okay.  She said she kept the photographs in a storage unit

21  at the phone company and was able to retrieve them, right?

22  A.  That's correct.  I think she had a cloud account of some

23  type.

24  Q.  Right, and that she brought them and put them on her own

25  phone, according to her, after Brian Armstrong had taken her

1   phone; correct?

2   A.   Correct.

3   Q.   And she was able to download them if she ever lost her

4   phone, right?

5   A.   That's correct.  She was able to get the same phone

6   number.

7   Q.   And she -- there were a couple of pictures of men, one

8   whom she said was a minor; correct?

9   A.   I don't remember that.

10  Q.   Okay.  And she didn't have any other information on Brian

11  Armstrong; correct?

12  A.   That's correct.

13  Q.   And she never heard from him since?

14  A.   As far as I knew, yes.

15  Q.   As far as she told you.

16  A.   Correct, that day.

17  Q.   Yes.  And that she -- she put all the pictures that were

18  on her current cell phone on there herself; correct?

19  A.   I believe she did, yeah.

20  Q.   But either they were selfies, or she downloaded from the

21  cloud?

22  A.   From the cloud, all the pictures she had, she downloaded

23  back into the new phone.

24  Q.   And did you -- you did an interview with her, which you

25  put on a disk; is that correct?  Is that somewhere?

1   A.   I did a report.

2   Q.   Okay.  And there were 56 pages of a phone examination

3   report; correct?

4   A.   I apologize.  I actually interviewed her, and I think it

5   was on a CD.

6   Q.   Okay.

7   A.   And then there was a report done.

8   Q.   Okay.  Thank you.  And have you seen that report?

9   A.   I believe last week.

10  Q.   Okay.  Now, in the times that you have met Bianca, were

11  you aware of an interview -- with Matthew Vierra that she had?

12  A.   I don't recall.

13  Q.   Okay.  Does Matthew Vierra work for the same department as

14  you do?

15  A.   Yes.

16  Q.   Okay.  And did you ever hear about an incident when

17  her mother called her brother and told him to come and

18  discipline her?

19  A.   Yes, I was aware of that.

20  Q.   And what happened there?

21  A.   Her brother got arrested for corporal punishment to a

22  child.

23  Q.   Was that the last time she was placed back in the home, or

24  do you know?

25  A.   I don't know.

311

1    Q.  Okay.  J. Bennett is also someone with your department;

2    correct?

3    A.  He's a deputy.

4    Q.  Okay.  And he prepared a report on -- let's see if the

5    date is here.  Can I show you this report?  This is Bates

6    stamp 385, 386.

7              MS. BERG:  I think you can ask him if he recalls it

8    first.

9    BY MS. McGLENON:

10   Q.  Do you remember seeing this -- the report by -- or

11   discussing this report of Mr. Bennett?  Did Detective

12   Bennett --

13   A.  No, he's just a deputy.

14   Q.  Deputy Bennett -- about Bianca December 24th, 2010?

15   A.  I remember Deputy Bennett did a report, but I never

16   discussed any report with him.

17   Q.  Okay.  So when he writes in there that the reporting

18   party, who would be Bianca's mother, said that she had run

19   away 20 times, that does not comport with your memory?

20   A.  If he wrote that in there, then he may have taken more

21   reports.  I wouldn't necessarily have always got them.

22   Q.  Okay, and maybe the mother didn't always make reports

23   every time she ran away?

24             MS. BERG:  Lacks foundation, calls for speculation.

25             THE COURT:  Sustained.

1          MS. McGLENON:  You don't have to answer that.

2   BY MS. McGLENON:

3   Q.  Did she -- and by "she," I mean Bianca, talk to you --

4   this interview was October 18th, 2011?

5   A.  I don't recall -- I know it was October.  I don't recall a

6   specific date.

7   Q.  Okay.  Did she -- she had stayed with a boyfriend at one

8   point, right?

9   A.  Yes.

10  Q.  And she was worried about his dad; is that correct?  Do

11  you recall that?

12  A.  She was scared.

13  Q.  And what was she scared of?

14  A.  Because she had overheard the dad talking to her boyfriend

15  about trying to turn her into a prostitute.

16  Q.  And so she stopped staying with that boyfriend and that

17  father; correct?

18  A.  She returned home because she was scared.

19  Q.  Okay.  So that time, she went home and not to a group

20  home?

21  A.  I just remember she went home because she was scared of

22  that.

23  Q.  After that boyfriend.

24  A.  No, about what was said.

25  Q.  Okay.  And she had told you at that time that she had had

313

1   sex with that boyfriend; correct?

2   A.  I believe she did, yes.

3   Q.  And in October 2011, that's when you had prepared the

4   flier?  No, you prepared the flier 9/17/11?

5   A.  That's correct.  September 17.

6   Q.  And then in October, you stated that -- you talked about

7   seven other reports.  Does that sound right to you?

8   A.  I can't recall unless I look at my report.

9        MS. McGLENON:  Okay.  May I approach?

10       THE COURT:  Yes.

11  BY MS. McGLENON:

12  Q.  Does that report refresh your recollection?

13  A.  Yes, it does.  It said seven.  That's correct.

14  Q.  And that report and the download of the -- the interview

15  and the download of the pictures, you said you reviewed those?

16  A.  I didn't review the interview of the disk or the pictures.

17  I don't know if we have them anymore.

18  Q.  Okay.  Did you provide them, if you know, to the FBI or to

19  the prosecutor?

20  A.  I don't remember.

21  Q.  Okay.  Thank you.

22       MS. McGLENON:  Nothing further.

23       THE COURT:  And redirect.

24       MS. BERG:  Thank you, Your Honor.

25  ///

314

REDIRECT EXAMINATION

BY MS. BERG:

Q.  Detective Copeland, I just want to go through a couple of
dates with you.  Do you recall that you were contacted by
Sergeant Schwartz on or about October 12th of 2011; is that
right?

A.  I believe it was October 11th, I think.

Q.  Okay.  And you interviewed Bianca approximately
October 26th of 2011; is that correct?

A.  I believe that's correct.

Q.  And that contact with Bianca was in connection with an
investigation regarding Brian Armstrong; is that correct?

A.  That's correct.

Q.  All right.  And you were requested by Sergeant Sparrow to
investigate her in connection with potential crimes by Brian
Armstrong; correct?

A.  That's correct.

Q.  And by the time -- is it also correct that when you had
interviewed Bianca in October 26th, she had already returned
home approximately at the beginning of October?

A.  I believe that's right.  It was about two weeks earlier.

        MS. BERG:  Okay.  No further questions.

        THE COURT:  And recross?

        MS. McGLENON:  No, Your Honor.  Thank you.

        THE COURT:  Any party wish this witness remain

1    subject to recall?

2              MS. McGLENON:  Your Honor, we -- we subpoenaed

3    Detective Copeland.  My only -- I think -- yes, I would like

4    to have him subject to recall.

5              THE COURT:  All right.  Either party may call you

6    still back to testify.  You're still under oath.  I'll leave

7    it to counsel to let you know the date and time if necessary.

8              THE WITNESS:  Thank you, Your Honor.

9              THE COURT:  Thank you.

10             All right, members of the jury, we'll take our

11   morning recess.  Remember the admonition, which is that jury

12   instruction I read to you.  We'll see you in 15 minutes.

13             (The jury left the courtroom.)

14             THE COURT:  All right, the jury has left for its

15   recess.  Anything we need to take up, plaintiff's side,

16   anything?

17             MR. ENOS:  No, Your Honor.

18             THE COURT:  Defense, anything?

19             MS. McGLENON:  Your Honor, I would love to see the

20   DVD of the interview and any download from that particular

21   camera if -- if I have not yet been provided -- that phone.

22             THE COURT:  Okay.  Why don't you folks meet and

23   confer on that.  If there is an issue, you can raise it.

24   Otherwise, if you can agree on something, that's great.

25             Anything else, then?

316

1          We'll take a recess.  There's been a note by a juror.

2    I'm going to have it -- copies made, and I'll give it to you

3    during the break.  We'll be in recess.

4          (Recess.)

5          THE COURT:  Back on the record, outside the presence

6    of the jury.  I had copies of the note given by the jury.

7    Just for your information, however you deal with these, that's

8    fine.  When we get a note from the jury, questions, whatever,

9    I'll always hand it to counsel, and I'll leave it to counsel

10   to determine how you would address it.  If anybody sends in a

11   note that you feel that I should address to the jury, you

12   know, you can't, or whatever, let me know, but I'll just leave

13   it to you folks.

14         I'm just going to mention to the jurors I did receive

15   a note, and they're free to submit notes, and I'll remind them

16   again that sometimes you may not be able to answer their

17   questions.  But with that, anything else before we have the

18   jury come for either side?

19         MS. McGLENON:  Your Honor, are we going to answer

20   that -- the question and just say that -- I can't read what it

21   says on those pictures.  I don't know if anybody else can or

22   whether --

23         THE COURT:  No, you're not required.  It's just more

24   information.  Like I said, I'm going to just mention to the

25   jury, send in notes.  For whatever -- you may or may not be

1    able to respond or comply, or whatever, but that's about it.

2    But I'm not going to require either side to do anything.  If

3    you think something could or should be done, I'll leave it up

4    to you folks.

5         MR. ENOS:  All I can say is that the original of what

6    we printed out will go back to the jury room, and they can

7    look at it closely if they would like, and if they deem it

8    relative to their deliberations.

9         THE COURT:  Let me ask you just as a question.  In

10   terms of all the exhibits, including the graphic exhibits,

11   think about how you want to address those in terms of sending

12   those back to the jury or not.  I'll leave it up to you folks.

13        Okay, that's fine.  Some of them, yeah, I'll just

14   indicate, maybe some exhibits they may not be able to see

15   really clearly.  They can just speak up and ask you to focus

16   in.  And I will say that most of the exhibits will go back to

17   them.  It might be easier to see them -- in front of them in

18   print as opposed to being projected.

19        MR. ENOS:  And, Your Honor, just the Government's

20   intention is whatever exhibits are admitted, with respect to

21   those that are sexually explicit, we would have them have the

22   right to review those.  What I've done, and I've done in prior

23   cases is, I put post-its around the private areas.  That way

24   every other binder only has the photocopy of the post-it, so

25   they're sanitized.  But with the original exhibits going back

1  to the jury, the post-its come off so they can really see what

2  the evidence is.

3          THE COURT:  Okay, that's fine.

4          Okay, anything else, then?  All right, we'll have the

5  jury come in.

6          (Pause in the proceedings.)

7          THE COURT:  Just as a side note for your information,

8  any note that's submitted, you'll obviously have copies of

9  them.  The original I just mark as a court document, so it's

10  in the record.

11          (Pause in the proceedings.)

12          (The jury returned to the courtroom.)

13          THE COURT:  All right, the jury is present.  Please

14  be seated.

15          Before we move forward, I did receive a note from a

16  juror regarding the clarity or lack of clarity of some of the

17  exhibits.  The attorneys are doing the best they can as far as

18  exhibits.  Sometimes photos or the documents are a little

19  grainy, and they can't do much about it.  And sometimes just

20  displaying it on our display machine here just isn't quite as

21  clear.

22          All the exhibits that are received into evidence will

23  be sent back with you, and sometimes it's a little easier once

24  you have the document in front of you to be able to see it

25  more clearly.  But even if that isn't clear, sometimes just

1   the exhibits -- they do the best they can, especially when

2   they're doing copies or copies of copies.  So please bear with

3   us.

4           Another side note on notes, again, feel free at any

5   time to submit notes to the Court.  I just give them to the

6   parties.  If you have any questions about anything that's said

7   or not said, or clarification of terms or words, whatever,

8   that's perfectly good.

9           I will remind you that I have given them to the

10  lawyers.  Sometimes the lawyers cannot respond, for whatever

11  reason.  They don't have the information available to them, or

12  maybe I've made a ruling that something is not admissible.

13  Just keep in mind that even if they don't respond to your

14  specific question, that they take them all very seriously.

15          All right, with that, we'll continue on with the

16  Government's case in chief.  The government may call its next

17  witness.

18          MS. BERG:  The Government calls Detective Sergeant

19  Jeff Morris.

20          THE CLERK:  After I administer the oath, please

21  affirm by saying "I do."

22                          **JEFF MORRIS**,

23  called as a witness on behalf of the Government, having been

24  first duly sworn, testified as follows:

25          THE CLERK:  Please have a seat.  State your full name

320

1    for the record and spell it.

2            THE WITNESS:  Jeff Morris, J-E-F-F, M-O-R-R-I-S.

3                        DIRECT EXAMINATION

4    BY MS. BERG:

5    Q.  You want to get yourself a glass?

6    A.  If you don't mind.

7    Q.  Sure.

8    A.  Thank you.  Sorry.

9    Q.  No problem.  Where do you work?

10   A.  The Sacramento Police Department.

11   Q.  And what is your position?

12   A.  I'm currently a sergeant in the homicide unit.

13   Q.  I'm going to jump right to where we're going in this case,

14   which is in 2012.  Were you asked to assist in the

15   investigation of a child sex trafficking case?

16   A.  Yes.

17   Q.  And what were you asked to do?

18   A.  Detective Stigerts asked me to respond to Tracy,

19   California to show a girl a photographic lineup.

20   Q.  And are you familiar with the procedures for preparing

21   photo lineups?

22   A.  Yes.

23   Q.  And are photo lineups a common investigative tool?

24   A.  Yes.

25   Q.  Approximately how many photo lineups have you prepared.

1   Can you give me a number, or are you more comfortable with how

2   many years you've been doing it?  What's best?

3   A.   It's hard to give a number.  I've been with the Sacramento

4   Police Department for almost 17 years, and before promoting to

5   sergeant, I was a detective for nine years.  And they were --

6   something that were -- it's something that's done in

7   investigations fairly commonly, so it's really hard for me to

8   give a number, but I've done a lot of photo lineups.  I've

9   created a lot.  Shown over nine years worth of work doing them

10  fairly regularly, but it's very difficult for me to give a

11  number.

12  Q.   Fair enough.  What's the procedure for preparing a photo

13  identification lineup?

14  A.   Initially the first thing is you need is a suspect.  And

15  so that's the -- step one of the photo lineup is identifying

16  the suspect that is potentially -- that you want the witness

17  to take a look at.  And then locating on whatever database is

18  being used additional photographs of people who share similar

19  characteristics.  So they don't necessarily need to be twins.

20  They don't necessarily need to look exactly alike, but you

21  want to look for a similar race, same sex, about the same age,

22  and just basically similar characteristics.  So I wouldn't put

23  myself and you in the same photo lineup, but I would find

24  someone, if it was me, that looks fairly similar to me.  If

25  that makes sense.

1  Q.  Okay.  And then so once you have those similar people, do

2  you create what's called a six-pack?

3  A.  Yeah.  That's kind of a, I guess, a slang term, or it's a

4  police term because there are a total of six photographs in

5  the lineup.

6  Q.  All right.  And then once you have that six-pack, is there

7  anything else that you use for these photo ID lineups?

8  A.  There is an admonishment form, and basically it's just the

9  admonishment form is a standardized form that I read verbatim

10  every time I do it.  I don't have the witness -- no matter who

11  the witness is, I don't have them read it themselves.  I

12  actually will read it out loud to the person and make sure

13  that they understand, and I do it the same way every time.

14  Q.  And what do you do after you have read verbatim the

15  admonishment?

16  A.  Sometimes I'll explain it a little bit, just kind of in

17  plain English because it's written in this very formal way and

18  on the admonishment.  So I'll make sure that it's explained in

19  plain English as well.  And then I'll have the witness sign

20  and date the admonishment indicating that they understand.

21  Q.  If you explain it in plain terms, what basically do you

22  say?

23  A.  Well, I'll say the one thing that I -- kind of a standard

24  thing that I say is that, "Just because I'm showing you this

25  photo lineup doesn't mean that you have to pick somebody out.

1    So I just want you to take a look and tell me if anyone looks

2    familiar or you recognize somebody.  Just because I'm showing

3    this lineup to you, don't feel pressured or that you have to

4    pick somebody out."  That's the first thing I say.

5              Then, if you identify the person that I believe to be

6    the suspect, I'm not going to tell you if you're right or

7    wrong, just for the integrity of the investigation, I'm not

8    going to tell you that.  I'll tell them -- I'll ask them not

9    to discuss it with anybody, not to tell anyone that they

10   observed that photo lineup also for the integrity of the

11   investigation.  And then depending on the circumstances, I

12   guess I'll say something about the person might look

13   different -- if the person is in these photos, they might look

14   different now because there is a section that says -- in the

15   admonishment form that says hairstyles and beards and facial

16   hairs very easily change.  And so I'll just kind of confirm

17   that they might look a little bit different now, just

18   basically break it down into plain English after reading the

19   admonishment.

20   Q.  And then what happens next?

21   A.  When I'm with -- with a witness or the victim?

22   Q.  Yes.

23   A.  I will then -- once I've read the admonishment and they

24   have signed the admonishment, I'll show them basically

25   depending on how we're sitting.  If we're sitting across from

1    each other or next to each other, I'll show them the photo

2    lineup, and I just watch and see what they do.

3    Q.  Let me focus you directly on to January 25th of 2012.  Do

4    you recall what investigation you were assisting with on that

5    time?

6    A.  Yes, it was the person's name -- the suspect's name or the

7    victim's name?

8    Q.  Victim's name.

9    A.  ██████.

10   Q.  All right.  And what did you do in connection with this?

11          MR. ENOS:  Motion to strike with respect to the last

12   name, Your Honor.

13          MS. BERG:  Oh, I apologize.

14   Q.  Please reference the --

15   A.  Minor.

16   Q.  You can use the name "Bianca," just no last name.

17   A.  I apologize.  It was the Bianca case.

18   Q.  Okay.  And did you create a photo lineup for the --

19   regarding -- to show Bianca?

20   A.  Yes.

21   Q.  And did you follow the procedure that you just explained

22   to me?

23   A.  Yes.

24   Q.  All right.  Can you turn to Exhibit 7 in the binder, the

25   one that has the numbers.

1          Okay, do you recall what that is?

2   A.   Yes.

3   Q.   It's two pages; correct?

4          And the second page, is that a fair and accurate

5   representation of the photo lineup that you created?

6   A.   This is the photo lineup, and it has my initials that I

7   put on it after I did the lineup.

8   Q.   And back to the first page of the exhibit, is that the

9   admonishment that you provided to Bianca?

10  A.   It is.

11         MS. BERG:  All right.  May I move Exhibit 7 into

12  evidence?

13         MR. FARKAS:  No objection.

14         THE COURT:  All right, it is admitted.

15         (Government's Exhibit 7, received in evidence.)

16         MS. BERG:  May I publish it?

17         THE COURT:  Yes.

18  BY MS. BERG:

19  Q.   All right, let me show Exhibit 7.  This is the

20  admonishment form; correct?

21  A.   It is.

22  Q.   All right.  And it can't get one whole page on the Elmo,

23  so -- there we go.

24         And you provided this to Bianca; is that correct?

25  A.   Yes, I read it to her.  Yes, and then she signed it and

1   wrote her name.

2   Q.   Did you provide your plain language explanation to Bianca?

3   A.   Yes.

4   Q.   And then did you show her the photo lineup?

5   A.   I did.

6   Q.   All right.  And when you showed her the photo lineup, had

7   you already made some handwritten changes to the photo lineup?

8   A.   Yes, and I explained that to her prior to her viewing this

9   lineup.

10  Q.   What did you explain to her?

11  A.   Basically what ended up happening, and I explained this to

12  her, is that when I made the lineup, when I printed it -- can

13  everyone see this what I'm looking at here on those monitors?

14          MS. BERG:  Ask them.

15          JUROR:  Yes.

16          THE WITNESS:  Okay.  You'll notice that there's

17  underneath the top left picture, it says "1" and then number

18  "2," and then number "3."  And then on the bottom, it says

19  number "4," number "5," and number "6" handwritten.  What I

20  noticed, once I got to Tracy, California, was that when it

21  printed, when it printed on the printer in the office, for

22  some reason, it chopped off the numbers, 4, 5, and 6 off the

23  bottom row.  And so right before I gave her the photo lineup,

24  I noticed that.  And so I just told her -- I explained that to

25  her that those numbers really have no significance, and I

1 explained that the 4, 5, and 6 had been printed, but it

2 printed on a separate page, and that I just wrote the numbers

3 in there and basically disregard those numbers.  So those

4 numbers really have no -- not to worry about the fact that

5 those are going to be handwritten on there.  I just tried to

6 explain why that occurred.

7 BY MS. BERG:

8 Q.  All right.  And what happened next?

9 A.  I showed her the lineup.  And we were sitting on -- I

10 think we were sitting on the couch right next to each other,

11 and she immediately pointed to number one and identified him

12 as -- she said either "Richy" or "Ricky."

13 Q.  And then what next?

14 A.  I asked her to circle the photo.  And she initialed her

15 initials, and then I asked her to put the date on there, and

16 that's what you see to the left of photo number 1.  And then I

17 gave her the admonishment form -- well, I asked her how sure

18 she was, and she said that she was positive that that was him.

19 And I gave her the admonishment form and asked her to write

20 what she thought when she saw the lineup, and she wrote, "I

21 recognize number 1 immediately.  That is Ricky or Richy."

22 Q.  And we're referring to the bottom portion of the

23 admonishment; correct?

24 A.  Yes.

25 Q.  And she wrote that in your presence?

1   A.  Right in front of me, yes.  And then after she wrote that,

2   then I wrote my name and my initials and then the date and the

3   time.

4           MS. BERG:  Okay.  No further questions.

5           THE COURT:  Cross-examination.

6                        CROSS-EXAMINATION

7   BY MS. McGLENON:

8   Q.  Sergeant Morris, you said the first thing you need for a

9   six pack is a suspect?

10  A.  Well, in order to do a photo lineup, I have to have

11  some -- I mean, I could make a photo lineup of six random

12  people, but it would have no bearing.  In order to do a photo

13  lineup, I have to have someone to -- to show a victim or

14  witness.

15  Q.  Okay.  But let's say the witness says -- says it was a

16  White guy six-two with a beard and dark hair.  You have to

17  have somebody in mind in order to create a lineup, or can you

18  just put -- you have to have -- that's what you're saying.

19  You have to have someone in mind.  You can't just have a

20  description and go from there.

21  A.  Well, I mean, I think that they -- in order for me to show

22  someone a six-pack photo lineup, there would have to be some

23  reason why based on the description, that I would think that

24  it's a particular person.  And then I would start with that --

25  that starting point.  But if -- let's say it was a random

1    crime.  Someone said it was a White male with a beard, I

2    need -- I would need more than that.  There has to be

3    something else, like maybe I knew at that location, at that

4    house, there is someone that lives there that's a White male

5    with a beard, then I would do a photo lineup.  But I would be

6    starting with that particular personal.  But I wouldn't just

7    normally throw a photo lineup together if I didn't have any

8    idea what I was looking at.  I can remember -- okay, go ahead.

9    I'm sorry.

10   Q.  No, that's all right.  I just -- I learn something new

11   every day.

12   A.  Yes.

13   Q.  And then on your admonition, you still tell them, though,

14   that there is no right or wrong, and that there is not

15   necessarily a suspect in there; is that correct?

16   A.  Well, in the admonishment -- can I reference the exhibit?

17   Q.  Please.

18   A.  The first line is, "The group of photographs may or may

19   not contain a picture of the person who committed the crime

20   now being investigated."  So that's the first line in the

21   admonishment.  And then I just -- I'll repeat that again to

22   the person, basically just saying, "Just because I'm showing

23   you this photo lineup, don't feel like you have to pick

24   somebody out," because I don't want them to feel pressured

25   that they have to pick someone else, so I'll just reiterate

1   that.

2   Q.  And then you don't tell them if they circle one, you don't

3   say, "Oh, that's the wrong guy," or "That's the right guy."

4   A.  No.

5   Q.  And you don't always put the guy in the same position so

6   that -- it's not always number 1?

7   A.  Correct.  Correct.

8         MS. McGLENON:  I have no further questions.

9         THE COURT:  And redirect?

10        MS. BERG:  No, Your Honor.

11        THE COURT:  Any party wish this witness remain

12   subject to recall?

13        MS. McGLENON:  No, Your Honor.

14        MS. BERG:  No, Your Honor.

15        THE COURT:  All right, you are excused.  Thank you

16   very much.

17        MS. BERG:  The Government now calls Parole Officer

18   Wendy Hall.

19        THE CLERK:  Please remain standing and raise your

20   right hand to be sworn.  After I administer the oath, please

21   affirm by saying "I do."

22                     **WENDY HALL**,

23   called as a witness on behalf of the Government, having been

24   first duly sworn, testified as follows:

25        THE CLERK:  Please have a seat.  State your full name

331

1   for the record and spell it.

2          THE WITNESS:  Wendy Jean Hall, W-E-N-D-Y, J-E-A-N,

3   H-A-L-L.

4                    DIRECT EXAMINATION

5   BY MS. BERG:

6   Q.  Good morning, Officer Hall.  Where do you work?

7   A.  I work for the California Department of Corrections.

8   Q.  And what is your position?

9   A.  I'm a parole agent.

10  Q.  And how long have you worked at the California Department

11  of Corrections?

12  A.  Twenty-one years, and I've been a parole agent since 2007.

13  Q.  And what are your duties as a parole agent?

14  A.  I supervise parolees.

15  Q.  And as part of your supervision, did you conduct in-home

16  visits?

17  A.  Yes.

18  Q.  And how often do you do in-home visits of your parolees?

19  A.  Once or twice a month.

20  Q.  Do you recognize the defendant?

21  A.  Um-hmn, yes.

22  Q.  And when did you become the parole agent for the

23  defendant?

24  A.  I started supervising him October 2010.

25  Q.  All right.  Was the defendant convicted in 2001?

332

1   A.   I'll have to look.  Correct.

2   Q.   And he was convicted as an adult?

3   A.   Correct.  Yes.

4   Q.   Now, how often did you interact with the defendant?

5   A.   Once to twice a month.

6   Q.   Did you ever contact the defendant by phone?

7   A.   Yes.

8   Q.   Do you remember his cell phone number?

9   A.   209-409-7070.

10  Q.   All right.  And approximately how often were you -- would

11  you contact the defendant using that cell phone number?

12  A.   Once a month maybe.

13  Q.   Are you familiar with his voice?

14  A.   Yes.

15       MS. BERG:  Your Honor, I'd like to play part of

16  Exhibit 12 for identification.

17       MS. McGLENON:  Your Honor, I would object.

18       THE COURT:  And grounds?

19       MS. McGLENON:  Relevance.

20       THE COURT:  Overruled.

21       MS. BERG:  Thank you.

22  BY MS. BERG:

23  Q.   Do you recall that you listened to a phone conversation

24  taken from the phone records of the Kern County Jail a week or

25  two ago?

1   A.  Yes.

2   Q.  And you are familiar with the defendant's voice as his

3   parole officer?

4   A.  Yes.

5   Q.  When you listened to that call, did you recognize a

6   specific voice?

7   A.  Yes.

8         THE COURT:  I'm sorry, hold on just a second.  Make

9   sure that the part that you're going to play is -- that the

10  defense has been advised of that.

11        MS. BERG:  Yes.

12        MS. McGLENON:  Your Honor, may we approach sidebar?

13        THE COURT:  Sure.

14        (The Court and counsel met outside the courtroom for

15  a sidebar, which was not reported.)

16        THE COURT:  All right, go ahead and proceed.

17  BY MS. BERG:

18  Q.  Okay, thank you for your patience.  We get to move on to a

19  different issue.

20        Let's turn to January of 2012.  The defendant was

21  still on parole at this time; correct?

22  A.  Yes.

23  Q.  Did you conduct a home visit on or about January 24th of

24  2012?

25  A.  Yes.

334

1    Q.  And what did you do during that home visit?

2    A.  I -- it was a routine home visit, and I took a picture of

3    his bedspread.

4    Q.  And did you send those photos to anyone?

5    A.  Yes.

6    Q.  Who did you send them to?

7    A.  Detective Stigerts.

8    Q.  All right.  Can you look in the binder in front of you at

9    Exhibit 8.

10           Okay, do you recognize what's in Exhibit 8?

11   A.  Yes.

12   Q.  And what is it?

13   A.  That is his bedspread.

14   Q.  And did you take those photos that are 8.1 and 8.2?

15   A.  Yes.

16   Q.  And are they a fair and accurate copy of the bedspread

17   that you took photos of on January 24th --

18   A.  Yes.

19           MS. BERG:  Move Exhibits 8.1 and 8.2 in evidence.

20           MS. McGLENON:  No objection.

21           THE COURT:  All right, they are admitted.

22           (Government's Exhibits 8.1, 8.2, received in

23   evidence.)

24           MS. BERG:  May I publish them to the jury?

25           THE COURT:  Yes.

335

BY MS. BERG:

Q.   All right.  So 8.1, this is the defendant's bedspread; correct?

A.   Yes.

Q.   And this is taken from his bedroom; correct?

A.   Yes.

Q.   Let me show you 8.2.  This is the second photograph you took of the defendant's bedspread?

A.   Yes.

Q.   And I will get one better than the photographs here.  I'd like to move exhibit -- you're familiar with the actual bedspread; correct?

A.   Yes.

          MS. BERG:  May I move Exhibit 4?

          MR. FARKAS:  We're not sure what's inside the bag.

          MS. BERG:  May I move Exhibit 4 into evidence, please.

          MR. FARKAS:  No objection, Your Honor.

          THE COURT:  All right, it is admitted.

          (Government's Exhibit 4, received in evidence.)

          MS. BERG:  May I publish it to the jury?

          THE COURT:  Yes.

          MS. BERG:  Permission to approach the witness?

          THE COURT:  Yes.

BY MS. BERG:

1   Q.  Officer Hall, is this the bedspread?

2   A.  Yes.

3   Q.  Did you conduct another home visit on or about

4   January 26th of 2012 of the defendant's home?

5   A.  Yes.

6   Q.  And did he live with his parents at the time?

7   A.  Yes.

8   Q.  All right.  Did you take any photos of that home visit?

9   A.  I did not, but there was phones taken.

10  Q.  And are you familiar with the defendant's home, his

11  bedroom, and --

12  A.  Yes.

13  Q.  -- people in there.  All right.

14          Let me have you look at Exhibit 9, and can you tell

15  me what those are, if you want to look through them all.

16  A.  The front of Ricky Davis' residence.

17  Q.  And that's 9.1?

18  A.  Yes.

19          MS. BERG:  Counsel, may I move Exhibits 9.1 through

20  9.7 into evidence?

21          MS. McGLENON:  No objection.

22          THE COURT:  All right, they are admitted.

23          (Government's Exhibits 9.1 to 9.7, received in

24  evidence.)

25          MS. BERG:  Your, Honor may I move those in?

337

1          THE COURT:  Yes.

2    BY MS. BERG:

3    Q.  Your Honor, may I publish them to the jury?

4    A.  Yes.

5    Q.  All right, let's go through these.  All right, what is

6    Exhibit 9.1?

7    A.  The front of his house.

8    Q.  What is Exhibit 9.2?

9    A.  That's the front dining area, front living room area.

10   Q.  Do you recognize the female in that picture?

11   A.  Yes.

12   Q.  And who is that?

13   A.  She identified herself as Dulcie Camacho.

14   Q.  What is shown in Exhibit 9.3?

15   A.  Ricky Davis' bedroom.

16   Q.  And what is shown in Exhibit 9.4?

17   A.  His bed inside his bedroom.

18   Q.  Again, with the bedspread?

19   A.  Yes.  And his cell phone.

20   Q.  Where is the cell phone?

21   A.  On the bed.

22   Q.  Am I pointing at it?

23   A.  Yes.

24   Q.  What's shown in exhibit 9.5?

25   A.  His bed, bedspread, the remote, TV and his cell phone.

338

1   Q.   What's shown in Exhibit 9.6?

2   A.   His bedroom, the nightstand, his bed, his computer.

3   Q.   And Exhibit 9.7.

4   A.   His bed, bedspread, and telephone.

5            MS. BERG:  I have no further questions.

6            THE COURT:  Cross-examination.

7            MS. McGLENON:  Yes, Your Honor.  All right, it will

8   be just a moment.

9            (Pause in the proceedings.)

10           MS. McGLENON:  Oh, sorry.

11                        CROSS-EXAMINATION

12  BY MS. McGLENON:

13  Q.   Did I hear you describe your going to the house on -- was

14  it January 23rd, 2012 as a routine home visit?

15  A.   Yes, I see him at least once a month, and I went there for

16  a home visit on the 24th.

17  Q.   Right, but it was nothing -- it was not routine, was it?

18  A.   Well, it's what I do.  I had been contacted by Detective

19  Stigerts, and I needed to see him.  And I knew there was an

20  investigation, so I took pictures of the bed.  But I needed to

21  see him.

22  Q.   Okay, but it was at the request of Detective Stigerts;

23  correct?

24  A.   Yes.

25  Q.   And did you e-mail Detective Stigerts?

339

1   A.   When?

2   Q.   On January 24th.

3   A.   Yes.

4   Q.   And you sent him a picture of the blanket; correct?

5   A.   Yes.

6   Q.   And I've identified the e-mail as Exhibit H.

7        MS. BERG:  No objections, Your Honor.

8        THE COURT:  All right.  Defendant's Exhibit H is

9   admitted into evidence.

10       MS. McGLENON:  Thank you, Your Honor.

11       (Defendant's Exhibit H, received in evidence.)

12  BY MS. McGLENON:

13  Q.   Okay.  So you sent attached to this, a picture of the

14  blanket; correct?

15  A.   Yes.

16  Q.   And Detective Stigerts responded that it was a perfect

17  match; correct?

18  A.   Yes.

19  Q.   And then you said, "Right on, I have a feeling his new

20  girlfriend is underage.  She looks young," with multiple

21  exclamation points; correct?

22  A.   Yes.

23  Q.   And then he asked you, "Did you get a name?"  And you sent

24  the name; correct?

25  A.   I don't see that on there.  Okay.  Yes.

340

1  Q.  You know, with e-mails, you kind of have to start from the

2  bottom and go up.

3  A.  Okay.

4  Q.  And you say "Dulcie Camacho."  Correct?

5  A.  Yes.

6  Q.  And that was Dulcie in this picture; correct?

7  A.  Yes.

8  Q.  She was at the house?

9  A.  Yes.

10  Q.  And did you ever talk to Dulcie about her identification?

11  A.  On the 26th, she provided her -- I think it was her

12  California ID.

13  Q.  And she was over 18; correct?

14  A.  I don't remember.

15  Q.  Okay.  Well, let me show you that.

16      This has been previously marked as Exhibit B.  Any

17  objection?

18      MS. BERG:  I have a foundation objection if she can

19  lay the foundation for it.

20      THE COURT:  Sustained.  Just foundation.

21      MS. BERG:  Was it sustained as to foundation?

22      THE COURT:  Yes.

23      MS. BERG:  Thank you, Your Honor.

24  BY MS. McGLENON:

25  Q.  Does that appear to be the California ID of Dulcie

341

1    Camacho?

2    A.   Yes.

3         MS. BERG:   Lacks foundation.

4    BY MS. McGLENON:

5    Q.   Did you see the California ID of Dulcie Camacho?

6    A.   Yes.   Are you talking about the 26th?

7    Q.   Yes.

8    A.   Yes.

9    Q.   And does that appear to be the -- you know what?  You've

10   got her called, so it doesn't matter.

11        Does she appear to be over 18?

12        MS. BERG:   Objection.  Lacks foundation, calls for

13   speculation.

14        THE COURT:   Sustained.

15   BY MS. McGLENON:

16   Q.   Is that a California ID for Dulcie Camacho?

17   A.   Yes.

18   Q.   And does that appear -- does she appear to be over 18 at

19   the time that you were referring to her as looking underage?

20        MS. BERG:   Objection.  Lacks foundation, calls for

21   speculation.

22        THE COURT:   Sustained.

23        (Pause in the proceedings.)

24        MS. McGLENON:   Your Honor, this is a -- I'd like to

25   present this to the Court and have the Court take judicial

342

1    notice of the ID.

2           THE COURT:  Okay.  All right, well, she's already

3    testified as to what it is.  So anything else by the

4    Government?

5           MS. BERG:  You mean defense?

6           THE COURT:  No, Government in terms of foundation,

7    any other objections, because I think the foundation has been

8    laid.  That is what she described as to what she has seen.

9           MS. BERG:  Yes, but -- okay.  The document itself --

10   statements about what it is or is not, we have objections to.

11   The document speaks for itself, so as to the document, yes.

12   We have no objection to presenting that.

13          THE COURT:  All right.  Okay, with that

14   understanding, then, it is admitted.

15          (Defendant's Exhibit B, received in evidence.)

16          MS. McGLENON:  Thank you, Your Honor.

17   BY MS. McGLENON:

18   Q.  And this is the identification of Dulcie Camacho that you

19   saw?

20   A.  Yes.

21   Q.  Okay.  And -- and her date of birth was -- well, I won't

22   ask you any questions about that.  The document speaks for

23   itself.

24          And this is the same young woman that is pictured in

25   the picture, which is 9.2.  Correct?

1  A.  Yes.

2  Q.  Okay.  And whom you referred to in your e-mail?

3  A.  Yes.

4  Q.  Okay.  And you checked that ID.

5  A.  On 1/26, she presented it.

6  Q.  Okay.  How long did you supervise Ricky Davis?

7  A.  There was a parole agent that supervised him prior to me.

8  I started supervising him October 2010.

9  Q.  And you did not violate him for anything; is that correct?

10  A.  Prior to 1/26, no.

11  Q.  Okay.  Thank you.

12          MS. McGLENON:  I have nothing further.

13          THE COURT:  Redirect?

14          MS. BERG:  No, Your Honor.

15          THE COURT:  Either party wish this witness to remain

16  subject to recall?

17          MS. McGLENON:  No, Your Honor.

18          MS. BERG:  No, Your Honor.

19          THE COURT:  All right, you are excused.  Thank you.

20          It's a little bit before 12:00.  We can take another

21  witness, or we can break a little early.  We do have a couple

22  things we need to talk about, but I'll leave it up to you

23  folks.

24          MR. ENOS:  Yes, Your Honor, probably a good idea if

25  we start our next witness right after lunch if that's okay

1    with the Court.

2          THE COURT:  That's fine.  We'll take our noon recess.

3    We need to stay in session.  We have a couple things we need

4    to take up.  But you're excused until 1:30 this afternoon.

5    Remember that admonition, which is that jury instruction.

6          (Jury excused.)

7          THE COURT:  All right, the jury has left for its noon

8    recess.  I just want to report something.

9          On Miss Hall's testimony, there was an objection to

10    playing the portion of Government's Exhibit 12, which is a

11    telephone conversation.  We went out in the hall to discuss

12    it, and it's my understanding the Government wish to play it

13    to this witness simply to identify the speaker, if she could,

14    as being Mr. Davis.  There was an objection regarding that.

15    This is, as I understand it, a telephone call that had

16    occurred fairly recently.  And it would be foundational for a

17    subsequent witness.  The parties agreed that they would

18    stipulate -- there would be a stipulation that the voice on

19    the phone is Mr. Davis'.  That stipulation would be made out

20    of the presence of the jury.

21          Later on, I think there's going to be an objection

22    with respect to Plaintiff's Exhibit 12, and I'll allow the

23    parties to be heard more fully on that.  If I sustain the

24    objection, and the 12 is not played, then the defense could

25    also move to strike the stipulation.

1          Anyway, that's the substance.  I recall the sidebar.

2          For defense side, anything further on that sidebar

3     that you wish to put on the record?

4          MS. McGLENON:  No, Your Honor.

5          THE COURT:  All right, Government, on the sidebar

6     only?

7          MR. ENOS:  No, Your Honor.

8          THE COURT:  Okay.  And, again, I'll leave it to the

9     parties to work out the exact wording of the stipulation.  We

10    can put that on the record maybe right -- well, whenever

11    you're ready, and then proceed forward, with the understanding

12    that the defense did reserve a right to move to strike the

13    stipulation, depending on the Court's ruling subsequently on

14    Exhibit 12.

15         Okay, I also did want to note something else, and

16    just as a caution for everyone.  Make sure you advise your

17    witnesses not to use her last name.  It's been done by two

18    witnesses so far and by counsel.  You were all really good

19    during pretrial proceedings as referring to her by her first

20    name, but then we got to trial, and all of a sudden, her last

21    name has come out several times.  So just caution your

22    witnesses that she's only to be referred to by her first name.

23    Okay.

24         The other thing I want to note is that there was a

25    question, I did sustain the objection.  She stated -- Miss

1    Hall, that she appeared to be over 18.  Again, that's that

2    whole thing of whether or not I'm going to allow opinions

3    regarding whether someone appears to be over 18 or under 18.

4    We still need to get that fleshed out, and I think the best

5    place to flesh all of that out is on the hearing that we're

6    going to have with respect to Mr. Lawson because my ruling on

7    that is pretty much going to dictate my rulings on any other

8    requests to have any witness render an opinion regarding

9    whether or not they believe that someone is over 18 or under

10   18; whether it's Dulcie or Bianca.  So I just want you folks

11   to keep that in mind.

12          All right, now with that, then, any other issues we

13   need to take up before noon recess?  First, plaintiff's side,

14   anything?

15          MR. ENOS:  I don't know if it's before noon recess or

16   not, but Bianca will be the next witness called.  And one of

17   the exhibits we intend to play for her is the jail call from

18   Mr. Davis back in December of 2014.  We can either address

19   that after lunch or now, but it might be a good idea to flesh

20   that issue out before the jury comes back.

21          THE COURT:  Okay, yes.  Why don't we do this:  If we

22   can just get at least the argument so that we can think about

23   it during the noonhour.  And that would be Government

24   Exhibit 12.  Is that the one?

25          MR. ENOS:  That's correct, Your Honor.  What

1    Government Exhibit 12 is, it was originally an 8 minute, 50

2    second phone call from defendant to Bianca -- Bianca through

3    the use of a third party, meaning a three-way phone call.  It

4    originally was 8 minutes, 50 seconds long.  As we stated in a

5    prior, I believe, yesterday, the Government excised any

6    reference that defendant made.  There is one reference about

7    him doing how much time he did with respect to his first

8    conviction.  That's been taken out, so it's probably closer to

9    8 minutes, 25 seconds long.

10           I don't have a transcript of it, but I did take notes

11   with respect to the particular statements that the Government

12   wants to get into.  We're going to ask Bianca if she was

13   called, and I think I know what she's going to say, you know,

14   generally that he wanted me to help her out, something -- help

15   him out, something to that effect.  But at 4 minutes, 58

16   seconds, defendant says, "Be careful around March.  Trial

17   starts.  They'll be looking out for you."

18           And then 6/28 -- the original 6/28, before there was

19   a redaction, "Be on your toes that month.  I'll get you

20   whatever you need."  That kind of thing.  "If you need

21   anything, contact my sister, she'll help you."  And so we

22   think that goes directly to his state of mind of guilt.  And,

23   yes, it is obstruction, and that's something we can handle at

24   sentencing, but it's more than that.  What defendant would

25   basically tell someone not to be available to be subpoenaed,

 1    if they had no problems with that witness testifying

 2    truthfully.

 3            THE COURT:  All right.  Okay.  Now, I assume that's

 4    the -- well, there was a transcript, but we did get a copy of

 5    the FBI investigation report.  It's a seven-page document

 6    dated February 24, 2015.  The copies were made.  Is that the

 7    conversation?

 8            MR. ENOS:  That's the same conversation, Your Honor,

 9    yes.

10            THE COURT:  Because I reviewed that.

11            All right, defense, again, if it's relevant at all,

12    it would go to state of mind as far as -- not obstruction of

13    justice.  We've already agreed that's not a charge in this

14    particular case.  But to tell, in essence, someone, that the

15    inference can be made, hey, you know, and I'm going to use

16    this term very broadly, "disappear," whatever, "be careful of

17    what you say or do" is arguably a consciousness of guilt.

18    Defense side?

19            MR. FARKAS:  Your Honor, I don't believe you can make

20    that inference.  I think even if -- you know, you believe in

21    your innocence 100 percent, you can -- it's to your benefit

22    not to have a witness show up at trial.

23            To me, Your Honor, he doesn't say anything that would

24    indicate that he feels he's guilty of these offenses.  I think

25    he believed -- it could also be inferred that he believes that

1   if Bianca doesn't show up, the prosecution may drop the case,

2   which, you know, obviously is a less risky path than taking it

3   before a jury.  So I don't think that that inference can

4   automatically be assumed from what Mr. Davis says in these

5   phone calls.

6           THE COURT:  All right.  Okay.

7           MS. McGLENON:  Your Honor, also the tape was -- has

8   been altered from what's originally referred to here.  He

9   explains that -- to her, that he was facing life, and that

10  they were trying to have him plead.  And I understand that the

11  jury is not supposed to consider punishment, but that really

12  puts it into context.  And if it's really important to have it

13  be in context, then maybe they shouldn't exclude that.

14          MR. ENOS:  That's actually -- we're mixing up audio

15  recordings.  The reference is to life, Your Honor, we're not

16  planning on introducing that.  That's when I believe

17  Mr. Davis' sister had called Bianca, or at least texted her

18  within Facebook messages.  This one just has to do with

19  references to doing 10 years with respect to a prior

20  conviction.  So there is no references to life even in this

21  exhibit.

22          MS. McGLENON:  Okay.

23          MS. BERG:  That's Exhibit 26.

24          MS. McGLENON:  Okay, sorry.

25          THE COURT:  Okay, a couple concerns I have.  One

1    thing, of course, is his comments regarding -- and I'm looking

2    at that -- the FBI report at essentially pages 4 and 5, when

3    Mr. Davis talks about -- well, on page 5, "They thought they

4    were going to scare me into taking a deal," et cetera,

5    et cetera.  And discussions -- and that's not really relevant

6    under 403, you know.  I just don't think it's appropriate for

7    a jury to get the thought process of someone who is concerned

8    about prison -- not just a concern, but, hey, you know, he's

9    not going to take a deal, et cetera.

10             He does talk in there, however, about being on your

11   toes a couple of times, but I'm not sure -- I agree, you know,

12   inferences can be drawn either way, but the fact that there

13   might be inferences drawn either way what the jury is supposed

14   to do on any piece of evidence, they decide what relevance --

15   not relevance, but they decide how much weight to give to it

16   and what inference can be drawn.  So I'm not necessarily

17   concerned that there could be inferences drawn either way, but

18   it is very sketchy because he talks about helping her out.  I

19   just don't know how that really is sufficiently relevant for

20   me to allow the playing of this particular conversation

21   because although there may be an inference to be drawn that

22   he's trying to influence her, the influence -- the inference

23   might be to disappear, so that she doesn't show up, so that

24   maybe he gets the case dismissed.  And that certainly arguably

25   would be a consciousness of guilt.  But I just -- I really

1    have a problem with -- maybe he's very cautious, speaking sort

2    of in code, but it is problematic.  And then what that leads

3    to is asking her about the conversation not only between her

4    and Mr. Davis, but more importantly, her and Mr. Davis' sister

5    because she says that it's Davis' sister who told her what

6    needs to be done because she says at page 4, "And she told me

7    what I have to do already like to help."  And I don't know

8    what that is.  And if she gets into that, I don't know

9    whether -- whatever her sister, Mr. Davis' sister says can be

10   attributable to Mr. Davis, such that those hearsay statements

11   would be admissible against Mr. Davis.  That's problematic.  I

12   mean, there's some evidentiary issues here, you know, outside

13   of the issue of relevancy, inferences, et cetera.

14           So it's -- it's very vague.  And what I'm concerned

15   about is inferences can be drawn, but from this, I'm just not

16   sure.  The jury would have to draw an inference that

17   Mr. Davis' sister told her what to do, and that Bianca is

18   ready to do it, whatever that is.  And we don't know what that

19   is.  And so that's really a problem.  At this point in time,

20   to the extent there is an objection to playing this portion of

21   Exhibit 12 to Bianca, I'm going to sustain the objection.

22           Now, I'm not sure how long she's going to be

23   available.  I assume that given her situation, her status,

24   that -- I don't necessarily want her to stick around wherever

25   she is for a couple of weeks.  But it's very possible that

1    during the course of her testimony, that I will revisit this

2    issue.  But I am concerned about her conversation with her

3    sister, and I'm not sure that she'd be allowed to testify to

4    that because it would be hearsay.  Her sister's statement to

5    her would be hearsay, and I don't know if I can attribute it

6    to Mr. Davis such that it would be an exclusion to the hearsay

7    rule as some admission, if you will, by Mr. Davis.  So that's

8    a concern.

9         Well, think about it.  At this point in time, my

10   tentative ruling is I'm going to sustain the objection as to

11   any testimony regarding the recent telephone conversation

12   between her and Mr. Davis and also the playing of Exhibit 12.

13        Now, as she testifies, as we go along, I'll keep that

14   in mind.  It is possible the Government can certainly ask me

15   to reconsider that.  We'll see how it goes.  Again, I don't

16   want her necessarily -- if the parties are done with her, I

17   don't want her to stick around for a couple of weeks in case

18   there are any legal issues, but at least tentatively now,

19   that's what I'm thinking.

20        MR. ENOS:  And, Your Honor, just to be clear, the

21   Government is still free to ask her directly if she received a

22   phone call and what her impressions were of that phone call,

23   is that correct, rather than play it?

24        THE COURT:  Rather than play it.  Defense, on that?

25        MR. FARKAS:  Yeah, I don't see why not, Your Honor.

1    Depending -- yeah, at this point.  I don't object to that.

2         THE COURT:  All right.  So that would be allowed.

3         MR. ENOS:  Thank you.

4         THE COURT:  All right.  Now, before we take our noon

5    recess, anything else that we should either take up now or

6    think about before 1:30?  Plaintiff's side, anything?

7         MS. McGLENON:  I made a note of something.  Detective

8    Copeland referred to the -- that there was a -- he had an

9    interview of Bianca, and that, we've never seen, and some

10   pictures that were downloaded from the phone.  And, you know,

11   if those pictures and texts preceded the meeting with Ricky

12   Davis, they would be extremely useful in establishing whether

13   she says -- says that she was over 18.  But also the disk with

14   the interview, we don't have.  I did discuss it with Miss

15   Berg, and her position is, well, that was to prosecute Brian

16   Armstrong.  Our position would be that it would be *Brady*, and

17   we would like to have it.

18        THE COURT:  Okay, Government on that?

19        MR. ENOS:  Well, I can -- Miss Berg can handle the

20   substance of the reports, but what I can say is that

21   everything that we've received from Stanislaus County

22   Sheriff's Office has been forwarded.  There is no privileged

23   log, there is nothing that's been withheld, other than me

24   having copies of things that they have had access to through

25   the Adam Walsh Act.

1          THE COURT:  Well, let me do this.  To the extent

2     that's a new motion for discovery, I'll grant the motion if it

3     does exist, and the parties can review that, and I'll leave it

4     to counsel to make arrangements on that.

5          MS. McGLENON:  And Miss Berg indicated that perhaps

6     it had gone to Schwartz or to the FBI agent who we stipulated

7     about, and so I would just ask that the Government make

8     inquiry and obtain that -- Bianca's statement for us.

9          THE COURT:  Sure.  Now, is it my understanding, then,

10    is Bianca going to be the very first witness after the recess?

11         MR. ENOS:  That's correct, Your Honor.  And if okay

12    with the Court -- I'm glad you brought this up.  If it looks

13    like we're getting close to the end of the day, and she's

14    close to being finished, we would request that we could finish

15    her today because the goal would be to bring her back to

16    Los Angeles tonight.  It's a lot of driving for Detective

17    Stigerts, but that would certainly be in her best interest.

18         THE COURT:  Try to do what you can, then.  And I

19    don't have a preference -- as long as the jury is willing to

20    stay after 4:30, I'm okay with that.  If we can finish her up

21    in a half an hour or so after that.

22         MS. McGLENON:  Your Honor, I really don't have a way

23    to predict.

24         THE COURT:  Sure.

25         MS. McGLENON:  I don't know how long they're going to

1  take.  And we don't have her statement to -- to Copeland.  If

2  we get that, and we either would need to -- and my intention

3  was to play her statements that we have previously -- and I

4  don't know if the Government has some objection to those, but

5  those -- they take a while.

6          THE COURT:  Okay.  All right, well, if we get to

7  4:30, we'll see.  If it looks like there needs to be more,

8  then she'll just have to be back tomorrow morning.  But if you

9  folks agree that she can finish up by 5:00-ish or so, then we

10  can stay a little bit longer.  But we'll see at 4:30.

11          All right, if there is nothing else, then, we'll

12  reconvene at 1:30 this afternoon.

13          (Noon recess.)

14                    **AFTERNOON SESSION**

15          THE COURT:  All right, on the record outside the

16  presence of the jury.  Anything we need to take up before we

17  have the witness come jury come in, plaintiff's side?

18          MR. ENOS:  The only thing that the Government thinks

19  is prudent, just to advise the Court and defense, that we

20  heard before lunch that the defense may play an audio of a

21  interview that Bianca had.  We're going to try to get the

22  substance of both of her interviews with Detective Stigerts

23  out.  And if it turns out that the audio is simply cumulative

24  of that, the Government will object on that basis.  The

25  Government is going to be vigilant with respect to Bianca's

1    cross, including that issue.

2           THE COURT:  Anything else for the plaintiff's side,

3    then?

4           MR. ENOS:  No, Your Honor.

5           THE COURT:  Defense side, anything?

6           MS. McGLENON:  No.

7           THE COURT:  All right, we'll have the jury come in.

8           Miss Gaumnitz has already indicated that when Miss

9    Bianca comes in, she's going to ask her to only state her

10   first name, not her last name.

11          (The jury returned to the courtroom.)

12          THE COURT:  The record will reflect that the jury is

13   present.  We'll continue on with the Government's case in

14   chief.  Government may call its next witness.

15          MR. ENOS:  Thank you, Your Honor.  The Government

16   calls minor Bianca.

17          THE CLERK:  Good afternoon.  Please approach the

18   witness stand.  Please remain standing and raise your right

19   hand to be sworn.  After I administer the oath, please affirm

20   by saying "I do."

21                           **BIANCA**,

22   called as a witness on behalf of the Government, having been

23   first duly sworn, testified as follows:

24          THE WITNESS:  I do.

25          THE CLERK:  Please have a seat and state only your

1  first name for the record.

2           THE WITNESS:  Bianca.

3                          DIRECT EXAMINATION

4  BY MR. ENOS:

5  Q.  Good afternoon, Bianca.  Good to see you.

6           Just before I forget, in a little while, I'm going to

7  ask you some questions about family members, and to be

8  consistent with what the courtroom deputy just said, please

9  don't give me any last names.  Okay?  So if I ask you about

10  your dad or your mom, your sister or brother, just give me

11  first names.  Is that understood?

12  A.  Yes.

13  Q.  Okay, thank you.  What's your birthday?

14  A.  February 3rd.

15  Q.  And what year is that?

16  A.  1998.

17  Q.  Does that make you 17 now?

18  A.  Yes.

19  Q.  Do you understand why you're here today?

20  A.  Yeah.

21  Q.  And why is that?

22  A.  For being at his house.

23  Q.  And when you say "at his house," are you talking about

24  Ricky Davis?

25  A.  Yes.

1  Q.  Do you see Mr. Davis?

2  A.  Yes.

3  Q.  And is he sitting at the table to my left in a white

4  shirt?

5  A.  Yes.

6  Q.  Thanks very much.

7       And do you recall how old you were when you were at

8  his house?

9  A.  About 13.

10 Q.  Thank you, Bianca.

11      At the outset, I'm going to ask you just a few

12 questions about your home life from the time you were born all

13 the way up to the time you were at Mr. Davis' house.  Okay?

14 A.  Okay.

15 Q.  Where were you born?

16 A.  Modesto, California.

17 Q.  Okay, and I'm first going to ask you questions with

18 respect to where you live, and then I'm going to ask you

19 questions with respect to who you lived with from the time you

20 were born until the time you were at the house.  Okay?

21 A.  Okay.

22      MS. McGLENON:  Your Honor, I would object to

23 relevance.

24      MR. ENOS:  Your Honor, this door was opened this

25 morning through the testimony of Mr. Copeland.

359

1          THE COURT:  Well, I'll sustain the objection as to

2    historically from birth to -- we need to get her closer to the

3    time frame involved.  So I'll sustain the objection on that

4    ground.

5          MR. ENOS:  Thank you, Your Honor.

6    Q.  When did you first move to Riverbank?

7    A.  When I was about 12 or 13.

8    Q.  When you were 12?  And before that, did you live in

9    Modesto?

10   A.  Yes.

11   Q.  Okay.  Now, who did you live with when you lived in

12   Riverbank?

13   A.  With my mom.

14   Q.  With your mom?  And did you live with anyone else?

15   A.  No.

16   Q.  Okay.  Now, do you have any brothers or sisters?

17   A.  Yes.

18   Q.  And do you have -- well, have you ever lived with your

19   dad?

20   A.  No.

21   Q.  Who -- how many sisters do you have?

22   A.  I have three sisters.

23   Q.  And how old are they?

24   A.  20, 23 and 34.

25   Q.  And how old -- what's the first name of your 20-year-old

360

1   sister?

2   A.   Marisabel.

3   Q.   Marisabel.  Is that M-A-R-I-S-A-B-E-L?

4   A.   Yes.

5   Q.   What's the name of your 23-year-old sister?

6   A.   Amber.

7   Q.   A-M-B-E-R?

8   A.   Yes.

9   Q.   And how about your oldest sister, the 34-year old?

10   A.   Isela.

11   Q.   And is that spelled Y-S-E-L-L-A?

12   A.   No.

13   Q.   Let me ask you a better question.  How do you spell Isela?

14   A.   I-S-E-L-A.

15   Q.   I-S-E-L-A.  Do you have any brothers?

16   A.   Yes.

17   Q.   How many brothers do you have?

18   A.   Two.

19   Q.   And how old are your brothers?

20   A.   Eight and 31.

21   Q.   How old is your -- what's the name of -- the first name of

22   your 31-year old brother?

23   A.   Jose.

24   Q.   And what's the name of your eight-year-old brother?

25   A.   Frank.

1  Q.  Do you share the same father with any of your five

2  brothers and sisters?

3  A.  No.

4  Q.  Have you ever lived with your father?

5  A.  No.

6  Q.  Have you ever lived -- well, let me ask you this:  Your

7  four oldest siblings, Marisabel, Amber, Isela, and Jose, do

8  they share the same father?

9  A.  Yes.

10  Q.  And what's the first name of their father?

11  A.  Jose.

12  Q.  And your younger brother Frank, does he have his own dad?

13  A.  Yes.

14  Q.  With your mom?

15  A.  Yes.

16  Q.  And what's his dad's name?

17  A.  Frank.

18  Q.  And what is your dad's name?

19  A.  Jose.

20  Q.  So there's two Joses.  Your older sibling's are -- their

21  dad is Jose 1, if I may, and your dad is Jose 2?  Does that

22  make sense to you?

23  A.  Yes.

24  Q.  Okay.  Have you ever lived with your older sisters?

25  A.  Once in awhile.

1    Q.  Once in awhile?  Was there ever a time when your

2    sisters -- when you were very young in age, did you live with

3    your older sisters?

4    A.  Yes.

5    Q.  And was there a point in time when they ultimately moved

6    out of the house where you no longer lived with your sisters?

7    A.  Yes.

8    Q.  When did that take place?

9    A.  When I was about three.

10   Q.  And why did they move out of the house?

11   A.  Because my mom and my sister got in a fight.

12   Q.  Was it a physical fight or an argument or --

13   A.  Physical fight.

14   Q.  And what was the reason why they got in a physical fight?

15          MS. McGLENON:  Your Honor, objection.

16          THE COURT:  Sustained.

17          MR. ENOS:  And just so the record's clear, we're

18   laying a foundation with respect to what Mr. Copeland had

19   discussed with respect to prior one raised, and we're trying

20   to provide some context to that.

21          THE COURT:  Understood.

22   BY MR. ENOS:

23   Q.  Okay.  Let me ask you this:  By the time you were three,

24   you no longer lived with your sisters, right?

25   A.  Yes.

1  Q.  From the age of three -- and where did your sisters go to

2  live?

3  A.  With their dad.

4  Q.  With their dad.  So from the age -- from three forward,

5  did you only live with your mom?

6  A.  Yes.

7  Q.  And did you live with anyone else in addition to your mom

8  once your sisters left the house?

9  A.  My little brothers and Frank.

10  Q.  And was there a time when you lived with -- and did your

11  mom ever marry Frank?

12  A.  No.

13  Q.  So there was a point in time when you lived alone with

14  your mom and her boyfriend Frank; is that right?

15  A.  Yes.

16  Q.  And after a while, your mom and her boyfriend Frank had a

17  son named Frank; is that correct?

18  A.  Yes.

19  Q.  Through the point when you lived in Riverbank, did you

20  still live with your brother Frank?

21  A.  No.

22  Q.  Why not?

23  A.  Because he lived with his father.

24  Q.  And why did he live with his father?

25  A.  Because my mom couldn't support him.

1  Q.  Okay.  And why was that?

2  A.  Because the dad had a better job.

3  Q.  I see.  And you may have already answered this question,

4  but when you moved to Riverbank, how old were you?

5  A.  Twelve.

6  Q.  And you were living alone with your mom?

7  A.  Yes.

8  Q.  Did you get along with your mom at that time?

9  A.  No.

10  Q.  Why not?

11  A.  We just got in a lot of arguments.

12  Q.  Did these arguments ever get physical?

13  A.  Yeah.

14  Q.  I'm not going to delve too deeply about this, but did your

15  mom ever hit you to the point where it led to bruising or

16  anything like that?

17  A.  Yes.

18  Q.  Okay.  And roughly how often did that take place?

19  A.  A few times a month.

20  Q.  A few times a month?

21  A.  Yeah.

22  Q.  And in addition to that, what's your recollection with

23  respect to the amount of time your mom was home when you were

24  living in Riverbank?

25  A.  Can you repeat the question?

1    Q.  Very good.  If I'm going to ask you a confusing question,

2    you ask me that, and I'll clear it up.  Okay?

3              Was your mom home a lot when you were living with her

4    in Riverbank?

5    A.  No.

6    Q.  Where was she?

7    A.  At work.

8    Q.  Anywhere else?

9    A.  Out.

10   Q.  Did she have a boyfriend or anything at that time?

11   A.  She was dating, yes.

12   Q.  Were there nights when you were alone because she wasn't

13   at home?

14   A.  Yes.

15   Q.  And how often was that?

16   A.  A few times a month.

17   Q.  Okay.  So the evenings your mom was not home, who was

18   taking care of you?

19   A.  Nobody.

20   Q.  You were home alone?

21   A.  Yes.

22   Q.  And this is the time when you were in Riverbank?

23   A.  Yes.

24   Q.  Thanks, Bianca.

25              Do you recall your brother, your oldest brother,

366

1    Jose, ever getting in trouble for hitting you?

2    A.   Yes.

3    Q.   What happened then?

4    A.   I had ran away.  And when I went back home, he wanted to

5    figure out where I was, but I didn't tell him, so he hit me.

6    Q.   And did he hit you with any type of device?

7    A.   He hit me with a belt.

8    Q.   Was that ultimately reported?

9    A.   Yes.

10   Q.   What happened to him?

11   A.   He got locked up.

12   Q.   Thank you.

13            Can you recall of any other instances when your

14   brother got locked up for hitting you?

15   A.   No.

16   Q.   Were there any times when your mom was locked up for

17   hitting you?

18   A.   No.

19   Q.   Thank you, Bianca.

20            Now, I'd like to ask you a few questions about the

21   extent you may have run away from home before the night you

22   went to Mr. Davis' house.  Okay?

23   A.   Okay.

24   Q.   You're doing great, by the way.

25            How many times had you run away before?

1  A.  Probably like five times.

2  Q.  Five times.  And when was the youngest age you were, to

3  the best you can recall when you first ran away?

4  A.  Eleven.

5  Q.  Eleven?  So is it fair to say from the age of 11 to 13,

6  you ran away five times?

7  A.  Yes.

8  Q.  And what were the reasons you ran away?

9  A.  Because my and my mom's relationship wasn't good.

10  Q.  And if you can recall, where would you go when you ran

11  away?

12  A.  Just from house to house.

13  Q.  When you say "house to house," were they parents of your

14  friends?

15  A.  No.

16  Q.  No?  What type of houses would you go to when you ran

17  away?

18  A.  Just friends' houses, people that I met.

19  Q.  Okay.  And were these friends themselves adults?

20  A.  Yes.

21  Q.  Okay.  Thank you.

22      Now I'd like to ask you some questions about

23  Mr. Davis.  Okay?

24  A.  Okay.

25  Q.  All right.  At the outset, before -- the night before you

368

1    went to Mr. Davis' house, had you talked to him before?

2    A.   Yes.

3    Q.   What -- under what circumstances did you first meet

4    Mr. Davis?  First talked to him, I should say?

5    A.   Can you repeat the --

6    Q.   Sure.  Sure.  I'm trying to ask you about what your

7    recollection is with respect to the first time you ever spoke

8    to Mr. Davis, either orally, either through words or typing or

9    else wise.

10   A.   Typing.

11   Q.   And in what -- were you on a certain website when you were

12   typing?

13   A.   Yes.

14   Q.   And what website was that?

15   A.   MocoSpace.

16   Q.   What's MocoSpace?

17   A.   I don't know, social media site.

18   Q.   Is it like Myspace?

19   A.   Yes.

20   Q.   Okay.  Are there certain in your opinion -- well, in your

21   experience, a certain type of person that participates in

22   MocoSpace?

23   A.   I'm not sure.

24   Q.   Okay.  Let me ask you this:  In your opinion, there seem

25   to be quite a few Latinos that get on MocoSpace?

1   A.  Yes.

2   Q.  All right.  Do you recall how you first began

3   communicating with Mr. Davis on MocoSpace?

4   A.  I don't remember.

5   Q.  No?  Do you remember whether he first contacted you or you

6   contacted him?

7   A.  I don't know.

8   Q.  You don't remember?

9       How often -- or let me ask you this:  How long do you

10  remember talking to Mr. Davis before you went to his house?

11  A.  Probably a few weeks.

12  Q.  A few weeks?

13      And do you remember roughly how many times you might

14  have communicated with him on MocoSpace before that time?

15      MS. McGLENON:  Your Honor, asked and answered.

16      THE COURT:  Overruled, if you can answer.

17      THE WITNESS:  I don't remember.

18  BY MR. ENOS:

19  Q.  Was it more or less than five, if you remember?

20  A.  More than five times.

21  Q.  More than five?  Okay.

22      Had you ever met Mr. Davis before the night you went

23  to his house?

24  A.  Yes.

25  Q.  And how many times?

370

1   A.   About two.

2   Q.   Two?  And to the best you can recall, under what

3   circumstances was the first time -- and when I mean met

4   Mr. Davis, I'm not talking about typing anymore, but

5   physically seeing him.  Okay?

6   A.   Okay.

7   Q.   And is your answer still two?

8   A.   Yes.

9   Q.   Okay.  To the best you can recall, please describe the

10  first time you met him.

11  A.   I don't remember.

12  Q.   I don't need the time, but do you remember how you met

13  him?  Was it a particular place or for some reason, or

14  anything like that?

15  A.   He picked me up.

16  Q.   He picked you up?

17  A.   Yeah.

18  Q.   And what was the reason for picking you up?

19  A.   To hang out.

20  Q.   To hang out?  And where did you guys hang out?

21  A.   I don't remember.

22  Q.   Okay.  Fair enough.  So at the very least, you recall he

23  picked you up in a car?

24  A.   Yes.

25  Q.   And did you guys drive around?

1    A.   Yes.

2    Q.   Did he give you a ride any particular place?

3    A.   I don't remember.

4    Q.   Okay, fair enough.

5         How about the second time you met him, under -- how

6    did you meet him a second time?

7    A.   We met up.

8    Q.   And when you say you met up, did you meet him at a

9    particular residence, at a house?

10   A.   I don't remember.

11   Q.   What did you do with Mr. Davis the second time you met

12   him?

13   A.   We had sex.

14   Q.   And where did that take place?

15   A.   The apartment.

16   Q.   Do you recall whose apartment that was?

17   A.   I believe it was his sister's.

18   Q.   Okay, and how did you enter that apartment?

19   A.   Through the window.

20   Q.   Why did you enter through the window?

21   A.   Because he said his sister was going to get mad.

22   Q.   Why would his sister get mad if you entered through the

23   front door?

24   A.   I don't know.

25   Q.   Did he say anything about why he thought his sister might

1    get mad?

2    A.   I don't remember.

3    Q.   You don't remember.  Okay, but did you feel like you were

4    being snuck in?

5    A.   Yes.

6    Q.   Okay.  And do you have an opinion why you felt like you

7    were being snuck in?

8    A.   Because I look too young.

9    Q.   Because you look too young?

10   A.   Yeah.

11   Q.   Okay.  Do you recall Mr. Davis saying anything to you

12   about that?

13   A.   I don't remember.

14   Q.   Okay.  Fair enough.  Other than these two instances we've

15   discussed, can you recall any other times you met -- where you

16   physically saw Mr. Davis before the other night you were at

17   his house?

18   A.   No.

19   Q.   Okay.  Do you see me pause?  Sometimes I run way ahead of

20   my notes, and I'm just making sure I catch up.  Okay?

21   A.   Okay.

22   Q.   Bianca, I'd now like to ask you questions about the night

23   you went to his house.  Okay?

24   A.   Okay.

25   Q.   Some of this may be uncomfortable.  If I show you

1   pictures, I just want to let you know and let the record know

2   it's going to be for two, tops three seconds, just long enough

3   to confirm you recognize certain pictures, okay?  Fair enough?

4   A.  Yes.

5   Q.  I just saw you nod "yes."  So the court reporter can

6   correctly transcribe everything, if you nod "yes," don't say

7   "yes," I'll ask you to say how you were nodding, whether it

8   was yes, no, or otherwise.  Okay?

9   A.  Okay.

10  Q.  All right.  Do you remember the evening where you went to

11  Mr. Davis' house?

12  A.  Somewhat.

13  Q.  Somewhat?  Do you remember why you went over to his house?

14  A.  To get a tattoo.

15  Q.  So had you guys previously discussed your getting a

16  tattoo?

17  A.  Yes.

18  Q.  Had you earlier talked about the extent that Mr. Davis may

19  have had some expertise in giving tattoos?

20  A.  Yes.

21  Q.  Okay.  Do you recall what kind of tattoo you wanted?

22  A.  A "Hello Kitty" tattoo.

23  Q.  A "Hello Kitty" tattoo?

24  A.  Yes.

25  Q.  Thank you.

1          Did you communicate with Mr. Davis about meeting him

2    somewhere so you could get your "Hello Kitty" tattoo?

3    A.   Yes.

4    Q.   And what do you remember about that?  Where did he pick

5    you up -- or rephrased, where did you meet him?

6    A.   Down the street from my house.

7    Q.   And to be clear, was your house in Riverbank at the time?

8    A.   Yes.

9    Q.   And where was this place down the street?

10   A.   By the skate park.

11   Q.   I'm sorry, did you say "skate park?"

12   A.   Yes.

13   Q.   All right.  And did Mr. Davis show up?

14   A.   Yes.

15   Q.   And did he pick you up?

16   A.   Yes.

17   Q.   Was it daytime or nighttime?

18   A.   Night.

19   Q.   What happened after he picked you up?

20   A.   Went back to his house.

21   Q.   Went back to his house.

22          I would like to show you a photograph, two

23   photographs that have already been admitted into evidence.

24   Okay?  I'm putting -- I'm putting Exhibit 5.1 on the Elmo.  Do

25   you recognize this photograph, Bianca?

375

1   A.   Yes.

2   Q.   What is represented in Exhibit 5.1?

3   A.   His house.

4   Q.   And when you say "his house," do you mean Mr. Davis'

5   house?

6   A.   Yes.

7   Q.   Thank you.

8        I might have said 5.1.  It's actually Exhibit 9.1.

9   My apologies.

10       I'm also going to show you Exhibit 9.4.  Can you see

11  a picture of that on the screen in front of you?

12  A.   Yes.

13  Q.   Do you recognize what is represented in picture 9.4?

14  A.   Yes.

15  Q.   What is that?

16  A.   His room.

17  Q.   And when you say "his room," do you mean Mr. Davis'

18  bedroom?

19  A.   Yes.

20  Q.   And do you recognize that pursuant to being there one

21  night when you were 13?

22  A.   Yes.

23  Q.   Thank you.

24       When you went to defendant's house that night, was

25  there anyone else in the car?

376

1   A.   No.

2   Q.   Just the two of you?

3   A.   Yes.

4   Q.   And once you got to the house, where did you go from

5   there?

6   A.   To his room.

7   Q.   And was there anyone else in the room at any time when you

8   were in there with Mr. Davis?

9   A.   No.

10  Q.   It was just the two of you?

11  A.   Yes.

12  Q.   Okay.  Do you recall seeing anyone else in the home that

13  night?

14  A.   No.

15  Q.   And just to be clear, "Yes, I recall, and I did not see

16  anyone at the home" or, "No, I don't recall."

17  A.   No, I don't recall.

18  Q.   You don't recall seeing anybody?

19  A.   No.

20  Q.   Did you talk to him once you got into his room about

21  getting a tattoo?

22  A.   Yes.

23  Q.   And did you get a tattoo?

24  A.   No.

25  Q.   How come?

1    A.  He said his tattoo machine was broken.

2    Q.  Okay.  I forgot to ask you an earlier question.

3         Before the night you ever went to defendant's house,

4    had you ever told him how old you were?

5    A.  No.

6    Q.  No?  Do you remember communicating with him on MocoSpace

7    and ever telling him how old you were?

8    A.  Yes.

9    Q.  And how old did you tell him you were?

10   A.  About 16 or 17.

11   Q.  Sixteen or 17?  Okay.  Other than that time on MocoSpace,

12   when you told him you were 16 or 17, do you recall any other

13   times where you may have told him how old you were?

14   A.  No.

15   Q.  Okay.  Thank you.

16        When you told him you were 16 or 17, how old were you

17   really?

18   A.  Thirteen.

19   Q.  Thirteen?  And are you 17 now?

20   A.  Yes.

21   Q.  Okay.  What happened in Mr. Davis' room once you realized

22   you were not going to get a tattoo from him that night?

23   A.  Well, at first, we were just, like, hanging out.  And then

24   after, he started talking about, like, a way to get money.

25   Q.  A way to get money?

1   A.   Yes.

2   Q.   And when you say "a way to get money," was he talking

3   about a way that you could make some money?

4   A.   Yes.

5   Q.   What did he initially tell you with respect to how you

6   could make money?

7   A.   That I just had to go on dates.

8   Q.   Okay.  And at the time, what did you think he meant --

9   what was your belief of what he meant with respect to you had

10  to go on dates?

11  A.   To just spend time with somebody.

12  Q.   So it didn't have anything to do with having sex according

13  to what you thought; is that right?

14  A.   Yes.

15  Q.   And so he told you essentially you could make money by

16  spending time with people?

17  A.   Yes.

18  Q.   Okay.  And what else, after he told you that, what

19  happened next?

20  A.   He -- well, I got undressed, and he started taking

21  pictures.

22  Q.   Why did you get undressed?

23  A.   Because he said it would be sexier for the guys.

24  Q.   Okay, and what did he tell you he planned on doing with

25  these pictures?

1   A.   Well, he said that he was going to post them.

2   Q.   And when you say "post them," does that mean post them on

3   a website?

4   A.   Yes.

5   Q.   What website?

6   A.   MyRedbook.

7   Q.   Do you know what MyRedbook is?

8   A.   I didn't at first, but now I do, yes.

9   Q.   What's your understanding of what "MyRedbook" is now?

10  A.   It's a home site for escorts.

11  Q.   When you say "escorts," is that a different way of saying

12  prostitute?

13  A.   Yes.

14  Q.   Okay, thank you.

15       I'm now going to show you three pictures, okay?  If

16  you want to look in your witness binder, there's a big wide

17  binder next to you, and if you can open up to tab 5 and look

18  for the pictures that say 5.2, 5.3, and 5.4.  And let me know

19  when you've had a chance to look at those.  Okay?  I saw you

20  nod "yes."  Was that yes?

21  A.   Yes.

22  Q.   All right, thank you.

23       Have you had a chance to look at these three photos?

24  A.   Yes.

25  Q.   Who are depicted in each of these photos?  I'll ask you

1    specific questions about them in a minute.

2    A.   Can you repeat the question?

3    Q.   Sure.  I think I use the word "depicted," which is a dumb

4    thing to ask you.  Who is the person in those photos?

5    A.   Me.

6    Q.   Okay.  And you're in all three of them?

7    A.   Yes.

8    Q.   All right.  Now, your witness binder has a version where

9    there's post-its covering up certain things; is that right?

10   A.   Yes.

11   Q.   What I'm going to do for no more than two seconds, just

12   because I want the record and the jury to know exactly what

13   we're talking about is, I'm going to put on the Elmo a picture

14   of 5.2 without the post-its on just so the record is clear

15   that the jury is seeing exactly the picture that is in

16   Exhibit 5.2.  Okay?

17   A.   Okay.

18   Q.   All right.  Have you had a chance to see 5.2?

19   A.   Yes.

20   Q.   Okay.  Do you recognize Exhibit 5.2?

21   A.   Yes.

22   Q.   Who is in that photo?

23   A.   Me.

24   Q.   Where was that photo taken?

25   A.   In his room.

381

1    Q.  When you say "his room," do you mean defendant's room?

2    A.  Yes.

3    Q.  Who took the photo?

4    A.  He did.

5    Q.  What type of device did he take the photo with?

6    A.  His phone.

7    Q.  Was anyone else in the room at the time?

8    A.  No.

9    Q.  Okay.  Just so you know where I'm headed, Bianca, I'm

10   going to ask you the same questions with respect to 5.3 and

11   5.4.  Did I put the picture on the screen long enough for you

12   to be able to recognize it?

13   A.  Yes.

14   Q.  Okay.  Actually 5.3 and 5.4, you probably recognize even

15   from the witness binder; is that right?

16   A.  Yes.

17   Q.  Okay.  I'm actually going to -- these next two will just

18   be for one second each, even shorter than the first.

19        If I put it on so short where you didn't have a

20   chance to recognize what it was, you let me know.  Okay?

21   A.  Okay.

22   Q.  Do you recognize photo 5.3?

23   A.  Yes.

24   Q.  Who's in that photo?

25   A.  Me.

382

1   Q.   Where was it taken?

2   A.   In his room.

3   Q.   When you say "his room," do you mean defendant's bedroom?

4   A.   Yes.

5   Q.   Who took the photo?

6   A.   He did.

7   Q.   Was anyone else in the room at the time?

8   A.   No.

9   Q.   What type of device was the photo taken with?

10  A.   With his phone.

11  Q.   I'm going to do the same thing with 5.4, and that will be

12  the last time I show you the pictures of you on his bed.

13  Okay, there will be one more set of uncomfortable pictures,

14  but this is the last one on the bed, okay?

15  A.   Okay.

16  Q.   You're doing great.

17       Do you recognize 5.4?

18  A.   Yes.

19  Q.   Who is in picture 5.4?

20  A.   Me.

21  Q.   Where was that photo taken?

22  A.   His room.

23  Q.   When you say "his room," do you mean defendant's bedroom?

24  A.   Yes.

25  Q.   Who took the photo?

383

1   A.   He did.

2   Q.   Was anyone else in the room at the time?

3   A.   No.

4   Q.   And what type of device did he take the photo with?

5   A.   His phone.

6   Q.   Did defendant ever tell you that he was going to post

7   those photos on Redbook?

8   A.   I don't remember.

9   Q.   Do you remember that they are -- that you ultimately saw

10  them on Redbook?

11  A.   Yes.

12  Q.   Who do you believe put them there?

13  A.   He did.

14  Q.   Okay.  And how much after -- if you remember -- the night

15  those photos were taken were they posted online?

16  A.   Probably a few days to a week after.

17  Q.   Few days to a week?  Okay, thank you.

18       What happened after those pictures were taken that

19  night in defendant's bedroom?

20  A.   We ended up having sex.

21  Q.   And did he tell you why you guys were going to have sex

22  that night?

23  A.   I don't remember.

24  Q.   You don't remember?  Okay.  And when you say "sex," do you

25  mean normal sex, oral sex, or what are you talking about?

384

1   A.   Both.

2   Q.   Both?  Okay.

3          Do you recall defendant as having any tattoos?

4   A.   Yes.

5   Q.   What do you recall with respect to the extent he has

6   tattoos?

7   A.   He had a few on his chest, and he had one on his penis.

8   Q.   He had a tattoo on his penis?

9   A.   Yes.

10  Q.   And what did it say?

11  A.   It said "porn star."

12  Q.   I'm sorry, "porn star?"  Okay, thank you.

13         Now, I'm going to ask you to look at some exhibits

14  that I'm actually going to try to get admitted through another

15  witness.  So if you can look in your witness binder, Exhibits

16  18.3 through 18.8.  Let me know when you've had a chance to

17  look at those.  And because your witness binder has sanitized

18  versions of those documents, the Government asks for

19  permission to approach the witness so she can look at the

20  unsanitized version, and then I'll lay the foundation to

21  getting -- to attempting to get these admitted through a

22  separate witness.

23         Permission to approach, Your Honor?

24         THE COURT:  Yes.

25  BY MR. ENOS:

1    Q.  And if you would, Bianca, go ahead and look at the

2    exhibits marked 18.3 through 18.8, specifically the pictures,

3    and then I'll take them back.  I'm not going to display them.

4    I don't have permission to.  I haven't even asked.  But I'm

5    going to ask to the extent you recognize who is in those

6    photographs.  Okay?

7            (Pause in the proceedings.)

8            Have you had a chance to review those photos Bianca?

9    A.  Yes.

10           MR. ENOS:  Permission to approach, Your Honor?

11           THE COURT:  Yes.

12   BY MR. ENOS:

13   Q.  Bianca, do you recognize who is in the photographs that

14   have been identified or at least premarked as Exhibits 8.3

15   through 8.8?

16   A.  Yes.

17   Q.  Who is in those photographs?

18   A.  Me.

19   Q.  Is there anyone else who are in these photographs as well?

20   A.  Yes.

21   Q.  And who is that?  Who is the other person in the

22   photographs?

23   A.  Him.

24   Q.  When you say "him," do you mean the defendant?

25   A.  Yes.

386

1    Q.   And are these photographs showing oral sex being given?

2    A.   Yes.

3         MS. McGLENON:  Your Honor, I'm sorry to interrupt.

4    But I get the leading, but I think at some point, she will

5    have to speak for herself without the Government leading.

6         MR. ENOS:  Fair enough.

7    BY MR. ENOS:

8    Q.   What's taking place in the photographs in 8.3 -- I'm

9    sorry, 18.3 through 18.8?

10   A.   Oral sex.

11   Q.   With -- involving who?

12   A.   Ricky.

13   Q.   And when you say "Ricky," you mean defendant?

14   A.   Yes.

15   Q.   Now, I'd like to ask you one more question.  It's not a

16   picture involving you.

17        Permission to approach with respect to 18.10 as well.

18   Again, I'm going to attempt to get these exhibits in through a

19   separate witness, but I do want testimony from Bianca with

20   respect to the extent she recognizes what's depicted in 18.10.

21        Permission to approach?

22        THE COURT:  Yes.

23   BY MR. ENOS:

24   Q.   Do you recognize what is being shown in Exhibit 18.10?

25   A.   Yes.

1   Q.   And what is that?

2   A.   The defendant's penis.

3   Q.   Is there a tattoo on it?

4   A.   Yes.

5   Q.   What does the tattoo say?

6   A.   "Porn star."

7   Q.   I'm sorry, a little louder.

8   A.   "Porn star."

9   Q.   Okay, thank you.  I'm done asking you about photos.  Okay?

10  A.   Okay.

11  Q.   All right.  Bianca, did there become a time around the

12  night you were at defendant's house where you realized that

13  going on dates may not have been what you originally thought

14  it was?

15  A.   No.

16  Q.   No?  Let me ask you this question:  What did you think

17  that going on date meant after you went to defendant's house?

18  A.   I still thought it meant just spending time with a person.

19  Q.   Did there become a time where you thought it meant

20  something different?

21  A.   No.

22  Q.   You always thought it meant just spending time with

23  somebody?

24  A.   Yeah.

25  Q.   Yeah?  Was there ever a time where you thought it meant

388

1    having sex with people?

2    A.   Yes.

3    Q.   When did that take place?

4    A.   When I went on my first date.

5    Q.   Okay.  I'll ask you questions about that now.  How were

6    you contacted when you went on your first date?

7    A.   Well, they texted him first, and then I got a text from a

8    guy.

9    Q.   Okay.  And you said they texted him first.  Was that a

10   single person who texted somebody?

11   A.   Yes.

12   Q.   And who was texted?

13   A.   The defendant.

14   Q.   Okay.  So -- and did this take place after the Redbook

15   photos were posted?

16   A.   Yes.

17   Q.   All right.  And did defendant contact you and let you know

18   that someone had responded?

19   A.   Yes.

20   Q.   And how did that someone contact you?

21   A.   They texted me.

22   Q.   And do you know how that person got your number to text

23   you?

24   A.   From the defendant.

25   Q.   From defendant?  Okay.

1          And that first date, is that when you realized that

2    going on dates meant more than spending time with somebody?

3    A.   Yes.

4    Q.   All right.  Bianca, before that first night, you went to

5    defendant's house, had you ever been involved in any way in

6    prostitution?

7    A.   No.

8    Q.   Had anyone ever asked you to be involved in prostitution?

9    A.   No.

10   Q.   How -- to the best you recall, how did you leave

11   defendant's house that night, the night you were in his room?

12   A.   He dropped me off -- he dropped me off at my house.

13   Q.   He dropped you off back at your house?

14   A.   Yes.

15   Q.   Okay.  And how long after that were you contacted by

16   someone with respect to your first date?

17   A.   Probably a few days after.

18   Q.   Few days after?

19        Bianca, before you testified today, have you been

20   shown a video of you and a friend of yours named Jovana?

21   A.   Yes.

22   Q.   Did you watch that video in its entirety from beginning to

23   end?

24   A.   Yes.

25        MR. ENOS:  The Government represents that this video

1   is identified as Exhibit 14.  And it's also been downloaded,

2   the same video into the Government's computer.

3   BY MR. ENOS:

4   Q.  Did that video fairly and --these are legal terms I have

5   to throw out at you.  Did that video fairly and accurately

6   describe or show the exact video that you took that day?

7   A.  Yes.

8   Q.  And from what device did you take that video?

9   A.  From my phone.

10  Q.  Okay.  Before I get to Exhibit 14, I just want to show you

11  a phone.  Okay?

12          MR. ENOS:  Permission to approach, Your Honor, with

13  what's been preadmitted as Exhibit 3?

14          THE COURT:  Yes.

15  BY MR. ENOS:

16  Q.  I'm going to walk up to you, Bianca, and hand you a phone.

17  Go ahead and look at it as long as you like, and let me know

18  when to the extent you recognize it.  Okay?  And you nodded

19  yes.  Did you mean "yes?"

20  A.  Yes.

21  Q.  Okay.

22  A.  Yes.

23  Q.  Do you recognize the phone that's been marked as

24  Exhibit 3, Bianca?

25  A.  Yes.

1   Q.  And how do you recognize it?

2   A.  It's my phone.

3   Q.  Your phone?  And when did you have this phone?

4   A.  Around the time when this was going on.

5   Q.  Okay.  Around the time that you were at Mr. Davis's house?

6   A.  Yes.

7   Q.  All right, thank you.  And is this the same phone that you

8   took -- the video of you and Jovana with?

9   A.  Yes.

10          MR. ENOS:  Okay, Government moves to admit exhibit

11  14, video.

12          MS. McGLENON:  No objection.

13          THE COURT:  All right, it is admitted.

14          (Government's Exhibit 14, received in evidence.)

15  BY MR. ENOS:

16  Q.  Now, if this video is super loud, I'll do my best to turn

17  it down right at the beginning.

18          (The video was played.)

19  Q.  All right, Bianca, I have stopped the video at second 14.

20  And there is a picture of someone at second 14 of Exhibit 14.

21  Who is that?

22  A.  Me.

23  Q.  And do you have makeup on in that picture?

24  A.  No.

25  Q.  The night you were at Mr. Davis' house, did you have

1    makeup on?

2    A.  No.

3    Q.  To the best you can recall, do you know how -- how many

4    days it was between the time that you were in defendant's

5    house and you took this video?

6    A.  I don't remember.

7    Q.  Do you know if it was within a couple months?

8    A.  Yes.

9    Q.  And, yes, it was within a couple months?

10   A.  Yes.

11   Q.  Is this how you looked the time you were at defendant's

12   house?

13   A.  Yes.

14   Q.  Okay, thank you.  I'm going to go ahead and just play the

15   rest of it.  Okay?

16          (The video was played.)

17   Q.  Do you recall if this video was taken before or after you

18   went to defendant's house?

19   A.  I don't remember.

20   Q.  You don't remember?  You just recall it was within a

21   couple months either way?

22   A.  Yes.

23   Q.  Bianca, do you remember talking to defendant about how to

24   respond to the Redbook ads if people responded to them online?

25   A.  No.

1    Q.   No?  Do you remember talking to the defendant about

2    getting customers?

3    A.   Yes.

4    Q.   And what do you remember in that regard?

5    A.   That that's when I texted him.

6    Q.   You texted him?

7    A.   Yes.

8    Q.   And was that after the Redbook ad was posted?

9    A.   Yes.

10   Q.   Okay.  Do you remember anything else you texted him about?

11   A.   That I needed money.

12   Q.   You needed money?  Do you remember him talking to you

13   about making money other than the night you were in his room?

14   A.   Yes.

15   Q.   Okay.  Do you recall anything else you guys talked about

16   after the Redbook ad was posted?

17   A.   No.

18   Q.   Did you guys talk about where you were going to ultimately

19   be able to make money?

20   A.   Yes.

21   Q.   And where was that?

22   A.   He said a motel.

23   Q.   A motel?

24   A.   Yes.

25   Q.   Okay.  Why did you tell him you needed money?

1   A.   Because I was a runaway at the time.

2   Q.   Okay.  Thank you.

3        In a little bit, I'm going to ask you questions about

4   whether policemen talked to you about this case.  Okay?  But

5   beforehand, I just want to tie up a loose end.  And you said

6   that you learned what going on dates meant the first time

7   someone texted you in response to the Redbook ad.  Is that

8   right?

9   A.   Once I went on a date with him, yes.

10  Q.   Do you remember what the name of the guy you went on a

11  date with?

12  A.   Ben.

13  Q.   Ben?  Who was Ben, if you know?

14  A.   He was just a guy.  I don't know.

15  Q.   Just a guy?  And so after you met with Ben, what happened?

16  A.   Well, we went to the mall, and then he picked out some

17  clothes for me to wear.  And then when we went back to

18  Stockton, because that's where he was from, he got me

19  something to drink, and I got drunk, and we ended up having

20  sex.

21  Q.   Okay.  Do you recall anything else that happened?

22  A.   No.

23  Q.   No?  All right.

24       And how long did you spend time with Ben?

25  A.   For about a week or two.

395

1    Q.  A week or two?  And how did that end?

2    A.  I don't remember.

3    Q.  Do you remember ever meeting someone named Brian

4    Armstrong?

5    A.  Yes.

6    Q.  How did you meet him?

7    A.  Me and Ben had got in an argument, so Ben had kicked me

8    out.  And Brian messaged me about the ad, and he was telling

9    me he could help me, and that's when I went with him.

10   Q.  And when you say "the ad," was that the ad that Ricky

11   posted?

12   A.  No, it was a different one.

13   Q.  Okay.  So did someone put an ad up after the ad the

14   defendant put up?

15   A.  Yes.

16   Q.  And who put that second ad up?

17   A.  Ben.

18   Q.  Okay, was Ben a pimp?

19   A.  I don't know.

20   Q.  You don't know?  All right.  Fair enough.  Okay.

21         But nevertheless, did Ben put up an ad offering you

22   as an escort?

23   A.  Yes.

24   Q.  Okay.  And how did you meet Brian?

25   A.  I met up with him in Stockton at In-N-Out.

396

1    Q.  At an In-N-Out?

2    A.  Yes.

3    Q.  Was that pursuant to you two texting each other?

4    A.  Yes.

5    Q.  And how long were you with Brian?

6    A.  For about a week.

7    Q.  And what did you do with him for that week?

8    A.  He ended up posting another ad.

9    Q.  Okay.  And another ad, does that mean a third ad?

10   A.  Yes.

11   Q.  Offering you up as an escort?

12   A.  Yes.

13   Q.  All right.  And did you still have your pink phone when

14   you met Brian?

15   A.  Yes, but he took it away.

16   Q.  And why did he take it away?

17   A.  Because he wanted to make sure I didn't leave.

18           MS. McGLENON:  Objection.  Objection.  Objection.

19           THE COURT:  Sustained.

20           MS. McGLENON:  Calls for speculation.

21           THE COURT:  Sustained.

22   BY MR. ENOS:

23   Q.  Okay, fair enough.  We'll just stop there.

24           He took your phone away?

25   A.  Yes.

397

1   Q.  And how long were you with Brian?

2   A.  For about a week.

3   Q.  And how did that end?

4   A.  I ended up running away from him.

5   Q.  Where were you when you ran away from him?

6   A.  Manteca.

7   Q.  Manteca?  And where in Manteca?

8   A.  At a hotel.

9   Q.  Do you remember the name of the hotel?

10  A.  No.

11  Q.  That's okay.  Thought I'd ask.

12          Okay, so when you last saw Brian, you were at a motel

13  in Manteca?

14  A.  Yes.

15  Q.  Okay, thank you.

16          After you left Brian, what happened?

17  A.  I went back home.

18  Q.  Went back home?  Okay.  And after you went back home, were

19  you contacted by law enforcement?

20  A.  Yes.

21  Q.  And who first contacted you?

22  A.  The Riverbank Police Department.

23  Q.  Riverbank.  Do you remember the name of the guy who talked

24  to you?

25  A.  No.

1  Q.  All right.  And anyone else after Riverbank contact you

2  that was law enforcement?

3  A.  Yes.

4  Q.  And who was that?

5  A.  Derek.

6  Q.  Derek.  Is Derek sitting in court today?

7  A.  Yes.

8  Q.  At counsel table?

9  A.  Yes.

10  Q.  And is he also known as Detective Stigerts?

11  A.  Yes.

12  Q.  What do you recall talking to him about when you first --

13  the first time you met Derek?

14  A.  We started talking about the ad and the pictures.

15  Q.  Did he show you the pictures that I showed you earlier

16  today?

17  A.  Yes.

18  Q.  And did he ask you where those pictures came from?

19  A.  Yes.

20  Q.  Did he ask you who took the pictures?

21  A.  Yes.

22  Q.  And did he ask you where they were taken?

23  A.  Yes.

24  Q.  What did you tell him?

25  A.  At first I told him Brian in a motel room.

399

1   Q.  And where was the motel room?

2   A.  In Manteca.

3   Q.  So the first time you met with Detective Stigerts, you

4   told him that Brian -- when you say "Brian," do you mean Brian

5   Armstrong?

6   A.  Yes.

7   Q.  Okay.  So he took the pictures, according to you, in a

8   motel room in Manteca?

9   A.  Yes.

10  Q.  Do you remember anything else that you talked about with

11  Detective Stigerts?

12  A.  I don't remember.

13  Q.  Okay.  Did you talk to Detective Stigerts again after

14  that?

15  A.  Yes.

16  Q.  And what did you talk about that second time?

17  A.  We ended up talking about the defendant.

18  Q.  Okay.  And how so?  Did you first tell him about

19  defendant?

20  A.  I don't remember.

21  Q.  What did you tell him the second time you met with him

22  with respect to who took the pictures?

23  A.  Told him the defendant did.

24  Q.  Where did you tell him the pictures were taken?

25  A.  In his room.

1    Q.   I'm sorry?

2    A.   In his room.

3    Q.   In his house?

4    A.   Yes.

5    Q.   Okay.  Did you tell him where this house was?

6    A.   Yes.

7    Q.   And I'll just ask you this:  What city was this house in?

8    A.   Modesto.

9    Q.   Do you remember any close-by streets?

10   A.   Oakdale Road.

11   Q.   Was it on Oakdale Road or near Oakdale Road?

12   A.   Near.

13   Q.   Okay.  Do you remember whether you told Detective Stigerts

14   what defendant's phone number was?

15   A.   I told him, but I don't remember now.

16   Q.   But then you remember telling him what it was?

17   A.   Yes.

18   Q.   And you remember describing what he looked like?

19   A.   Yes.

20   Q.   All right.  Speaking of what defendant looked like, I'd

21   like to go ahead and have you turn the witness binder to

22   Exhibit 7.  Go ahead and look at both pages of Exhibit 7, and

23   let me know when you've had a chance to do so.  Okay?

24        Have you had a chance to look at Exhibit 7?

25   A.   Yes.

401

1   Q.  It's already been admitted into evidence.  I'm just going

2   to ask you a few questions about it.  Okay?

3   A.  Okay.

4   Q.  First of all, how do you remember -- or how do you

5   recognize Exhibit 7?

6   A.  That's when they went to the house.

7   Q.  When you say "the house," was it the house that you were

8   living in at the time?

9   A.  Yes.

10  Q.  Now, who is "they," was it someone from law enforcement?

11  A.  Yes.

12  Q.  And was this presented to you at the house?

13  A.  Yes.

14  Q.  Where was the house?

15  A.  The house was in Tracy.

16  Q.  In Tracy?  Were you living with your mom in Tracy?

17  A.  No, I was in a foster home.

18  Q.  Foster home.  Okay.  I'm going to show you the first page

19  of Exhibit 7, where it says -- where there's a bunch of words

20  on it.  Okay?

21  A.  Okay.

22  Q.  Do you recognize the signature on the first page of

23  Exhibit 7?

24  A.  Yes.

25  Q.  And I know it just shows the first name, but who's

402

1   signature is that?

2   A.   Mine.

3   Q.   And do you remember who wrote the date in?

4   A.   I did.

5   Q.   And also the sentence behind the comments section at the

6   bottom, what's that say?

7   A.   "I recognized number 1 immediately, that is Ricky or

8   Richy."

9   Q.   And who wrote those words?

10  A.   I did.

11  Q.   Thank you.

12        I show you page 2 of Exhibit 7.  Do you see where one

13  of the photos is circled?

14  A.   Yes.

15  Q.   Who circled that?

16  A.   I did.

17  Q.   Do you see initials next to one of the photos, the one

18  that's circled?

19  A.   Yes.

20  Q.   And who wrote those initials?

21  A.   I did.

22  Q.   And do you see a date below the initials?

23  A.   Yes.

24  Q.   Who wrote that?

25  A.   I did.

403

1    Q.   Okay, thank you.

2         When you first told Detective Stigerts about

3    defendant, what did you say his first name was?

4    A.   Richy.

5    Q.   Richy?

6    A.   Yes.

7    Q.   And why did you tell him his name was Richy?

8    A.   Because that's what he told me in the beginning.

9    Q.   And when you say "he," that's what the defendant told you

10   his name was?

11   A.   Yes.

12   Q.   I'm sorry?

13   A.   Yes.

14   Q.   Okay, thanks.

15        The second time you talked to Detective Stigerts, did

16   you also tell him about what you and defendant talked about

17   when the photos were taken?

18   A.   I don't remember.

19   Q.   Okay.  Bianca, have you heard from defendant within the

20   last several months?

21   A.   Yes.

22   Q.   How so?

23   A.   I got a phone call.

24   Q.   And how long ago was that?

25   A.   In December.

1   Q.   And do you recall what you talked about with him?

2   A.   Yes.

3   Q.   What was that?

4   A.   A video.

5   Q.   And what video did you guys talk about?

6   A.   A video that I was supposed to make to help him.

7   Q.   Okay.  And what do you mean by that?

8   A.   I was supposed to say that I lied about everything.

9   Q.   Okay.  Have you lied about everything since the second

10  time you talked to Detective Stigerts?

11  A.   No.

12  Q.   All right.  Do you remember anything else that you talked

13  about with the defendant?

14  A.   He asked me when my birthday was.

15  Q.   What else?

16  A.   About his dad.

17  Q.   Okay.  Anything relating to this case that you recall?

18  A.   I don't remember.

19  Q.   You don't remember?

20       Why do you think he -- what was your impression of

21  why he called?

22  A.   For me to help him.

23  Q.   To help him with what?

24  A.   I don't know, to get the video.

25  Q.   Okay.  And what was that -- well -- I'm not going to ask

1   anything else about the phone call.  At least -- unless I have

2   to later on.  Okay?

3   A.  Okay.

4   Q.  Thank you, Bianca.

5         Subject to what may be asked of you by defendant's

6   attorney, I have nothing else at this time.

7         THE COURT:  Cross-examination.

8                     CROSS-EXAMINATION

9   BY MS. McGLENON:

10  Q.  Hello, Bianca.

11  A.  Hi.

12  Q.  Now, you said here that you were not wearing makeup when

13  you first met Ricky.  Is that true?

14  A.  Yes.

15  Q.  So you were not all hoochied up when you went to his

16  house?

17  A.  No.

18        MR. ENOS:  Objection, Your Honor.  Argumentative, the

19  term "hoochied."

20        THE COURT:  Vague, but she seemed to understand.  So

21  I'll overrule the objection.

22  BY MS. McGLENON:

23  Q.  You had a MocoSpace account; correct?

24  A.  Yes.

25  Q.  And how many names did you have on MocoSpace?

Bianca - X

406

1   A.   Will you repeat the question, please.

2   Q.   What was your name on MocoSpace?

3   A.   Bianca.

4   Q.   Bianca.

5   A.   Yes.

6   Q.   And did you have any other names?

7   A.   No, I don't remember.

8   Q.   Who -- who was Mafia Barbie?

9   A.   That was mine.

10  Q.   And who was Miss Tasty?

11  A.   That was mine.

12  Q.   And how many other names did you have on MocoSpace?

13  A.   I don't remember.

14  Q.   More than 10?

15  A.   Perhaps.

16  Q.   Okay.  And you were Roxy Rodriguez, right?

17  A.   Yes.

18  Q.   And do you have a Twitter name?

19  A.   Yes.

20  Q.   What's your Twitter name?

21  A.   I don't remember.

22  Q.   Okay.  Did you have a name with Tumblr?

23  A.   Yes.

24        MR. ENOS:  Objection, Your Honor.  No foundation with

25  respect to date.

407

1          THE COURT:  All right, go ahead and pursue it.

2    BY MS. McGLENON:

3    Q.  Around the time that this occasion happened, did you have

4    an Instagram account?

5    A.  No.

6    Q.  Okay.  Now -- oh, I'm sorry.  This has been previously

7    marked and admitted as Exhibit A.

8          This is Ricky's MocoSpace; correct?

9    A.  Yes.

10   Q.  And can you see that?

11         THE CLERK:  If you zoom in a little bit, it might

12   clear it up.  There you go.

13         MS. McGLENON:  Okay.

14   BY MS. McGLENON:

15   Q.  And on his MocoSpace, he describes himself; correct?

16   A.  Yes.

17   Q.  And did you describe yourself on your MocoSpace?

18   A.  I don't remember.

19   Q.  Okay.  Now, he described himself as 82 years old, right?

20   A.  Yes.

21   Q.  You didn't think he was 82, did you?

22   A.  No.

23   Q.  Did you describe yourself as 19?

24   A.  Yes.

25   Q.  And that was before the two of you met; correct?

408

1   A.   Yes.

2   Q.   And your -- you said in your first contact with Ricky, you

3   broke into his sister's house through the window --

4           MR. ENOS:   Misstates testimony, Your Honor.  I don't

5   think there was any discussion of a break-in.  It was just

6   going in through a window.

7           THE COURT:   Sustained, form of the question.  Go

8   ahead and rephrase.

9   BY MS. McGLENON:

10  Q.   Okay.  Your testimony was that you went through a window

11  in his sister's house; correct?

12  A.   Yes.

13  Q.   Where was his sister's house?

14  A.   It was in the apartments across the street from the

15  Riverbank High School.

16  Q.   Okay.  And when did you do that?

17  A.   It was the first or second time we met.

18  Q.   Okay.  You never mentioned that in the first two times you

19  talked to Detective Stigerts, did you?

20  A.   No.

21  Q.   Okay.  That was a new piece of information; correct?

22  A.   Yes.

23  Q.   And you climbed through the window to get into that house;

24  correct?

25  A.   Yes.

409

1    Q.  And was his sister home?

2    A.  Yes.

3    Q.  So you climbed in the window and went where?

4    A.  In his room.

5    Q.  He had a room in his sister's house?

6    A.  Yes.

7    Q.  And a room in his mother's house?

8    A.  It was after all this that he moved with his mother.

9    Q.  After all what?

10   A.  The first time I met him, he lived in the apartment with

11 his sister, and then he told me he moved.  And that's when he

12 was with his mom.

13   Q.  And when -- where did you meet the time that you went into

14 the -- the sister's house?

15   A.  I don't remember.

16   Q.  Okay.  Was it in Riverbank or --

17   A.  Yes.

18   Q.  In Modesto?

19   A.  In Riverbank.

20   Q.  Was it at your house?

21   A.  I don't remember.

22   Q.  What did his house -- his sister's house look like?

23   A.  It was an apartment.

24   Q.  Okay.  Just an apartment?

25   A.  Yes.

410

1    Q.   Okay.  What did the room that you went into look like?

2    A.   Well, he had a bed.

3    Q.   Okay.  Was it a different bed from the bed that he had --

4    A.   Yes.

5    Q.   Okay.  How did you know the sister was home?

6    A.   Because that's why he told me I had to sneak in.  And his

7    sister, you could hear the kids and the sister.

8    Q.   When you -- you had a friend who told you about Redbook.

9    Right?

10   A.   No.

11   Q.   No?

12   A.   No.

13   Q.   You didn't ask Ricky to put you on Redbook?

14   A.   No.

15   Q.   When you -- when you went to his house, you told him that

16   you needed money.  Right?

17   A.   This was after.

18   Q.   After what?

19   A.   After he already posted it, I told him I needed money.

20   Q.   So you went to his house, and he took pictures of you;

21   correct?

22   A.   Yes.

23   Q.   And wasn't that at your request?

24   A.   He told me about it, and that's when I agreed to it.

25   Q.   Okay.  And -- and you asked him to do that, right?

411

1    A.   He's the one that suggested it.

2    Q.   Okay.  You told him you needed to make money?

3    A.   When he brought up how the money was made, he told me I

4    just had to go on a date, and I was going to make money.  So I

5    said, okay.  He asked me if I was willing to do it, and I told

6    him yes.

7    Q.   And then you posted it that night, right?

8    A.   I did not.

9    Q.   You did not post it?

10   A.   No.

11   Q.   And did you call him about 45 minutes later and tell him

12   to take it down?

13   A.   I don't remember.

14   Q.   You don't remember.  And did he take it down within 45

15   minutes of putting it up?

16   A.   No.

17   Q.   Okay.  How do you know that?

18   A.   Because when I was with Ben, it was still up.  That's how

19   we got all the pictures.

20   Q.   But didn't you say that Ben posted his own set of

21   pictures?

22   A.   Yes.  No.  We got the pictures from the original ad.

23   Q.   Okay.  When you say "we," you mean you and Ben?

24   A.   Yes.

25   Q.   Okay.  So you had that little phone that's identified

412

1   there, right?

2   A.   Yes.

3   Q.   And you stopped having that phone after Brian Armstrong

4   took it from you, right?

5   A.   Yes.

6   Q.   So that little video of you and your blond girlfriend

7   was -- had to have been before you met Ricky; correct?

8   A.   Yes.

9   Q.   It couldn't have been after.  Right?

10  A.   No.

11  Q.   And you told -- let's see -- so you went with Ben.  Right?

12  A.   Yes.

13  Q.   And he downloaded -- well, let me ask you this:  You

14  told -- you went and met with Detective or Sheriff Copeland,

15  right?

16  A.   Yes.

17  Q.   And he talked to you about the phone and the pictures.

18  Right?

19  A.   Yes.

20  Q.   And you had a new phone, right?

21  A.   Yes.

22  Q.   And it had lots of the same pictures on it.  Right?

23  A.   I don't remember.

24  Q.   Okay.  Did he ask you -- do you recall him asking you how

25  you got the pictures on the new phone?

413

1    A.   No.  I recall him showing me pictures from printed out
2    paper of the ad.
3    Q.   Okay.  And did you -- did you or your mother give Copeland
4    the phone that you currently had?
5    A.   Yes.
6    Q.   And did you tell him that you downloaded pictures from the
7    Internet?
8    A.   I don't remember.
9    Q.   Okay.  Did you download pictures from the Internet and put
10   them on your new phone?
11   A.   I don't remember.
12   Q.   Do you keep pictures -- when you've had phones, do you
13   keep pictures on the Internet and then put them on your new
14   phone each time?
15   A.   No.
16   Q.   No?  Okay.
17        And how many phones have you -- did you have when you
18   were 13?
19   A.   Probably three.
20   Q.   Okay.  How many phones did you have when you were 14?
21   A.   I don't remember.
22   Q.   Okay.  Fifteen?
23   A.   I don't remember.
24   Q.   How many phones do you think you've had?
25   A.   Quite a few.  I'm not sure.

414

1    Q.   Twenty?

2    A.   Perhaps.

3    Q.   Okay.  And each time, are you able to put your pictures

4    from your old phone onto your new phone?

5    A.   Sometimes.

6    Q.   Okay.  Now, there was a picture of you identified as

7    Exhibit F.  May I approach?

8            THE COURT:  Yes.

9    BY MS. McGLENON:

10   Q.   Do you recognize that picture?

11   A.   Yes.

12   Q.   And did you take that picture?

13   A.   Yes.

14   Q.   And did you put those lips on that picture?

15   A.   Yes.

16   Q.   Okay.  Thank you.

17           I request that Exhibit F be admitted.

18           MR. ENOS:  No objection, Your Honor.

19           THE COURT:  All right, it is admitted.

20           (Defendant's Exhibit F, received in evidence.)

21   BY MS. McGLENON:

22   Q.   Now, is this at approximately the same time that you met

23   Ricky Davis?

24   A.   I don't remember.

25   Q.   Okay.  Do you remember talking to Detective Stigerts about

415

1    this picture?

2    A.   I think so.  I'm not sure.

3    Q.   Do you remember him putting it in front of you and asking

4    you about it?

5    A.   Yes.

6    Q.   And do you remember him asking you how you got those put

7    in the background?

8    A.   I don't remember.

9    Q.   Okay.  How did you get those put in the background?

10   A.   With the photo app.

11   Q.   Okay.  How old were you in this picture?

12   A.   Thirteen.

13   Q.   And you're all made up, right?

14   A.   I don't have makeup on, no.

15   Q.   No makeup in that picture?

16   A.   No.

17   Q.   So would that be approximately the way you looked at the

18   time that you met Ricky Davis?

19   A.   Yes.

20   Q.   Thank you.

21        Now, this guy, Ben Martinez, you spent a week with

22   him?

23   A.   Yes.

24   Q.   And did you say you went to the mall and bought clothes?

25   A.   Yes.

416

1    Q.  With him?  And then where were you staying with him?

2    A.  At his house.

3    Q.  At his house.  Okay.  Was he, like, your age?

4    A.  No.

5    Q.  Who did he live with?

6    A.  He lived with his roommates.

7    Q.  Okay.  And now you said that he -- he left you?

8    A.  Yes.

9    Q.  Okay.  And what happened, if you remember?

10   A.  He was talking about getting back with his girlfriend.

11   Q.  Okay.  And so then you went with Brian Armstrong?

12   A.  Yes.

13   Q.  And you met him at the hotel in Manteca or in Stockton?

14   A.  I met him on the streets in Stockton.

15   Q.  Okay.  Had you -- you'd already met him through -- was it

16   MocoSpace?

17   A.  Redbook.

18   Q.  Through Redbook.  Okay.  So you were -- you were still on

19   Redbook?

20   A.  Yes.

21   Q.  Okay.  And you had not seen Ricky Davis in two weeks?

22   A.  I saw him, like, maybe like a week before.

23   Q.  A week before.

24   A.  Yes.

25   Q.  Did you see him -- so there is a time that you saw him

417

1    after those pictures got posted?

2    A.   Yes.

3    Q.   Where did you see him?

4    A.   I went to his house.

5    Q.   Okay.  And how come you went to his house?

6    A.   I don't remember, but I went, and he was talking about

7    having me stay with him.

8    Q.   Okay.  He wanted -- he asked you, he told you that if you

9    needed a place to stay, you could stay with him?

10   A.   Yes.

11   Q.   And -- and is that the time when you and he were texting

12   back and forth, and you said -- but kept asking him to get you

13   people?

14   A.   Yes.

15   Q.   And you asked him to get you customers?

16   A.   Yes.

17   Q.   Okay.  And -- and he didn't, right?

18   A.   No.

19   Q.   Now, you said earlier that you had gone to his house,

20   hoping to get a "Hello Kitty" tattoo?

21   A.   Yes.

22   Q.   And you're sure that that was not to get WSM on your lower

23   back?

24   A.   I'm sure.

25   Q.   Okay.  Did you ever ask him to put WSM on your lower back?

1   A.   Yes.

2   Q.   Okay.  And what is WSM?

3   A.   West Side Modesto.

4   Q.   And he would not do that; correct?

5   A.   No, I changed my mind.

6   Q.   Okay.  And you wanted to switch it to "Hello Kitty"?

7   A.   Yes.

8   Q.   Was he aware that you wanted to switch it to "Hello

9   Kitty"?

10  A.   Yes.

11  Q.   And did he tell you that he could not do a gang tattoo on

12  you?

13  A.   He did not say that.

14  Q.   Okay.  Did he tell you he couldn't put a "Hello Kitty"

15  tattoo on you?

16  A.   No.  I went to his house, and that's when he showed me the

17  tattoo machine was broken.

18  Q.   Okay.  How was it broken?

19  A.   Something about the wires.

20  Q.   Okay.  Okay, see, we've talked about your names.

21       Ricky didn't pay you any money, right?

22  A.   No.

23  Q.   And he was not the only person you met on MocoSpace,

24  right?

25  A.   Yes.

419

1   Q.  He was the only person you ever met on MocoSpace?

2   A.  At that time, yes.

3   Q.  Well, at that time.  So you'd never met anybody before

4   on -- on that website?

5   A.  No.

6   Q.  How long had you been on it?

7   A.  A few months, a year.  I don't know.

8   Q.  Okay.  And you didn't make any friends on that?

9   A.  I didn't meet up with nobody, no.

10   Q.  Okay.  So he's the only person you ever physically met?

11   A.  Yes.

12   Q.  Okay.  You were -- who is David?

13   A.  David?

14   Q.  Um-hmn, when you were talking to Detective Stigerts, you

15   were talking about a guy named David.  Do you remember who

16   that person was?

17   A.  I don't remember.

18   Q.  Okay, was it a made-up person?

19   A.  I don't remember.

20   Q.  Okay.  But he's not a friend that you were with that

21   night.  Right?

22   A.  No.

23   Q.  Did you ever meet Ricky's sister?

24   A.  No.

25   Q.  Did he ever take any money from you?

1    A.   No.

2    Q.   Did he ever entice you?

3    A.   Can you repeat the question?

4    Q.   Did he ever entice you?

5    A.   Can you explain?

6    Q.   Did he ever invite you to do anything that you did not

7    want to do?

8    A.   No.

9    Q.   He never provided people to you; correct?

10   A.   Just Ben who texted me.

11   Q.   Okay.  Let's talk about Ben who texted you.  Originally

12   when that thing went up, did it have your phone number on it?

13   A.   No.

14   Q.   Okay, so originally it had Ricky's number on it, right?

15   A.   Yes.

16   Q.   And then you told him to change the number, or did he tell

17   you to change the number?

18   A.   He never changed it.  When I made my own ad, I put my own

19   number.

20   Q.   Okay.  And no one -- so no one ever responded to his ad.

21   Right?

22   A.   I don't know if they did.  They texted him because I

23   didn't get anything.

24   Q.   So you made your own ad.  Was that the next day?

25   A.   No, that's when I went with Ben.

1   Q.  Okay.  And -- what period of time was that?

2   A.  Like a few days or a week after.  The night -- the

3   defendant --

4   Q.  And did you -- did you ever -- other than Ben and that

5   text, did you ever go with anyone based on the ad that you and

6   Ricky made?

7   A.  No.

8   Q.  When you were talking to -- to Detective Stigerts, did

9   you -- did you tell him that you didn't know whether Brian

10  Armstrong got your number off Facebook or from Moco?

11  A.  I don't remember.

12  Q.  Okay.  You said your friend David dropped you at In-N-Out.

13  Was that true?

14  A.  Yes.

15  Q.  And who is David?

16  A.  He was the guy that picked me up because I was walking in

17  Stockton.

18  Q.  Okay.  And was that before or after you met Ricky?

19  A.  After.

20  Q.  Okay.  And is that -- how did you get to Stockton?

21  A.  Ben.

22  Q.  Okay.  Is that where Ben left you?

23  A.  Yes, because that's where he lived.

24  Q.  Okay.  So did he take you -- did Ben take you someplace

25  from his house where you had been staying?

Brian - X

422

1   A.   We went to a hotel.

2   Q.   Okay, and then when you left the hotel, because you

3   weren't -- or did he just leave you at the hotel?

4   A.   I left it.

5   Q.   Okay, you left the hotel?

6   A.   Yes.

7   Q.   And you were just walking down the street?

8   A.   Yes.

9   Q.   And you met David?

10  A.   Yes.

11  Q.   And David picked you up?

12  A.   Yes.

13  Q.   And how long did you stay with David?

14  A.   He just gave me -- as soon as he picked me up, he gave me

15  a ride to the In-N-Out, and that was it.

16  Q.   Okay.  Had you ever met him before?

17  A.   No.

18  Q.   Ever seen him since?

19  A.   No.

20  Q.   Okay.  What did he look like?

21  A.   I don't know.  He was Mexican.

22  Q.   Okay.  So he dropped you at the In-N-Out.  And then

23  Detective Stigerts asked you whether David knew what you were

24  doing when you went with Brian.  So had you planned to meet

25  Brian at the In-N-Out?

1   A.  Yes, because Brian sent me a picture of money, and he said

2   he could help me, so I told Brian to meet me there, and that's

3   when I went over there and met up with him.

4   Q.  Okay, and you have any idea what that was all about?

5   A.  At first, no.

6   Q.  Okay.  Were you starting to get your suspicions that

7   perhaps when Brian took a picture -- was that like on a bed --

8   A.  He sent me a picture of money, and he said he could take

9   care of me, so that's when I went to go meet up with him.  He

10  said he could help me, and that's when he started explaining

11  he still wanted me to be doing what I was doing.

12  Q.  Okay, because you were already doing that.

13  A.  Yes.

14  Q.  Okay.  Were you trying to -- you like Detective Stigerts,

15  right?

16  A.  Yes.

17  Q.  And you wanted to -- to please him.  Right?

18  A.  Yes.

19  Q.  And is that why you would -- when he would ask you a

20  question, if he seemed not to like the answer, you would

21  change your answer?

22  A.  I lied --

23          MR. ENOS:  Objection.  Lacks foundation.

24          THE COURT:  Overruled, if you can answer.

25          THE WITNESS:  I lied about a lot of the stuff at

424

1    first, but then I became more honest with him towards the end.

2    BY MS. McGLENON:

3    Q.  Okay.  And -- okay.

4         You made some other videos on your Facebook.  Right?

5    A.  Yes.

6    Q.  And -- -- may I approach, Your Honor?

7         THE COURT:  Yes.

8    BY MS. McGLENON:

9    Q.  Do you recognize that?

10   A.  Yes.

11   Q.  And what is that?

12        MR. ENOS:  Can the Government know what we're looking

13   at?

14        MS. McGLENON:  It is Exhibit C.

15   BY MS. McGLENON:

16   Q.  Do you recognize that?

17   A.  Yes.

18   Q.  And what is it?

19   A.  It's my Facebook.

20        MR. ENOS:  Your Honor, in light of the date of this,

21   the Government objects on relevance and 403 grounds.

22        THE COURT:  All right.  Okay, let me take it under

23   submission.  We'll take it up at the break.

24   BY MS. McGLENON:

25   Q.  Okay.  How many Facebook friends do you have?

425

1   A.   A lot.

2   Q.   Over 6,000?

3   A.   Yes.

4   Q.   Okay.

5        MR. ENOS:   Likewise, objection to relevance.

6        THE COURT:   All right.   Sustained for now.

7   BY MS. McGLENON:

8   Q.   Did you have a Facebook page in 2010?

9   A.   I don't remember.

10  Q.   Did you have a Facebook page in 2011?

11  A.   Yes.

12  Q.   Did you have a Facebook page at the time you met Ricky?

13  A.   I don't remember.

14  Q.   Okay.   You met him in about September?

15  A.   Yes.

16  Q.   2011.

17       And did you have a Facebook page or only the

18  MocoSpace?

19  A.   I don't remember.

20  Q.   This -- I'm going to show you a picture -- it's the front

21  thumbnail from Exhibit C.   I don't know if you'll recognize

22  it.   Do you recognize that?

23  A.   Yes.

24  Q.   And what is that?

25  A.   That's my video.

426

1   Q.  Okay.  And how old were you when you made that video?

2   A.  Thirteen.

3   Q.  Okay.  So it's about the same time?

4   A.  Yes.

5   Q.  Okay.  Thank you.  And what was -- do you have an

6   objection?

7           MR. ENOS:  It depends if you're planning on showing

8   the picture or playing the video.

9           MS. McGLENON:  Well, let's start with the picture.

10          MR. ENOS:  No objection.

11          THE COURT:  So that's admitted into evidence?

12          MS. McGLENON:  Yes.

13          THE COURT:  Okay, that would be --

14          MS. McGLENON:  Let's call it C-1.  Wait, let me make

15  sure -- I'm going to cross out the name.

16          MR. ENOS:  Oh, thank you.

17          THE COURT:  All right, Defense Exhibit C-1 is

18  admitted into evidence.

19          (Defendant's Exhibit C-1, received in evidence.)

20          THE COURT:  This is probably a good time -- we'll

21  take our afternoon recess.  Remember the admonition.  We'll

22  take a 15-minute recess.

23          (Jury was excused.)

24          THE COURT:  All right, can you step outside just for

25  a little bit.

1          (The witness left the courtroom.)

2          THE COURT:  All right, still on the record out of the

3     presence of the jury.  Defense Exhibit C, the Facebook.  I

4     think there was a relevancy objection.

5          MR. ENOS:  Yes, Your Honor.  The dates -- I'm looking

6     on that.  Appears it's 2014.  Has no bearing on this case

7     whatsoever.

8          THE COURT:  Defense?

9          MS. McGLENON:  Well, Your Honor, the video she just

10    identified as being at the exact same time.  I don't know -- I

11    can understand why -- I don't -- you know, she had 6,403

12    followers.  She says she went to Regency High School from 2014

13    to 2014 and lives in Modesto.  I -- I don't -- the only reason

14    that we don't have the Facebook from the time period is

15    because we've got what we took off at that time.  Like, for

16    example, this picture on the front says that it's at least

17    2012.  I don't know when it got posted or taken, but it's very

18    close in time to the time period.  And I think -- and the -- I

19    guess the December 15th to 25th, one of the twerking, we might

20    have some other questions about, but I don't see why this

21    video from 2012, why there's anything wrong with it.

22         MR. ENOS:  Well, to respond to that, Your Honor,

23    first of all, this video has never been played to me.  I

24    happen to be fortuitous enough during our IT meeting pretrial

25    to realize that it includes a multitude of references about

1    Bianca's sexual history.  It's exactly what we've been arguing

2    ad infinitum on January 7th and March 2 about it staying out.

3    But for me seeing that, I wouldn't have even know what it

4    depicted.  I do know what it depicts.  Bianca testified that

5    that was around the time of the incident.  So if they want to

6    show another picture what she looked like with makeup and

7    glasses on, okay.  But as far as the content of that video,

8    that's precisely what this Court had ruled to be excluded from

9    evidence based on Rule 412, which is very clear.

10             MS. McGLENON:  Your Honor, it doesn't talk about --

11   it talks about her stealing and her lying and all of the

12   things that she shoplifted on that day.  And the only -- my

13   recollection, the only discussion at all of sex is she

14   describes herself as bisexual.

15             MR. ENOS:  More than one time.

16             MS. McGLENON:  More than one time.

17             THE COURT:  Okay, well, I'm going to sustain the

18   objection on relevancy and 403 grounds.  But the -- as I

19   understand, C-1, the photo of her is in evidence.

20             Anything else before we take our break?  Plaintiff's

21   side, anything?

22             MR. ENOS:  The only thing is -- and I think the

23   parties are in agreement on this, that C-1 is in evidence once

24   we redact Bianca's middle and last names.

25             MS. McGLENON:  Middle name is out too?  I can do that

1    right now.

2         Your Honor, I'd like a clarification as to whether I

3    can play the interview of Stigerts and Bianca.

4         MR. ENOS:  The Government would -- first of all, are

5    we talking about the first or second interview?

6         MS. McGLENON:  Both.

7         MR. ENOS:  The Government objects to that as

8    cumulative.  Bianca has already testified that she told him

9    one story the first time, and she told him the second story

10   the second time.  It's just -- you know, the Court knows, I'm

11   going to be vigilant about turning this into a witch-hunt

12   against the minor, and we've already got testimony about that.

13   The recordings are consistent with that.  If there is

14   particular matters to which they think they can impeach her,

15   maybe we can address that outside the presence of the jury.

16   So this is just going over stuff that we've already gotten out

17   of this witness.

18        MS. McGLENON:  Your Honor, this is not a witch-hunt,

19   number one.

20        Number two, the first time I've ever heard about her

21   going over to the sister's house and going through the windows

22   and having sex at a place that she identifies as his house,

23   you know, that makes me want to bring Miss Hall back.  You

24   know, she said that he's lived at his parents house the entire

25   time, and now this girl's got him breaking in the windows and

1   going and having sex on a bed in a room that he claims is --

2   that she says he said he lived there, and that the sister and

3   all the kids were there.  And this is the first time -- so

4   we've got a whole third story.  And I think it's important for

5   the jury to hear exactly what she said to this detective in

6   her multitude -- she lies like breathing.  And I think it's

7   important for the jury to know that.

8           THE COURT:  All right.

9           MR. ENOS:  Your Honor, defense counsel has already

10   gotten out of her, "You didn't tell Detective Stigerts that

11   the first few times you talked to him, right?"

12         "No."

13         It's already been resolved.

14           THE COURT:  But still there is context with respect

15   to -- it's one thing to say, "Well, I lied and now I'm telling

16   the truth."  It's another thing the extent of the lies.  So

17   I'm not sure how long the video is.  I'll overrule the

18   objection.  Are we talking about one video or two?

19           MS. McGLENON:  Your Honor, they're not videos.

20   They're audio, and there are two.  The first one is split --

21   it's 30 minutes and 10 minutes.  And the second one is 20

22   minutes.

23           THE COURT:  That's pretty long.  And it encompasses

24   both video, the full length?

25           MS. McGLENON:  Your Honor, Mr. Farkas has a

1    suggestion, which is that the second one where she talks about

2    Ricky Davis, because in the first one, she never mentions him.

3    So I could just ask her, "The first time you met Stigerts, you

4    never talked about Ricky Davis."  Then the second time after

5    they -- you gave a description.

6            THE COURT:  All right.  Okay, so the first video will

7    not be played, but you can ask her obviously on the first time

8    that she had the video interview -- or the audio, I guess it's

9    audio now -- did she ever mention Mr. Davis.  If she says no,

10   then move on, then the second interview can be played.

11           MS. McGLENON:  I'm sorry.

12           THE COURT:  Are we okay, then?  Not okay, but do you

13   understand what the ruling is?

14           MR. ENOS:  Just the second video, but the first

15   video, the defense counsel cleaned that up.  I asked her if

16   she never mentioned Mr. Davis.

17           THE COURT:  Yes, correct, and Miss McGlenon says that

18   she then doesn't need to play the first video, but she will

19   play the second video.

20           MR. ENOS:  And how long is the second video?

21           MS. McGLENON:  Twenty minutes.

22           MR. ENOS:  Is it something that we're expected to get

23   to today?

24           MS. McGLENON:  I think we can get to it right away.

25           MR. ENOS:  Your Honor, pursuant to what the parties

1   had discussed with the Court this morning, Detective Stigerts

2   at lunch time contacted Stanislaus County, and I understand --

3   what is there that they have?

4           DETECTIVE STIGERTS:  They stated there was a disk, I

5   believe, that was the interview that Detective Copeland did

6   and also pages of pictures.  So actual hard copy of pictures

7   is what I understood that they still had in evidence.

8           THE COURT:  All right.

9           MR. ENOS:  And so we did not know that, and so we're

10  going to have that here tomorrow; is that right?

11          DETECTIVE STIGERTS:  Depends if I have to drive to LA

12  tonight or not.

13          MR. ENOS:  Okay.

14          DETECTIVE STIGERTS:  It will be here tomorrow.

15          MR. ENOS:  It will be here tomorrow, but my

16  presumption is we would need Bianca here to potentially

17  discuss that as well.

18          THE COURT:  All right.  Sure.  Okay.

19          All right, so if there is nothing else now, we'll

20  take our 15-minute recess now.  Go ahead and get organized.

21  Let me and Miss Gaumnitz know what you're going to designate

22  that video as in terms of exhibit number.

23          All right, we'll see you in 15 minutes.

24          (Recess.)

25          THE COURT:  All right, back on the record outside the

1    presence of the jury.  Are there any issues regarding that

2    second video, and et cetera, how that's to be handled?

3              MS. McGLENON:  It's an audio.

4              THE COURT:  Or audio.

5              MS. McGLENON:  I'm just trying to decide whether

6    that's the best use of our time.

7              Our other question, Your Honor, is that our sanitized

8    texts that we had where they went through and said -- and each

9    time that she said she was 18 in the texts, I can't remember

10   whether we had said that was okay -- whether the Court had

11   ruled that that was okay or not.  And if so, if the Court

12   wanted to review the documents before -- before I went through

13   them with her.

14             THE COURT:  Government?

15             MR. ENOS:  Your Honor, the Government still maintains

16   that the Court's original ruling, I believe it was on

17   March 2nd, that after the fact, responses to johns' queries

18   about Bianca's age are not relevant to any part of defendant's

19   mistake of age defense.

20             THE COURT:  Okay, well, it's my understanding the

21   primary -- well, maybe I'm not sure, but I thought one of the

22   reasons for playing an audio, even though she has admitted

23   that she initially lied, and the reason it's not cumulative,

24   it's to show the nature and scope of the lies.  But if some of

25   this is being offered for the truth of the matter, I guess

1    that's problematic.  I see there is something in here.

2            MS. McGLENON:  This is -- okay.  The audio is the

3    third interview.  What I was just asking about are these texts

4    where she said she was 18.  And I wonder if I could just mark

5    these as K and provide them to the Court and to counsel.  They

6    came -- they were -- we -- we went through and sanitized

7    them -- for example, on the tape, on the second interview, she

8    told Detective Stigerts that she never had sex with Ben.  And

9    she's testified a couple of times that she did have sex with

10   Ben.

11           THE COURT:  Um-hmn.

12           MS. McGLENON:  And basically, that each time she

13   talks to Detective Stigerts, she changes her story.

14           THE COURT:  All right.  Okay.  Well, for example, at

15   page 9, she says, "but he thought I was 18 the whole time,"

16   but then, "Okay, do you think you look 18?"  The answer is

17   "no."

18           I suppose this is all -- again, I'm just looking at

19   things that I was concerned about, opinions regarding age, but

20   I think in the overall context, I don't think that's

21   particularly -- I don't think really interferes with my prior

22   rulings regarding opinions regarding age.  So --

23           MR. ENOS:  Is the Court looking at the transcript of

24   the January 2012 interview between Detective Stigerts and

25   Bianca.

1          THE COURT:  It's just labeled "Bianca 2."  It doesn't

2     show a date on it, at least what I'm looking at very quickly.

3          MS. McGLENON:  We had one that had it -- well,

4     actually there wasn't a date on the tape, I don't think.

5          THE COURT:  Okay, anything else?

6          MS. McGLENON:  Yes, Your Honor, this is our potential

7     K.

8          MR. FARKAS:  These are the sanitized text messages.

9          MS. McGLENON:  These are the sanitized text messages,

10    and did we give these to you?  And these are the afterwards

11    texts where she says that she's 18 to various people, and

12    they're not -- the Government's characterizing them as johns.

13    I think she would characterize them as something else.

14         MR. ENOS:  Well, I'll just tell you, Your Honor, that

15    the third grouping of texts looks like Bianca says, "How did

16    you get my number," and the response is "RB, Redbook."  These

17    are responses to the ad.

18         MS. McGLENON:  Is that a problem?

19         MR. ENOS:  Sure.  Yes, it's a problem.  It has no

20    bearing on the defense.  We've argued this ad infinitum.

21         THE COURT:  Well --

22         MR. ENOS:  Meaning, that mistake of age defense that

23    defendant is putting forth.

24         THE COURT:  Okay, but again, you know, it's the

25    proximity of time that at least it's some circumstantial

1    evidence.  I think the jury can decide how much weight, if

2    any, to give to the fact that shortly after her encounter with

3    Mr. Davis, that she was telling people she was 18.  So I think

4    just overall, and, again, looking at that Ninth Circuit case,

5    it does not appear to be improper to allow that.  So I am

6    going to allow it, Defense Exhibit K.  I will allow it.

7    Obviously it's not for the truth of the matter, but simply

8    indicating that she had told others that she was over the age

9    of 18.

10          MR. ENOS:  Your Honor, this would, therefore, be an

11    area where we will intend to qualify Detective Stigerts at the

12    end of his testimony as an expert.  So he can explain why

13    people say they're 18 when they're contacted by such

14    responders to ads.

15          THE COURT:  Sure.

16          MS. McGLENON:  We can have a hearing on whether he's

17    qualified to do that.

18          THE COURT:  All right.  Okay, with that

19    understanding, then, I'll go ahead and admit Defense Exhibit K

20    and also the audio, then.  If there is no other issues on the

21    audio, I'll admit the audio.

22          Now, there is a jury instruction I'm going to read

23    regarding the transcript.  If we're going to distribute

24    transcripts, there is a specific instruction that indicates

25    the tape-recording is the evidence.  The transcript is only to

1   assist the jury.  After the tape is played, then the

2   transcripts will be taken away from them, and the evidence

3   really is the audio.

4           And so the audio, as far as exhibit number is what

5   number?

6           MS. McGLENON:  The audio is also J.

7           THE COURT:  Okay.

8           MS. McGLENON:  We can make it J-1 and J-2.

9           THE COURT:  So Defense Exhibit J-1 is the audio?

10          MS. McGLENON:  Yes.

11          THE COURT:  J-1 is the audio.  It is admitted.

12          (Defendant's Exhibit J-1, received in evidence.)

13          MR. ENOS:  Your Honor, just to preserve this for the

14  record, I got this, I believe, as I last night looked in my

15  mailbox, so I have not had a chance to go over and confirm the

16  accuracy of this.  So if I see any inaccuracies, the

17  Government request the need to mention that, being that we

18  haven't had a chance to confirm that indeed it's accurate.

19          MS. McGLENON:  And, Your Honor, I provided this the

20  same day I provided from my secretary these -- these things,

21  we went and transcribed them the same day that we did Ricky

22  Davis's.  And we provided them to the Government at the same

23  time, all three of them.  The only difference between this one

24  and that one is I took everything off that referred to the

25  Federal Defender's Office.

1          THE COURT:  All right.  Okay.  All right.

2          MS. McGLENON:  And that was months ago.  Whenever

3    they provided us with a disk, because I've gone through this

4    before and I wanted to make sure that we had a transcript, and

5    I provided it to the Government on that date, and they have

6    not -- you know, I can't make them read it.

7          THE COURT:  All right.  Okay, well, I'm going to read

8    the jury instruction which does say, "However, bear in mind

9    that the tape-recording is the evidence and not the

10   transcript.  If you hear something different from what appears

11   in the transcript, what you heard is controlling."  Which

12   obviously means that the parties are still free to argue as to

13   what the parties believe that the tape -- what's being said on

14   the tape.  And that the jury independently decides, and if the

15   jury has any questions or concerns later on, we can always

16   play the tape for them if they request it.

17          Okay, and the other thing is, before the jury comes

18   in, if you can confirm whether or not we're going to do a

19   *Daubert* hearing with respect to Mr. Lawson tomorrow morning?

20          MR. FARKAS:  Yes, Your Honor, he will be available

21   for a *Daubert* hearing tomorrow.

22          THE COURT:  Okay.  If we do it at -- yes.

23          MS. BERG:  Your Honor, based on the fact that -- we

24   just got our order of witnesses for the Government, make sure

25   that that still makes sense.  It just interrupts our case in

1   chief.

2        MR. FARKAS:  The jury won't be here.

3        MS. BERG:  I understand.

4        THE COURT:  Let me just say this:  Before, the

5   urgency was would I have to make a decision before opening

6   statement.  That's not an issue.  So there is no -- there is

7   no urgency to have him come in tomorrow morning.  I mean,

8   obviously if you want, the Government can continue on with the

9   case in chief, and Mr. Lawson can come in Tuesday morning or

10  Wednesday -- whenever the Government rests its case in chief,

11  and we can do the *Daubert* hearing at that point in time.  And

12  then if we need to do a *Daubert* hearing with Mr. Stigerts, we

13  can do that at some point in time also.

14       So all I'm saying is that what I thought might be

15  some urgency to get that resolved more quickly doesn't seem to

16  be an issue.  So I really don't have a problem with just

17  setting him for a date and time that's a little bit later on,

18  and then maybe the Government -- I don't know if the

19  Government is going to be able to finish its case tomorrow,

20  but if it helps move the case along as far as the Government,

21  as soon as we finish that up, then obviously the defense will

22  be in a better position to figure out how it wants to proceed

23  on the defense.

24       MR. ENOS:  I will say, Your Honor, all else equal, if

25  we could have the *Daubert* after we finish our case in chief,

1    it would allow us to finish it earlier than otherwise.

2              THE COURT:  All right.

3              MS. McGLENON:  And our only problem is that we're

4    paying.  He's our expert that we pay.

5              THE COURT:  Sure.

6              MS. McGLENON:  So we brought him.  He is here.

7    Right?

8              MR. FARKAS:  Tonight he will be here.

9              MS. BERG:  Has he already left?

10             MR. FARKAS:  He's in Sacramento.

11             MS. BERG:  If he hasn't left, we would prefer that we

12   do this on Tuesday.  The Government requests that we do it on

13   Tuesday.

14             THE COURT:  I'll give you a chance.  If can you give

15   him a call and say, "Don't come today, come Tuesday."  If it

16   works out for you folks, then, because I'd rather have him

17   come Tuesday morning.  That way, we can spend tomorrow trying

18   to move the Government's case along.

19             MS. McGLENON:  Your Honor, I guess we're going to

20   keep him anyway because we would like to have him present when

21   the Government's experts testify.

22             THE COURT:  Sure.  He's obviously welcome.  An expert

23   is entitled to be in the courtroom observing the testimony.

24   So I don't --

25             MS. McGLENON:  I mean, we were trying to make it

1  convenient for everybody.  And if that's not convenient, we

2  won't --

3          MS. BERG:  The Government would prefer we do it on

4  Tuesday.

5          THE COURT:  Okay, that's fine.  So we won't do it

6  tomorrow.  I just need to let the jury know what time to come

7  in.  They will be in tomorrow morning continuing on with the

8  Government's case in chief.

9          MS. BERG:  Thank you, Your Honor.

10         THE COURT:  Anything else before we have the jury

11 come in?

12         MR. ENOS:  The only thing, Your Honor, is with

13 respect to witnesses, I don't think we'll finish with Bianca

14 today anyway, but if we somehow miraculously did, I'm not sure

15 our computer guy is here yet, so if we finish at 4:25, just

16 permission to clean up whatever is left of Bianca pursuant to

17 what arrives tonight or tomorrow morning and then start

18 Investigator Vasiliou tomorrow.

19         THE COURT:  Yeah, that's fine.  By the time the tape

20 is played, if it's 20 minutes, we'll be close to 4:30 anyway,

21 and that doesn't complete defense cross.

22         MS. McGLENON:  Okay, thank you.

23         THE COURT:  Okay, we'll have the jury come in.

24         MR. ENOS:  Go ahead and get Bianca now, Your Honor?

25         THE COURT:  Yes.

442

1          (Pause in the proceedings.)

2          THE COURT:  Okay, Bianca, go ahead and retake the

3   witness stand.

4          (The witness returned to the witness stand.)

5          (The jury returned to the courtroom.)

6          THE CLERK:  Your Honor, we were one transcript short.

7          THE COURT:  All right, the jury is present.  Please

8   be seated.  And let me ask, just tell me when to read the

9   instruction.  Questions first?

10          MS. McGLENON:  Let me ask just a couple questions.

11          THE COURT:  Sure.

12          MS. McGLENON:  Well, I think it's okay for the Court

13   to read the instruction first.

14          THE COURT:  Go ahead.  Just as soon as you're ready

15   to play.

16          MS. McGLENON:  Okay.

17   BY MS. McGLENON:

18   Q.  Bianca, you -- in your first time that you talked to

19   Detective Stigerts, you did not tell the truth; is that

20   correct?

21   A.  Yes.

22   Q.  And you talked about Brian, but you never mentioned Ricky,

23   right?

24   A.  Yes.

25   Q.  And then in the second one, you talked about Ricky;

1   correct?

2   **A.**   Yes.

3   **Q.**   And what we'd like to do is -- is playing the transcript

4   of that -- I'm sorry, play that for you, and then I'll have

5   some questions after you've listened to it.  Okay?

6   **A.**   Okay.

7   **Q.**   And in your binder there, that other binder is Exhibit J.

8   And you can follow along.  Okay?

9          THE COURT:  All right, members of the jury, I'm going

10  to read you a jury instruction.

11         "You're about to listen to a tape-recording that has

12  been received into evidence.  Please listen to it very

13  carefully.  Each of you have been given a transcript of the

14  recording to help you identify speakers and as a guide to help

15  you listen to the tape.  However, bear in mind that the

16  tape-recording is the evidence, not the transcript.  If you

17  hear something different from what appears in the transcript,

18  what you heard is controlling.  After the tape has been

19  played, the transcript will be taken from you."

20         So it's basically the transcript is just to help you

21  out a little bit.  The content of the recording, what you hear

22  is the evidence.  Obviously both sides are going to be allowed

23  to argue to you that what's in the transcript isn't

24  necessarily accurate.  And that's simply because sometimes

25  it's very difficult to take down exactly what's being said on

1    a transcript -- on a tape-recording depending on the quality

2    of the tape, et cetera.  So just keep that in mind.

3          All right.

4          (The tape was played.)

5          MS. McGLENON:  Your Honor, we're going to go ahead

6    and stop.

7          THE COURT:  So are we done with the audio?  Okay.

8    You can go ahead and collect the transcripts, then.

9    BY MS. McGLENON:

10   Q.   Bianca, where did that interview take place?

11   A.   In the foster home at Tracy.

12   Q.   Okay.  And so all the people and talk in the background

13   were just the other people that were at the house there?

14   A.   Yes.

15   Q.   Okay.  And so the first question that Stigerts asked you

16   was that -- first, about MocoSpace, and you said that you

17   met -- met Ricky about a year before this interview took

18   place.  Right?

19   A.   Yes.

20   Q.   Okay.  And -- and then you said that when you ran away,

21   you went to his house.  Right?

22   A.   Yes.

23   Q.   And then when he asked had you ever been to his house

24   before, you said no.  Right?

25   A.   Yes.

445

1   Q.  And then you explained that he picked you up, and he

2   talked about a Camaro.  Did he own a Camaro?

3   A.  No.

4   Q.  What did he have?

5   A.  I don't know what kind of car it was.

6   Q.  Okay, but it wasn't a Camaro?

7   A.  No.

8   Q.  But when Detective Stigerts suggested Camaro, you agreed

9   that it was a Camaro.  Right?

10  A.  Yes.

11  Q.  And then he took you to downtown Modesto.  And you didn't

12  mention having gotten together with him at his -- climbing

13  through the window at his sister's at that point, right?

14  A.  Yes.

15  Q.  Yes, you did or --

16  A.  Yes, I did not.

17  Q.  Okay.  And then you said he wanted to have sex, and you

18  didn't want to, right?

19  A.  Yes.

20  Q.  And was that true?

21  A.  I don't remember.

22  Q.  Okay.  And you said you snuck out of your house.  Is that

23  true?

24  A.  Yes.

25  Q.  Now, on -- on the runaway flier, have you seen the runaway

1  flier?

2  A.  Yes.

3  Q.  Had you told your mom that you were going to the skate

4  park?

5  A.  If you're talking about the runaway flier that I think of,

6  that happened like before all this happened.

7  Q.  Okay.

8  A.  So that they didn't have to do anything with that.

9  Q.  Okay.  So there's a runaway flier that's dated on

10  September 17th, which is the date that you met with Ricky, but

11  that's a different one?

12  A.  Yes.

13  Q.  Okay.  Okay, and then you said that he told you that you

14  were going to go on dates with guys and get money, and you

15  really wanted to run away, so you told him okay.  Right?

16  A.  Yes.

17  Q.  Okay.  Then Detective Stigerts -- you had never told him

18  that you were scared of Ricky before that.  Right?

19  A.  I don't remember.

20  Q.  Okay.  But then he asked you if you were scared?  Right?

21  A.  Yes.

22  Q.  And -- and you said "yeah."

23  A.  Yes.

24  Q.  And you said that the reason that you were scared is

25  because you'd never done that before.  Was that true?

1   A.   Yes.

2   Q.   Okay.  And -- and then Detective Stigerts suggested, "Were

3   you scared of him?"  And you said "yeah."  And then you said

4   he was scary looking.  Were you -- you weren't scared of him,

5   were you?

6   A.   I was scared because this was my first time meeting with

7   somebody online like that.

8   Q.   Okay.  And -- and you had -- but you had been in touch

9   with him for quite a period of time, right?

10  A.   Yes.

11  Q.   And you had -- now, your story now is that you had even

12  had sex with him before.  Right?

13  A.   Yes.

14  Q.   And -- but in this statement, you said that the reason

15  that you had sex with him was so he could see what you were

16  like.  He didn't need to if you had already had sex with him,

17  did he?

18  A.   Well, I never did oral with him.

19  Q.   So you had had conventional --

20  A.   That's when he took the pictures.

21  Q.   Okay.  And so that's what you're talking about when you

22  say he wanted to see what you were like?

23  A.   Yes.

24  Q.   But you had already had regular sex with him, you're

25  saying?

1   A.  Yes.

2   Q.  Uh-huh.  Okay.  And then you said that -- that what you

3   were really going to do was have him beat people up who came

4   to have dates with you, right?

5   A.  Yes.

6   Q.  And -- but that never happened, right?

7   A.  No.

8           MR. ENOS:  Objection to the extent the question was

9   that she was going to have him beat people up.  That's not

10  what was stated.

11          THE COURT:  Form of the question only.  Go ahead.

12  BY MS. McGLENON:

13  Q.  So you told Detective Stigerts that he told you -- oh, I'm

14  sorry.  That you were -- okay.  I can't even find it right

15  now.

16          MR. ENOS:  Page 5.

17          MS. McGLENON:  Okay.

18  BY MS. McGLENON:

19  Q.  That you were going to act like you were going to have sex

20  with the guys, and then he was going to beat them up for

21  money.

22  A.  Yes.

23  Q.  Okay.  That never happened?

24  A.  No.

25  Q.  Okay.  Did you ever intend for that to happen?

449

1    A.   No.

2    Q.   Did he ever intend for that to happen?

3    A.   I don't know.  I don't think so.

4    Q.   Okay.  And then did he ever actually say that?

5    A.   I don't remember.

6    Q.   Okay.  And then you start to talk about Ben because your

7    number was on the website.  Right?

8    A.   His number was on the website.

9    Q.   And then Ben made contact with him --

10   A.   Which he gave him my number, and that's when me and Ben

11   started texting.

12   Q.   Okay.  And Ben didn't pay Ricky, right?

13   A.   No.  I met up with Ben behind Ricky's back.

14   Q.   And you told -- and you put your own number up there

15   and --

16   A.   After.

17   Q.   And never had any further contact with Ricky at all.

18   A.   I saw Ricky one more time after that day.

19   Q.   Where did you see him?

20   A.   I went back to his house.

21   Q.   Okay, and -- and what happened then?

22   A.   We had got in an argument, and I walked out.

23   Q.   Okay.  What were you -- is that the time when you and he

24   were texting, and he offered for you to stay there?

25   A.   Yes.

450

1    Q.   And you didn't want to stay there?

2    A.   No.

3    Q.   You wanted him to find somebody to -- to help give you

4    money, right?

5    A.   That's not what we were arguing about, but I left.

6    Q.   Okay.  What were you arguing about?

7    A.   I don't remember, but it wasn't for that reason.

8    Q.   Okay.  But you and he were texting about that, right?

9    A.   Yes.

10   Q.   Okay.  Now, then, you said -- you said here that you never

11   ever had sex with Ben.  Right?

12   A.   Yes.

13   Q.   But now, when you're testifying, you said you did have sex

14   with Ben.  Right?

15   A.   Yes.

16   Q.   Okay.  Which -- which -- which statement is true?

17   A.   I did have sex with Ben.

18   Q.   Okay.  And -- and did he -- he took you out shopping?

19   A.   Yes.

20   Q.   And did he give you money?

21   A.   Yes.

22   Q.   And the other guy gave you money?  Right?

23   A.   Which guy?

24   Q.   The guy that was 30 when Ben was in the pool.

25   A.   Yes.

451

1   Q.  Okay.  And you said that you gave that money to Ben?

2   A.  Yes.

3   Q.  And then Ben had a girlfriend, and that's what happened.

4   A.  Yes.

5   Q.  And he -- Ben believed you were 18 because you told Ben

6   you were 18.  Right?

7   A.  Yes.

8   Q.  And did you tell everyone who asked that you were 18?

9   A.  Everybody who asked from the website, I told them I was

10  18.

11  Q.  Okay.  And did they all believe you?

12  A.  No.

13         MR. ENOS:  Objection.  Calls for speculation.

14         THE COURT:  Sustained.

15  BY MS. McGLENON:

16  Q.  Okay.  Now, who was Johnny?

17  A.  It was one of Ben's friends.

18  Q.  Okay.  Was he one of the guys that was living in the house

19  that you went to Ben --

20  A.  No, he's just a guy that Ben would call, and I would meet

21  up with him, and we'd have sex.

22  Q.  Okay.  So he's somebody you were having sex with?

23  A.  Yes.

24  Q.  Okay.  And Ricky's number was never on any ad again.

25  Right?

452

1   A.   No.

2   Q.   Oh, Brian.  Looking at G.  Do you recognize that person?

3   A.   Yes.

4   Q.   And who is that?

5   A.   Brian.

6   Q.   Okay.  And this is the man you met in Stockton?

7   A.   Yes.

8   Q.   The man who had your phone?

9   A.   Yes.

10  Q.   And took your phone?

11  A.   Yes.

12  Q.   And he took your phone from the hotel in Manteca?

13  A.   Yes.

14          MR. ENOS:  Are we going to admit Exhibit G --

15          MS. McGLENON:  Oh, I would request that -- I'm sorry.

16          THE CLERK:  The jury monitors are off.

17          MS. McGLENON:  I'd request that it be admitted.

18          MR. ENOS:  No objection.

19          THE COURT:  It is admitted.

20          (Defendant's Exhibit G, received in evidence.)

21          THE COURT:  It's Defense G.

22          MS. McGLENON:  And I'd like to publish it to the

23  jury.

24          THE COURT:  Yes.

25  BY MS. McGLENON:

453

1   Q.  You felt that Brian took advantage of you, right?

2   A.  Yes.

3   Q.  You didn't feel that Ben took advantage of you.  Right?

4   A.  No.  No, I did not.

5   Q.  Do you now feel that Ben took advantage of you?

6   A.  Yes.

7   Q.  Okay.  What has changed?

8   A.  Just looking back.

9   Q.  Okay.  And when Detective Stigerts started asking you who

10  you thought was at fault, you said that you felt you were.

11  Right?

12  A.  Yes.

13  Q.  How come?

14  A.  Because I was the one lying about my age and lying to

15  these guys about it.

16  Q.  Okay.  And then he told you it's not your fault, right?

17  A.  Yes.

18  Q.  And you believed that, right?

19  A.  Yes.

20  Q.  Then -- then you decided that it was Ricky's fault.

21  Right?

22  A.  Yes.

23  Q.  And now I don't -- you haven't -- did you go to Ricky's

24  house and ask him to help you make money?

25  A.  After the first date with Ben, yes.

1  Q.  After the first date with Ben.  Okay.  But -- but when you

2  posted the pictures online, wasn't the purpose of that for you

3  to make --

4  A.  Yes, but Ricky wasn't the one helping me anymore, so

5  that's why I asked him after.

6  Q.  Okay.  And he wouldn't do it.  Right?

7  A.  I don't remember because we got into an argument.

8  Q.  Okay.  Okay.  I have one more thing to ask you about.

9         I'm going to hand you a document that is -- has been

10  previously marked and, I believe, admitted?

11         THE COURT:  K.

12         MS. McGLENON:  Exhibit K?

13         THE COURT:  Yes.

14  BY MS. McGLENON:

15  Q.  Now -- and may I publish this to the jury, Your Honor?

16         THE COURT:  Yes.

17         MR. ENOS:  Is there a way to get all of the text on

18  the screen?

19         MS. McGLENON:  I can try.  I'll do the best I can.

20  I'll move it down when I'm done.

21  BY MS. McGLENON:

22  Q.  This phone number here, when it says "sent," that's -- is

23  that you -- no.  You're receiving it, and then "Read" is you,

24  right?

25  A.  Yes.

455

1    Q.  Okay.  And on each of these -- do you remember any of

2    these texts, like this guy that wrote on every text, "Highway

3    to Heaven.  God, do you see my headlights?"   Do you remember

4    that text?

5    A.  I don't remember.

6    Q.  It was like a signature on every text he did.  And then

7    you told him that you're 18.  Right?

8    A.  Yes.

9    Q.  And -- and you told this guy that you're 18.  Right?

10   A.  Yes.

11   Q.  When these guys are sending -- you're just sending

12   pictures back and forth.  Right?

13   A.  I think so.  I don't remember.

14   Q.  And -- and then the 28-year-old guy said that he -- he

15   asked how old you were and asked if he -- if you thought that

16   he was too old.  Right?

17   A.  Yes.

18        MR. ENOS:  And, Your Honor, I'd just like to assert a

19   foundational objection.  I'm not sure we've got any testimony

20   from Bianca saying that she recalls these texts, or that she

21   remembers them to be accurate.

22        THE COURT:  All right.  Okay, well, just go ahead and

23   continue to lay the foundation.

24   BY MS. McGLENON:

25   Q.  And then there was a guy who said that he was scared to

456

1   walk alone.  Do you remember that?

2   A.  I don't remember.

3   Q.  Okay.  Okay.  But you -- these dates are 9/19, 9/20/11,

4   9/21, 9/24, and 9/25, and you told all these guys that you

5   were 18.  Right?

6   A.  Yes.

7           MR. ENOS:  Actually misstates the exhibit.  The very

8   bottom, I believe, she says she's 16.

9           THE COURT:  Um, okay.

10  BY MS. McGLENON:

11  Q.  " How old are you?"  And she said "16, but I said I'm 18."

12  Do you remember that conversation?

13  A.  I don't remember.

14  Q.  Was it you or the other person who was scared to walk

15  alone.  Do you know?

16  A.  The other person.

17  Q.  Yeah.  Okay.  And then you told -- "If anybody comes, just

18  say you're 18."  Right?  You were advising another person;

19  correct?

20  A.  Yeah.

21          MS. McGLENON:  Okay.  I have nothing further.

22          THE COURT:  Okay, it's about 4:35.  All right, we'll

23  take our evening recess.  We'll reconvene tomorrow morning at

24  9:00.  Remember the jury instruction admonition regarding

25  that.  So we'll see you tomorrow morning at 9:00.

1          (The jury was excused from the courtroom.)

2          THE COURT:  All right, the jury has left for the

3     evening.  Yes, you may step down.

4          All right, she has left the courtroom.  Anything for

5     this evening or for tomorrow morning, first plaintiff's side?

6          MR. ENOS:  Not that the Government can think of off

7     the top of our heads.

8          THE COURT:  Defense, anything?

9          MS. McGLENON:  No.

10         THE COURT:  All right.  What I'll do, let's reconvene

11    at 8:30.  I'll come on in.  If there are any issues we need to

12    take up, we'll take up.  If not, I'll let you folks continue

13    to get ready, and at 9:00, we'll have the jury come on in, and

14    we'll continue on with the testimony of Bianca.

15         MR. ENOS:  Thank you.

16         MS. BERG:  Thank you, Your Honor.

17         THE COURT:  All right, we'll recess for the evening.

18         (Court was adjourned at 4:36 PM.)

19

20

21

22

23

24

25